**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

FLORIDA HEALTH SCIENCES
CENTER, INC. d/b/a TAMPA
GENERAL HOSPITAL,

     Plaintiff,

v.

ELI LILLY AND COMPANY;
and LILLY USA, LLC,

     Defendants.

_____/

Case No. _____

Jury Trial Demanded

## **COMPLAINT**

1.    This action challenges Eli Lilly and Company's and Lilly USA, LLC's ("Lilly") exploitation of safety-net hospitals, abuse of market power, and mistreatment of Florida residents. Through a multi-pronged campaign of false representations, threats, denials of access, and pricing penalties, Lilly is lining its pockets with illegal profits on drug sales allocated to the needy.

2.    Two examples among dozens show the immediate impact of Lilly's conduct on Plaintiff Florida Health Sciences Center, Inc. d/b/a Tampa General Hospital ("TGH") and its patients. Before Lilly cut TGH off from discounted pricing it had promised to extend to safety-net hospitals like TGH, TGH paid around **$2,426** per unit for Lilly's single source, blockbuster drug for treating advanced breast cancer, Verzenio. TGH now pays **$4,327** per unit. Similarly,

before Lilly took the actions detailed, TGH paid **$2.22** per unit of Lilly's Humalog 3ML Kwik Pen, its market-leading insulin product for glycemic control in adult and pediatric patients with diabetes. TGH is now being charged **$159.12** for the exact same product, in the same amounts, from the same seller.

3.     While Lilly's actions arise in connection with the federal 340B Drug Pricing Program, they involve conduct the State of Florida has long independently condemned: unfair methods of competition, unfair trade practices, and unconscionable conduct. The federal program in question, the 340B Drug Pricing Program, was created by Congress as essential to safety-net healthcare providers like TGH, who provide services to vulnerable patients regardless of their ability to pay. *See* Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967–71 (1992), classified at § 340B, Public Health Service Act, 42 U.S.C. § 256b (1992).

4.     The 340B Drug Pricing Program allows select healthcare providers ("covered entities") to purchase certain outpatient medications at reduced cost and use the savings to expand access to care, and improve patient services, for vulnerable populations. *See* H.R. Rep. No. 102–384, pt. 2, at 12 (1992) (program's purpose is "to enable [covered entities] to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services").

5.      The Health Resources and Services Administration ("HRSA")—an agency of the U.S. Department of Health and Human Services ("HHS")—is tasked with administering the 340B Drug Pricing Program. HRSA requires drug manufacturers to offer discounted medications at the point of sale to covered entities as a condition for participating in this market. This "upfront discount" is essential to the functioning of the 340B Program, as covered entities operate on razor thin or negative margins and cannot expend their small budgets at point of sale and then be compelled to wait for rebates from the drug manufacturers to offset their costs. The upfront discount recognizes the economic reality that for-profit pharmaceutical companies, such as Lilly, are better situated to absorb the cost of paying a discount upfront. Drug manufacturers have the right to seek an audit of covered entities through HRSA to determine overpayments.

6.      In January 2026, Lilly—today the largest and most valuable pharmaceutical company in the world, by market cap—announced that every hospital and healthcare provider purchasing through the federal 340B Drug Pricing Program must submit detailed, prescription-by-prescription data covering every Lilly drug dispensed, whether through an outside pharmacy, the hospital's own pharmacy, or administered directly to a patient, to a Lilly-designated privately-owned data platform called "340B ESP." Hospitals that do not accede to Lilly's threats would lose access to the discounted drug prices.

7.    Lilly, however, has promised the federal government through its pharmaceutical pricing agreement ("PPA") with the Secretary of HHS that it would extend required 340B discounts to covered entities, like TGH. It has also promoted its participation in the 340B  Program to the marketplace, including to TGH, advertising the availability of discounts to covered entities like TGH and subjecting itself to regulations that require that advertising be true and not misleading. HRSA regulatory guidance, and enforcement actions that include matters involving Lilly, make clear that Lilly cannot condition sales in the manner demanded, and that Lilly knows it cannot do so.

8.    Yet as of June 18, 2026, Lilly has cut off TGH's access to 340B discounts on all of Lilly's 340B-eligible products. Because of Lilly's denial of access, TGH must spend an average of 25-50% more, with outliers well above that range, for each Lilly product, many of which it must purchase because of Lilly's status as the market's only supplier of a given drug product.

9.    For hospitals who have caved to Lilly's new demands, Lilly's requirements effectively increase the cost of covered outpatient drugs above the 340B ceiling price, due to the substantial administrative costs of providing claims level data for all 340B claims, in violation of Section 340B's pricing mandate. Lilly's conditions, accordingly, have hurt all of its 340B Drug Pricing Program customers, in Florida and throughout the nation.

10.     Lilly can take its stridently anti-consumer position because it is indispensable to health providers like TGH. Lilly is the single source or monopoly supplier of numerous critical medicines with high demand, and is a significant supplier of dozens more, meaning a hospital cannot decline to do business with Lilly and still abide by its obligations to its patients and communities, let alone compete successfully in the marketplace. Only an indispensable supplier can credibly threaten to arbitrarily cut off access to discounted pricing on all customers who do not comply with extra-legal demands, and only an indispensable supplier can follow through on those threats.  Suppliers with competitive replacements do not act this way.

11.     The results of Lilly's actions are what one would expect when a monopolist unshackles itself from restraints in place to foreclose monopoly pricing and protect consumers: dramatically higher prices, harm to hospitals that serve the underprivileged, and harm to Florida's, and the nation's, most vulnerable patient bases. Savings TGH would otherwise have used to improve health outcomes and expand healthcare services throughout the region will instead be used to bolster the bottom line of a company slated to take in around $85 billion in revenue, and over $20 billion in profit, in the current fiscal year.[1]

---

[1] *See Lilly Reports First-Quarter 2026 Financial Results, Raises Full Year Guidance, and Highlights Momentum of New Medicines*, LILLY INVESTORS:

12.     Lilly, for its part, asserts that everyone just has to live with this, because it needs the claim-by-claim transaction data it demands to deter fraud. Its defense is pretextual. In fact, (i) the 340B program *already has* a process for challenging and auditing claims that Lilly can invoke, making its demands unnecessary; and (ii) Lilly's unreasonable demands followed regulatory setbacks, including its inability to implement its rebate model, and unsuccessful challenges to 340B's expansion. *See, e.g., Eli Lilly and Co., et al. v. U. S. Dep't of Health and Hum. Servs., et al.*, No. 1:21-cv-00081-SEB-MJD, 2021 WL 5039566 (S.D. Ind. Oct. 29, 2021), *appeal docketed*, No. 21-3405 (7th Cir. Dec. 28, 2021); *Eli Lilly and Co., et al. v. Robert F. Kennedy Jr., et al.*, No. 1:24-cv-03220-DLF, 2025 WL 1423630 (D.D.C. May 15, 2025), *appeal docketed*, No. 25-5221 (D.C. Cir. June 13, 2025).

13.     Lilly's self-help campaign is a thinly-disguised response to setbacks in its legal and regulatory challenges to steps the government has taken to expand the 340B program in recent years. For consumers like TGH, Lilly's actions allow it to maintain massive profit margins on sales the government has decided must be deeply discounted, and Lilly promised it would discount.

---

NEWS RELEASE (Apr. 30, 2026), https://investor.lilly.com/news-releases/news-release-details/lilly-reports-first-quarter-2026-financial-results-raises-full.

14. The State of Florida does not tolerate this kind of bullying and exploitation of Florida consumers. The Florida Deceptive and Unfair Trade Practices Act, or "FDUTPA," protects consumers like TGH, its patients, and the citizens of Florida more broadly, from unfair methods of competition, unfair or deceptive acts or practices, and unconscionable acts or practice in the conduct of any trade.

15. Lilly's conduct checks all of these boxes. The exploitation of its monopoly and market power to raise prices and injure consumers is a straightforward unfair method of competition. Its failure to deliver promised discounts is an unfair trade practice, one the Federal Trade Commission has recognized time and again under Section 5 of the FTC Act, which FDUTPA follows. Its actions transgress public policy that makes conditioning discounts on requirements like Lilly's an unfair trade practice, and federal policy that protects consumers by barring manufacturers from fully flexing their market power in their 340B sales. Lilly's conduct, consequently, qualifies as a *per se* unfair trade practice under FDUTPA.

16. Finally, the reverse-Robin Hood aspects of Lilly's actions, which result in a massive transfer of wealth earmarked to defray the costs of serving the underprivileged to Lilly—recently trumpeted as the world's first "trillion

dollar" pharmaceutical company[2]—seals the conclusion that Lilly's conduct is unconscionable and immoral, and far outside the bounds of what Florida's legislature, courts, and citizens deem acceptable.

## PARTIES

17. TGH is a Florida nonprofit corporation licensed to do business and doing business in the State of Florida. TGH, with nearly 1,000 licensed beds, is one of the most comprehensive medical facilities in Florida, serving the entire state. It is the region's only Level 1 Trauma Center, leading safety net provider, major transplant center, and primary academic teaching center for the USF Health Morsani College of Medicine. TGH is a disproportionate share hospital that receives funds from the federal government to provide healthcare services to people residing in medically underserved areas, regardless of their ability to pay.

18. Defendant Eli Lilly and Company is a publicly traded pharmaceutical company organized and existing under the laws of the State of Indiana and headquartered in Indianapolis, Indiana.

---

[2] *See* Mrinalika Roy*, Lilly Becomes First Drugmaker to Hit $1 Trillion Valuation on Weight-Loss Demand*, REUTERS (Nov. 21, 2025, at 17:13 ET), https://www.reuters.com/business/healthcare-pharmaceuticals/lilly-becomes-first-drugmaker-join-trillion-dollar-club-weight-loss-demand-boom-2025-11-21/

19. Defendant Lilly USA, LLC (with Eli Lilly and Company, "Lilly") is a wholly owned subsidiary of Eli Lilly and Company existing under the laws of the State of Indiana and headquartered in Indianapolis, Indiana.

**JURISDICTION AND VENUE**

20. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because TGH and Defendants are citizens of different states, and the amount in controversy exceeds $75,000.

21. Venue is proper in this Court because Defendants regularly transact business within this District and because they may be found in this district, and because a substantial part of the events giving rise to TGH's claims occurred in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

22. This Court has personal jurisdiction over Defendants because Defendants marketed and sold products in this District, are found in this District, and have had substantial and repeated contacts within this District in furtherance of the activity alleged herein.

## I.   FACTUAL ALLEGATIONS

### A.   Summary of Program and TGH's Participation

23. In 1990, the Congress established the Medicaid Rebate Program, as part of the Omnibus Reconciliation Act of 1990 (Pub. L. No. 101-508), 104

Stat. 1388, to address the fact that Medicaid, which serves the poorest Americans, was often paying full price for prescription drugs, while private payers were negotiating deep discounts from manufacturers.[3] The new law required manufacturers participating in Medicaid to give states and the federal government, which jointly pay for Medicaid, discounts comparable to those given to other payers. Specifically, it required manufacturers to offer states a rebate on their purchases of certain prescription drugs, and the size of the rebate was calculated based on the "best price" the drug manufacturer has given to most purchasers for a particular drug or between 13% and 23.1%, of average manufacturing price, whichever was greater. In order to avoid giving state Medicaid programs what had been their best price prior to 1990, drug manufacturers discontinued many of the discounts that they had been offering non-state purchasers which raised the "best price" for the most common drugs among Medicaid patients across the board. As a result, the prices paid by federally funded clinics and hospitals serving vulnerable populations surged. To address this new problem arising out of price manipulation, Congress enacted the 340B Drug Pricing Program.

---

[3] Melvina Ford, CRS-17, CONG. RSCH. SERV., MEDICAID: REIMBURSEMENT FOR OUTPATIENT PRESCRIPTION DRUGS (Mar. 7, 1991).

24.    The 340B Drug Pricing Program was established by Section 602 of the Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967, classified at 42 U.S.C. § 256b. Section 340B offers drug manufacturers a deal: in exchange for Medicaid and Medicare Part B's inclusion of covered outpatient drugs, its manufacturer must sell the drugs at a discount to "covered entit[ies]"—such as hospitals with a high share of low-income patients, black-lung clinics, and clinics receiving grants from state or local governments to treat sexually transmitted diseases. *See* 42 U.S.C. § 256b(a)(1), (4)(F), (4)(K)–(L).

25.    The program requires pharmaceutical manufacturers that participate in the Medicaid Drug Rebate Program to enter into a PPA with the Secretary of HHS. Under that agreement, manufacturers must "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." 42 U.S.C. § 256b(a)(1).

26.    The ceiling price is calculated as the Average Manufacturer Price minus the Medicaid rebate—typically resulting in discounts of 25% to 50% below wholesale acquisition cost. For safety-net hospitals like TGH, these discounts generate savings that fund patient care programs, charity care, and community health services.

27.    Eligible "covered entities" include disproportionate share hospitals, children's hospitals, cancer hospitals, critical access hospitals, federally qualified health centers, and other safety-net providers. 42 U.S.C. § 256b(a)(4).

28.    TGH is a safety-net hospital and "covered entity" under Section 340B, registered with HRSA as a disproportionate share hospital pursuant to 42 U.S.C. § 256b(a)(4)(L) under 340B ID DSH100128. TGH operates 24 registered child sites under its 340B program.

29.    TGH cares for all who walk through its doors regardless of their ability to pay, ultimately funding around 34% of Hillsborough County's health charity costs. In fiscal year 2025, the number of patient visits to TGH's five Health Park clinics was 90,653. The clinics deliver primary and specialty care along with a full range of child and acute services from birth to age 18. More than half of the patients are underserved, making the clinics a critical resource for the Tampa Bay community.

30.    As TGH has expanded in recent years, so too has its need for drugs at 340B prices, to serve an expanding patient base. TGH now has approximately 30 institutes that provide integrated patient care, including the Cancer Institute, Advanced Lung Disease, Dermatology Institute, Digestive Diseases Institute, Neuroscience Institute, Ophthalmology Services, Transplant Institute, Urology Institute, and others.

31.    TGH has partnered with other healthcare providers to expand patient reach and access to care. For example, in 2026, TGH partnered with Mass General Brigham (MGB) to broaden its network of ambulatory services— including primary care, specialty care, advanced imaging, oncology, and outpatient surgical procedures—making high-quality care more accessible to underserved patients.

32.    TGH acquires Lilly's medicines through McKesson, its wholesaler, via the McKesson Connect ordering portal. McKesson purchases Lilly products directly from Lilly and resells them to TGH. TGH places orders across four settings: its mixed setting (including the infusion center and outpatient clinics), its specialty pharmacy, its retail pharmacy, and its BHP retail pharmacy. TGH purchases Lilly products exclusively through its in-house pharmacy—it does not use contract pharmacies for Lilly products.

33.    Lilly, however, decides in its sole discretion whether or not a customer is eligible for 340B discounts on its products, and whether McKesson will extend such discounts or not. This is made clear by the fact that it is Lilly, not McKesson or other distributors, who has adopted the data submission requirement, and it is Lilly who expressly told the marketplace generally and TGH specifically that failure to comply would result in a denial of access to 340B pricing.

34.     Lilly, accordingly, is the party whose conduct is at issue in this case. That is because Lilly is the party that has caused TGH's injury and damages, by denying it access to 340B pricing, and the party that directly benefited from TGH's injury, by forcing TGH to purchase the same products without such access and increasing Lilly's profit margins. Lilly is the party this Court must enjoin in order to restore TGH's access and remedy TGH's injury.

35.     TGH does not retain 340B savings as profit. Rather, consistent with Congress's purpose in establishing the 340B Program, TGH reinvests those savings to expand access to healthcare and improve services for medically underserved, uninsured, and underinsured patients.

36.     TGH uses the savings from 340B discounts to provide sponsorship and financial help to multiple community health organizations, and to offer free community health education and screenings. It also uses them in support of specialized treatment, to accelerate research, and to train future clinicians. TGH also reinvests the millions of dollars of savings in 340B discounts to cover money-losing segments of its organization, like its emergency rooms, which accept all patients regardless of ability to pay, along with free services, medicines, and vaccines for underprivileged, under-insured, or uninsured patients. In fiscal year 2023 alone, TGH provided a net community benefit worth $301.8 million, including $61 million in charity care, $208 million in

subsidized health services, and $42.8 million in community benefit programs and services.

37.    The 340B Drug Pricing Program is administered by HRSA's Office of Pharmacy Affairs. Compliance is overseen by HHS, not by manufacturers. Congress created specific mechanisms for addressing suspected covered-entity noncompliance: manufacturer-initiated audits (conducted by independent public accountants under HRSA-approved plans, with reasonable cause required) and Administrative Dispute Resolution ("ADR") proceedings. 42 U.S.C. § 256b(a)(5)(C), (d)(3).

38.    Hospitals and other covered entities, in addition, are subject to audit by HRSA, which audits around 200 covered entities each year and has the authority to approve drug company audits. Hospitals also disclose how they employ savings from their purchase of discounted pharmaceuticals. They submit annual Medicare cost reports and IRS forms that detail the community benefits and charity care that they provide for patients.

### B.    Regulatory Guidance

39.    The 340B statute establishes a comprehensive, HHS-administered enforcement architecture. Various sets of published agency guidance together with two formal enforcement letters issued in 2021 and 2024, inform the boundaries of manufacturer conduct.

### *1.    The 1994 Entity Guidelines (59 FR 25,110)*

40.    The 1994 Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 establishes two foundational prohibitions. Section (11) provides that "[a] manufacturer may not condition the offer of statutory discounts upon an entity's assurance of compliance with section 340B provisions." Covered entities may not be required to assure manufacturers of their compliance with the program, including by "submitting information related to drug acquisition, purchase, and inventory systems." The guidance further states that "[e]ntities are not required to sign agreements assuring manufacturers of their compliance with section 340B provisions."

41.    This prohibition contains a narrow exception: it "does not include provisions that address customary business practice, request standard information, or include other appropriate contract provisions." The phrase "standard information" was initially used by HRSA in the 1994 Final Notice in response to a commenter who asked it to "[p]ermit a manufacturer to require the covered entities to sign a contract containing only the manufacturer's normal business policies (e.g., routine information necessary to set up and maintain an account)."

42.    Lilly's demand for detailed prescription-by-prescription data—covering every Lilly drug dispensed, whether through an outside pharmacy, the hospital's own pharmacy, or administered directly to a patient—goes well

-16-

beyond the "standard information" necessary to set up and maintain an account.

43.     Section (10) provides that "[m]anufacturers may not single out covered entities from their other customers for restrictive conditions that would undermine the statutory objective." Manufacturers "must not place limitations on the transactions (e.g., minimum purchase amounts) which would have the effect of discouraging entities from participating in the discount program."

### 2.     The 1996 Manufacturer Audit Guidelines (61 Fed. Reg. 65,406)

44.     The 1996 guidelines establish the exclusive procedural mechanism for manufacturer-initiated compliance investigations:

- A manufacturer may audit "only when it has documentation which indicates that there is reasonable cause" to believe a covered entity has violated § 340B(a)(5).

- The manufacturer must give the covered entity written notice and allow at least 30 days for good-faith resolution before auditing.

- If unresolved, the manufacturer must "file an audit work plan with the Department," setting forth "a clear description of why it has reasonable cause" and "sufficient facts and evidence in support."

- HRSA reviews the plan within 15 days to determine if reasonable cause exists.

- Audits must be conducted by "an independent public accountant," in accordance with "Government Auditing Standards," and with the "least possible disruption to the operations of the covered entity."

-17-

- "Confidential patient information and/or proprietary information which auditors may access in the performance of an audit will not be disclosed to the manufacturer."

- "Only those records of the covered entity... that directly pertain to the potential 340B violation(s)" may be reviewed.

45. Most critically, HRSA rejected a manufacturer request to stop selling at discounted prices once an audit is initiated. HRSA stated unequivocally:

> Manufacturers must continue to sell at the statutory price during the audit process. Once the audit has been completed and the manufacturer believes that there is sufficient evidence to indicate prohibited entity activity, then the manufacturer may bring the claim to the Department through the informal dispute process. Not until the entity is found guilty of prohibited activity and a decision is made to remove the entity from the covered entity list, will the manufacturers no longer be required to extend the discount.

46. This passage establishes a four-step sequence before any pricing suspension: (i) complete the audit; (ii) determine there is sufficient evidence; (iii) bring the claim to HHS through the dispute process; (iv) the entity must be found guilty and removed from the covered entity list. Only after all four steps may the manufacturer cease offering the discount.

47. The dispute resolution section separately provides that conditioning sales on compliance assurances is itself a recognized category of dispute subject to resolution under the process.

### 3.    *The 2010 Contract Pharmacy Guidance (75 Fed. Reg. 10,272)*

48.    The 2010 guidance governs the use of contract (outside) pharmacies by covered entities. It reinforces several principles relevant here:

- Covered entities must maintain "auditable records sufficient to demonstrate continued compliance with 340B requirements," but HRSA declined to require the automatic submission of compliance data to anyone—including HRSA itself—stating: "HRSA does not feel there is a need for the automatic submission of audits conducted by covered entities." Manufacturers specifically asked that audit results "be made available to manufacturers." HRSA refused.

- Manufacturer access to covered-entity dispensing records is limited to the formal audit process. The 2010 Guidance provides that contract pharmacies must maintain dispensing records that "will be made available to the covered entity, HRSA, and the manufacturer in the case of an audit." The phrase "in the case of an audit" limits manufacturer access to audits properly initiated under the 1996 Audit Guidelines—with reasonable cause, HRSA approval, and an independent accountant. Blanket data-extraction demands outside the audit process are not authorized.

- Manufacturer audits require "reasonable cause." HRSA rejected manufacturer requests to audit entities with multiple contract pharmacies without cause, stating: "We do not agree that utilization of more than one contract pharmacy creates automatic cause to suspect diversion."

- Manufacturers cannot demand copies of contracts at will. HRSA stated: "HRSA declines to mandate that covered entities must provide copies of contracts upon any request." If denied, "the manufacturer may ask OPA to obtain a copy."

### 4.    *ADR Process*

49.    On April 19, 2024, HRSA issued a final rule in the Federal Register titled "340B Drug Pricing Program; Administrative Dispute Resolution."

-19-

50.    Consistent with Section 340B(d)(3) of the Public Health Service Act, the final rule establishes an Administrative Dispute Resolution (ADR) process to resolve:

- Claims by covered entities that they have been overcharged for covered outpatient drugs by manufacturers;

- Claims by manufacturers, after the manufacturer has conducted an audit of a covered entity, that a covered entity has violated the prohibition on diversion or duplicate discounts.

51.    The 340B ADR final rule establishes a 340B ADR Roster consisting of members of HRSA's Office of Pharmacy Affairs (OPA) staff who are appointed by the Secretary of HHS. From the 340B ADR Roster, three members are selected to form a 340B ADR Panel. Each 340B ADR Panel is selected and convened by the OPA Director. The 340B ADR Panel reviews properly submitted claims and issues final agency decisions. Parties to the claim are offered an opportunity for reconsideration of the 340B ADR Panel's decision.

52.    HRSA's ADR process addresses the problem of "diversion or duplicate discounts," the same issues Lilly has asserted its data demands serve. It represents the federal government's balancing, following notice and comment, of the interests of manufacturers, covered entities, and the 340B program when there is a claim dispute. The existence of the audit process and ADR program show: (i) self-help, in the form of exclusion of covered entities

from 340B pricing, is neither contemplated nor authorized by this rule (or any other); and (ii) Lilly's demands are not necessary to address diversion or duplicate discounts.

### C.    Lilly's Data Demands Are Pretextual

53.    Lilly's justifications for its data demands and unilateral termination of TGH's access to 340B pricing are pretextual. As noted, Lilly has asserted they are necessary to deter diversion (e.g., dispensing the 340B drug to an ineligible patient) and duplicative discounts. But HRSA has come up with a better and fairer system to address these issues, rendering Lilly's demands unnecessary. As Lilly is aware of the ADR program, its insistence that only compliance with its unreasonable demands will solve these issues is pretextual.

54.    The pretextual nature of Lilly's actions is further highlighted by the fact that its data demands followed close on the heels of setbacks to Lilly's legal and regulatory efforts against the expansion of 340B eligibility and the rejection of its rebate model. The switch to unilateral price increases appears to have been Lilly's "Plan B" if its advocacy did not succeed.

### D.    Lilly Has Repeatedly Told the Market that It Offers Covered Entities Discounted Pricing for 340B Purchases

55.    Lilly has executed a PPA with the Secretary of HHS. Under PPA Section II(a), Lilly agreed "to charge covered entities a price for each unit of

the drug that does not exceed" the ceiling price. A PPA Addendum provides: "Manufacturer shall offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price, if such drug is made available to any other purchaser at any price." Neither the PPA nor the Addendum conditions the pricing obligation on the covered entity's submission of claims-level data. PPA Section IV(d) provides that a covered entity's failure to comply with audit requirements "will not relieve the Manufacturer from its obligation to conform to the pricing requirements." Even actual noncompliance with a lawful audit does not relieve the pricing obligation—*a fortiori*, refusal to submit data through a manufacturer-designated third-party platform cannot justify a pricing suspension.

56.    PPA Section VII(b) further provides that the manufacturer "will be permitted to audit the records of each covered entity"—"in accordance with procedures established by the Secretary" and "at the Manufacturer's expense." The PPA provides no authority for the manufacturer to impose blanket data-submission requirements on covered entities as a condition of pricing.

57.    The PPA provides an elective dispute resolution process for manufacturers that believe a covered entity has violated the diversion or duplicate-discount prohibitions: the manufacturer attempts good-faith resolution, then may notify the Secretary, and the Secretary determines whether a violation occurred. Lilly did not use this process. Instead, Lilly

bypassed the PPA's framework entirely and imposed its own enforcement mechanism—blanket data extraction through a third-party platform—that the PPA does not authorize.

58.    Lilly has regularly told the market that it offers discounts to covered entities for their 340B purchases by noting its participation in the 340B program, which by definition requires such discounts.[4] Every time Lilly confirms it participates in 340B, it represents to the market that it offers discounts on eligible products to covered entities. Lilly's representations to that effect continue today.

59.    Covered entities reasonably expected to receive 340B discounts for their eligible Lilly purchases, in light of these repeated representations.

---

[4] *See, e.g.*, *Lilly Statement on New 340B Litigation*, Lilly Investors: News Release (Nov. 14, 2024), https://investor.lilly.com/news-releases/news-release-details/lilly-statement-new-340b-litigation; Prospective Expansion of Lilly's 340B Distribution Program, Lilly (Dec. 16, 2021), https://340breport.com/wp-content/uploads/2021/12/Lilly-340B-ESP-Announcement-and-FAQ-12.16.2021.pdf; Eli Lilly and Company, *Lilly Responds to American Hospital Association Letter to HRSA About 340B Program Changes*, Public (Jan. 29, 2026), https://www.publicnow.com/view/BBB3F633ABC3F271D5C1BFFEF1C932BDC3A2FEFF; *Lilly's In-House Claims Data Requirement – Upcoming Action*, Lilly: News and Stories (June 1, 2026), https://www.lilly.com/news/stories/lilly-in-house-claims-data-requirement-upcoming-action.

**E.    Lilly Is on Notice Regarding Its Unlawful Conduct**

**1.    *May 17, 2021 HRSA Enforcement Letter to Lilly***

60.    In May 2021, HRSA Acting Administrator Diana Espinosa wrote directly to Lilly's Senior Director of Government Strategy, Derek L. Asay, in light of a previous attempt by Lilly to condition access to 340B discounts it had pledged to offer. The letter contained a formal agency determination:

> HRSA has completed its review of Eli Lilly and Company's (Lilly) policy that places restrictions on 340B pricing to covered entities.... After review of this policy and an analysis of the complaints HRSA has received from covered entities, HRSA has determined that Lilly's actions have resulted in overcharges and are in direct violation of the 340B statute.

The letter stated the governing legal principle in categorical terms:

> Nothing in the 340B statute grants a manufacturer the right to place conditions on its fulfillment of its statutory obligation to offer 340B pricing on covered outpatient drugs purchased by covered entities.

61.    HRSA rejected Lilly's program-integrity justification:

> The 340B statute provides a mechanism by which a manufacturer can address these concerns. Specifically, the manufacturer must (1) conduct an audit and (2) submit a claim through the Administrative Dispute Resolution process as described in section 340B(d)(3)(A) of the PHS Act. The 340B statute does not permit a manufacturer to impose industry-wide, universal restrictions.

62.    HRSA ordered Lilly to "immediately begin offering its covered outpatient drugs at the 340B ceiling price to covered entities through their

-24-

contract pharmacy arrangements, regardless of whether they purchase through an in-house pharmacy," and to "credit or refund all covered entities for overcharges." HRSA warned that "[c]ontinued failure to provide the 340B price to covered entities... may result in CMPs" of up to $5,883 (as of 2021) per instance of overcharging.

63.    HRSA also articulated the "same opportunity" principle: "Manufacturers are expected to provide the same opportunity for 340B covered entities and non-340B purchasers to purchase covered outpatient drugs."

64.    Lilly did not comply. It sued HHS instead. And in January 2026, it expanded its restrictions to encompass all dispensing channels, all products, and medical claims, despite its knowledge of the impropriety of its acts.

### 2.    *The September 17, 2024 HRSA Enforcement Letter to Johnson & Johnson*

65.    In September 2024, HRSA wrote to Johnson & Johnson ("J&J") regarding J&J's announcement of a rebate model for 340B drugs, which would change the current practice of upfront discounts to purchasers like TGH to one with back-end rebates, after the customer pays full price. The letter found J&J's proposal violated § 340B(a)(1) on multiple independent grounds:

- Charging WAC up front is itself a statutory violation, regardless of any intent to rebate later, because it requires covered entities "to purchase [drugs] at prices that exceed 'the maximum price[s] that covered entities may permissibly be required to pay.'"

- The manufacturer's rebate model requires Secretarial approval under the "as provided by the Secretary" clause. J&J had not obtained such approval.

- The rebate is "conditioned on J&J's prior approval at J&J's sole discretion." The notice "does not commit to an enforceable timeframe for issuing the 'rebate payment,'" the payment is "subject to J&J's unilaterally imposed requirements for the timely submission of 'Rebate Claim Data,'" and "issuance of the 'rebate payment' is conditioned on J&J's prior approval at J&J's sole discretion."

- Manufacturer-imposed rebate models are fundamentally different from voluntary replenishment: they impose higher up-front costs on every purchase, they require Secretarial approval the statute requires, and they are not voluntary for covered entities.

- HRSA cited *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), for the proposition that PPAs "are not transactional, bargained-for contracts" but simply the means by which manufacturers "opt into the 340B Program."

66. HRSA warned J&J of potential PPA termination and civil monetary penalties. Lilly is aware of HRSA's findings on this subject, as HRSA's findings are public.

67. Lilly is not acting alone. Based on recent media accounts, multiple pharmaceutical manufacturers have launched or are preparing similar claims-data policies. If Lilly's approach is permitted to stand, it stands to become the industry standard.

**F. Lilly's January 2026 Policy**

68. On January 15, 2026, Lilly issued a notice to all 340B covered entities titled "Update to Lilly's 340B Distribution Program for In-House

Pharmacies." The letter stated: "effective for dispenses on or after February 1, 2026, Eli Lilly and Company (Lilly) will require covered entities to submit [claims level data] for all 340B dispenses, including in-house pharmacy dispensing." It warned: "[a]ll covered entity types will be required to provide claims level data (CLD) for pharmacy dispenses and medical claims for Lilly's entire portfolio of products .... Failure to provide timely, complete, and accurate data for all products dispensed at 340B ceiling prices may result in loss of access to pricing until such time as the outstanding data is provided." Lilly stated that "[t]he 340B ESP platform is the only way a covered entity can submit CLD under Lilly's policy." It also reserved "the right to change the criteria or list of exemptions at any time in its sole discretion."

69.    The new policy represented a massive expansion of Lilly's prior data demands, which since December 2021 had been limited to claims data for contract pharmacy dispensing. The January 2026 policy extends the data requirement to: all covered entity types (not just those using contract pharmacies); in-house pharmacy dispensing (not just contract-pharmacy dispensing); medical claims (not just pharmacy claims)—i.e., drugs administered directly to patients in clinical settings across Lilly's entire portfolio of products.

70.    Lilly's January 15 letter included a FAQ confirming that an entity that "dispenses exclusively through in-house dispensing and does not use

contract pharmacies" is nonetheless required to submit claims-level data "in order to maintain access to Lilly products at 340B ceiling prices." TGH is such an entity—it does not use contract pharmacies for Lilly products. Yet Lilly imposed the same data demands and the same penalty on TGH as on entities with extensive contract pharmacy networks.

### G.    The Impracticality of Lilly's Data Demands

71.    The American Hospital Association, on behalf of around 5,000 hospital members, described the operational burden of Lilly's policy in detail in a January 26, 2026, letter to HRSA:

- Setting up data feeds for the contract-pharmacy portion alone takes hospitals "weeks, if not months" of coordination with their 340B third-party administrator.

- Data for in-house dispenses is "often spread across multiple recordkeeping systems," and reconciling those systems adds "significant complexity and cost."

- Hospitals do not currently provide medical claims data to 340B ESP or any other vendor. Doing so requires "direct interface with a hospital's electronic medical record," which "not only take[s] time and resources to establish but also carr[ies] serious data security and privacy risks." Without those interfaces, hospitals must "manually provide that information."

- The 340B ESP platform is "rife with problems." Pricing is "often loaded incorrectly," claims are "often wrongly denied for unknown reasons," and hospitals must "devote significant staff time to resolving such problems."

72.    The AHA concluded that Lilly's policy is "at best... prohibitively costly for 340B hospitals" and "[a]t worst... unworkable."

73.    The financial impact of manufacturer restrictions on Florida hospitals is severe. In the context of manufacturer-imposed rebate models—which, like Lilly's claims-data policy, deny covered entities the statutory ceiling price at the point of purchase—Baptist Hospital in Pensacola, Florida reported to the AHA that it "would have to advance $33 million per year to the drug companies," including more than $9 million per year in upfront costs for just five oncology medications. Baptist stated it "would need to take a hard look whether they could continue to offer these costly medications to its cancer patients." While Baptist's figures were calculated for a rebate-model structure, the economic effect on hospitals denied access to 340B pricing under Lilly's claims-data policy is comparable: in both scenarios, the hospital pays commercial prices instead of the statutory ceiling price, and the pricing differential is the same.

74.    More broadly, more than 200 hospitals reported to the AHA that manufacturer restrictions on 340B pricing would cause their cash-on-hand to drop low enough to risk violating bond covenants—with consequences including credit-rating downgrades, increased borrowing costs, and potential facility closures.

75.    TGH made attempts to understand Lilly's demands and work towards a solution, but Lilly did not bend. On May 8, 2026, TGH responded to Lilly in writing, stating that TGH was "carefully evaluating Lilly's request for

submission of detailed claims data, including in-house dispensing data, to ensure alignment with applicable regulatory requirements, patient privacy considerations, and internal data governance standards." TGH posed specific questions about the data elements required, their intended use, safeguards, retention policies, third-party access, and alignment with HRSA guidance. TGH stated it was "not rejecting Lilly's 340B pricing offer" and "remain[ed] open to engaging in further discussion." On May 13, 2026, Lilly responded—not with answers to TGH's questions, but with a form letter referencing pre-drafted materials. Lilly's June 1, 2026 Final Notice then mischaracterized TGH's engagement as having "declined to meet."

76. Because Lilly's demands were unreasonable, expensive, impractical on Lilly's timetable, and unauthorized, TGH did not comply with Lilly's artificially imposed deadline, and Lilly instructed McKesson to cut off TGH's 340B pricing.

## H. Lilly's Indispensability

77. Lilly is a single source or monopoly supplier of numerous medicines for which there is significant demand. A single source drug is a brand-name drug produced by one manufacturer that does not have a generic equivalent. Hospitals like TGH have no choice but to be Lilly customers in order to serve their patient populations.

78.    For example, Lilly is a single source provider of Mounjaro (tirzepatide) for type 2 diabetes, Zepbound (tirzepatide) for weight management in obesity, Kisunla (donanemab) for the treatment of early Alzheimer's disease, Verzenio (abemaciclib) used for certain types of advanced breast cancer, Retevmo (selpercatinib), for the treatment of certain types of cancers, and Ebglyss (lebrikizumab) for the treatment of moderate-to-severe atopic dermatitis (eczema). TGH has purchased all of these drugs from Lilly.

79.    Lilly touts the unique benefits its products provide to patients, including patients with cancer, where any delay in initiating treatment reduces patient survivability. For example, a peer-reviewed publication[5] funded by Lilly and listing four Lilly employees as authors, touted the superiority of Verzenio (abemaciclib) in improving outcomes for breast cancer patients, noting that "[a]vailable data reinforce the role of . . . abemaciclib in improving outcomes and QoL [Quality of Life] for patients with high-risk, node positive, HR+, HER2-breast cancer . . . ." Another publication,[6] funded by Lilly and authored by Lilly employees, recommending "the use of selpercatinib [Retevmo] as the standard of care for patients with RET-altered cancers in a

---

[5] Martin M, et al. *Abemaciclib in HR+, HER2- Breast Cancer: A Narrative Review of the Clinical Evidence*. ONCOL THER. Jun 15 (2026).

[6] Liao CY, et al. *Real-World Outcomes of Selective RET Inhibitor Selpercatinib in the United States: Descriptive, Retrospective Findings from Two Databases*. CANCERS (BASEL). 2024 Nov 15;16(22):3835 (2024).

real-world setting, including those with lung and thyroid cancers" to improve survivability.

80. In its 2025 Annual Report,[7] Lilly has highlighted the long period of estimated patent protection in the United States covering the active compound in its most expensive products (patent protection for Mounjaro until at least 2036; patent protection for Zepbound until at least 2036; patent protection for Kisunla until at least 2036; patent protection for Verzenio until at least 2031; patent protection for Retevmo until at least 2038). Moreover, products are generally protected by multiple patents, providing an even greater barrier to generic entry. For example, the FDA's Approved Drug Products With Therapeutic Equivalence Evaluations ("Orange Book"), which lists patents that manufacturers have submitted as claiming coverage of the drug or a method of using it, currently lists eight patents protecting Mounjaro, including the compound patent, with the latest patent expiring in 2041. The Orange Book also lists twelve patents protecting Retevmo, including the compound patent, with the latest patent expiring in 2039.

81. Even at 340B discounted prices, Lilly's drugs are major cost items for TGH. For example, in just the three-month period from March to May 2026, TGH spent more than $5 million on Lilly's Zepbound, and more than $5 million

---

[7] Eli Lilly and Co., Annual Report (Form 10-K) (Feb. 12, 2026).

for Lilly's Mounjaro. It purchased dozens of different drugs from Lilly during that period, for which TGH paid over $14 million, inclusive of discounts.

### I.    Harm to TGH

82.    Since Lilly issued its threats in January 2026, as noted, TGH has engaged with Lilly in hopes of persuading Lilly to abide by its legal obligations and to understand its demands. While Lilly would claim an interest in meetings and working out the issues, it appeared to be merely papering the record, since it never offered to modify its demands one bit, and did not negotiate in good faith.

83.    On June 1, 2026, Lilly sent TGH a "Final Notice: 340B Ceiling Price Inaccessibility Imminent," signed by Derek Asay—the same Lilly executive to whom HRSA addressed its May 2021 enforcement letter ordering Lilly to cease its prior restrictions. Asay has since been promoted from Senior Director to Senior Vice President. The Final Notice stated: "complete and accurate claims-data submission is a condition of Lilly's offer to sell its products at 340B ceiling prices." It continued: "If you fail to submit the required data within [5 business days], Lilly will assume that you have chosen to reject Lilly's 340B offer and, given that choice, will notify wholesalers that 340B pricing for Lilly products is no longer accessible to your entity until the outstanding claims data is submitted."

84. Lilly's letter noted that it had successfully bullied around 2,350 customers, or around 70% of its base, into compliance, and made plain TGH needed to join them or be denied access to discounted pricing.

85. TGH continued to try to work with Lilly on a solution, but Lilly never wavered from its one-size-fits-all approach. On June 4, 2026, TGH responded to Lilly's Final Notice, requesting a sixty-day extension to conduct due diligence on the legal, operational, and data-privacy implications of Lilly's demands. TGH explicitly stated that it was not rejecting Lilly's 340B pricing offer. On June 17, 2026, TGH sent a second letter requesting "immediate confirmation as to whether Lilly has in fact directed wholesalers to restrict or discontinue 340B ceiling pricing for our organization." TGH reiterated that "at no point has Tampa General rejected Lilly's 340B pricing offer or refused to engage regarding Lilly's claims submission requirements." Lilly has not responded to either letter.

86. TGH elected not to reward Lilly's wrongdoing and cave to its demands, and it would have been unduly expensive and impractical to do so on Lilly's timetable. On or about June 18, 2026, Lilly cut off TGH's 340B pricing through McKesson. The denial of access impacted Lilly's entire line of products, including its single source products for which there are no substitutes. TGH's own purchasing records confirm the overnight price increase: on June 17, 2026, TGH purchased Mounjaro (tirzepatide) from McKesson at a unit price of

**$750.52**, the 340B ceiling price; on June 22, 2026, TGH purchased the identical product from the same McKesson distribution center at a unit price of **$1,019.74**, the wholesale acquisition cost—a 35.9% increase.

87.    Lilly has denied access to 340B pricing across its full product line. Thus a unit of Zepbound, the weight loss drug, that cost TGH around **$766** with the requisite 340B discount, will now cost around **$1,086**. One of Lilly's leading diabetes drugs, Trulicity, will see a price hike from just under **$700** to just over **$1,007**. Lilly's single source breast cancer drug, Verzenio, will rise from around **$2,426** to over **$4,327**. Taltz, a Lilly biologic indicated for plaque psoriasis for which no biosimilar exists, will rise from around **$3,000** per unit to over **$7,624**. Emgality, the only brand name product with the active ingredient galcanezumab, for migraines, will rise from around **$514** per unit to around **$764**.[8]

88.    If TGH had been denied access to 340B discounts from March of 2026 to May of 2026, when TGH paid approximately **$14,159,237** for Lilly drugs inclusive of 340B discounts, TGH would have paid around **$20,334,953** for the exact same purchases, an increase of approximately **$6,175,716** over the three-month period, or approximately **$24.7** million annually. This figure

---

[8] By way of comparison, Martin Shkreli, of the infamous "Pharma Bro" case, raised the price of just a *single* drug, Daraprim.

is based on a product-by-product analysis of TGH's purchasing data across all Lilly products purchased.

89. Since Lilly suspended pricing, TGH has observed direct patient impact. TGH has posted notices in its pharmacy informing patients that drug prices have increased as a result of Lilly's actions. TGH is seeing patients who do not qualify for its internal charity care policy and whose third-party payor reimbursement does not cover the cost of the pharmaceutical expense—leaving those patients unable to afford their Lilly medications.

90. As a direct and proximate result of Lilly's use of unfair methods of competition, unfair and deceptive acts, and unconscionable conduct, TGH will lose tens of millions of dollars annually.

91. By denying TGH access to 340B pricing, Lilly has also directly injured TGH and is continuing to injure TGH by interfering with TGH's ability to fulfill its mission and serve the community. The reduction in 340B savings will directly impair TGH's ability to provide comprehensive care to underserved and uninsured patients, a role at the heart of its mission.

92. Lilly's actions also harm TGH directly by placing more strain on TGH, its facilities, and its providers. 340B savings are used to fund programs that improve medication access, increase adherence, reduce hospital readmissions, provide clinical pharmacist interventions, and ensure continuity of care for patients with chronic and complex diseases. Reduced 340B savings

limit TGH's ability to provide financial assistance for essential medications, bridge therapy while insurance coverage is obtained, and furnish medications at reduced or no cost when patients otherwise would be unable to afford treatment. The resulting reduction in medication access is likely to increase medication nonadherence, disease progression, avoidable emergency department utilization, preventable hospitalizations, and poorer clinical outcomes among TGH's most vulnerable patient populations. Such developments are likely to lead to an increase in emergencies and in overall health care costs.

93. TGH is unable to avoid this injury in light of Lilly's indispensability. TGH cannot decline to purchase Lilly's drugs and at the same time fulfill its mission.

94. There are no consumer benefits that flow from Lilly's improper conduct. Harm to consumers overwhelms any theoretical benefit to consumers or competition.

## J. Harm to TGH's Patients

95. As a safety net hospital, or hospital of last resort, TGH will continue to service its patients and purchase the medicines they need, including Lilly's medicines. But Lilly's unlawful acts will still impact them in the short and long term.

96.    TGH uses 340B savings to provide free care for under-insured and uninsured patients; support money-losing but critical aspects of its offerings; implement disease state management and medication management programs; provide community health events, education, and screenings; support clinical and specialty pharmacy services, patient navigation, medication access programs, and other services that are not fully reimbursed by governmental or commercial payors.

97.    For example, TGH's five Health Park Clinics provide care to underinsured and underserved families throughout the region, with patients making a combined 98,619 visits in 2024. TGH has also partnered with the City of Tampa to launch TampaWell, a health and wellness initiative focused on expanding access to preventive health care for the city's most at-risk residents—in 2024, TampaWell hosted or participated in 97 health and wellness events, reaching more than 101,000 people.

98.    These types of programs would not be possible without 340B savings.

99.    Every dollar wrongfully diverted from TGH through Lilly's refusal to provide lawful 340B pricing is a dollar unavailable to support these patient care programs. As TGH costs increase, fewer resources remain available to expand access to care, maintain existing clinical services, and provide medications to financially vulnerable patients.

100. As a direct and proximate result of Lilly's use of unfair methods of competition, unfair and deceptive acts, and unconscionable conduct, TGH's patients, as consumers of health care, will be harmed.

### K.    Lilly's Conduct Is an Unfair Method of Competition

101. Lilly's patents provide it with market or monopoly power in several pharmaceutical markets. Lilly supplies a number of medicines for which it is a single source provider and for which there is significant consumer demand. For example, Lilly is the single source provider of Mounjaro (tirzepatide) for type 2 diabetes, Zepbound (tirzepatide) for weight management in obesity, Kisunla (donanemab) for the treatment of early Alzheimer's disease, Verzenio (abemaciclib) used for certain types of advanced breast cancer, Retevmo (selpercatinib), for the treatment of certain types of cancers, and Ebglyss (lebrikizumab) for the treatment of moderate-to-severe atopic dermatitis (eczema).

102. The absence of competitive choices, high demand, and Lilly's intellectual property rights provide it with significant market power across its product line. Lilly's patents provide it with the right to exclude others from competing within the scope of its patents, limiting competition. TGH cannot prescribe a different medicine to patients with a condition for which only Lilly's single source drugs are indicated, giving Lilly significant pricing power. Lilly's

pricing power is further illuminated by its ability to charge prices for branded drugs in its portfolio far above competitive levels for a sustained period of time.

103.  Lilly's market power is further demonstrated by its conduct. By denying TGH access to promised discounts, Lilly effectively raised the price of Lilly products to TGH across the board, demonstrating its power over price. Lilly's "take it or leave it" offers of 340B pricing if its conditions are met, and denial of access otherwise, *to the entire marketplace*, is clear evidence of market power. Firms without market power cannot behave this way, or they would quickly be ejected from the market.

104.  Lilly's broad product portfolio, in addition, gives Lilly outsized bargaining power. Lilly has conditioned access to 340B discounts as to *all* products in its portfolio on compliance with its pretextual demands, which has the same effect of threatening to raise prices to penalty (or wholesale) levels across the same, vast portfolio, multiplying the threat. By bundling together all of its products and holding access to all of them over purchasers' heads, Lilly has been able to compel one group of its customers to provide it with data to which Lilly is not entitled, and to deny access to discounted 340B purchasers to another group of its customers. This is direct evidence of market and/or monopoly power.

105.  Lilly's abuse of its market power and monopoly power is likely to lead, or has led, to reduced output in pharmaceutical markets in which Lilly

has denied TGH and other hospitals access to 340B pricing. As an economic matter, higher prices result in, among other things, underconsumption and diversion to imperfect substitutes, reducing output and giving rise to deadweight loss.

106. Lilly's abuse of its market power and monopoly power is injuring and will injure TGH financially, by causing TGH to lose tens of millions of dollars in savings annually.

107. Lilly's abuse of market power also injures competition among health care providers, by raising their costs and depriving them of resources to expand access to healthcare, improve their facilities, open new facilities, attract better practitioners, or improve health outcomes. Lilly's conduct, accordingly, reduces the output of healthcare services, and will negatively impact the health of Florida residents and others served by Florida providers, by reducing competition to provide health care services to them.

108. There are no procompetitive benefits to Lilly's conduct. Lilly's actions will not reduce health care costs, improve healthcare quality, or provide additional choice in the marketplace. The fattening of Lilly's mammoth bottom line is not a procompetitive benefit.

**L.    Lilly's Conduct Is An Unfair Trade Practice**

###    *1.    Lilly's Failure to Extend Promised Discounts Is an Unfair Trade Practice*

109.    Lilly represents to the market that covered entities can purchase Lilly products at the requisite 340B ceiling price, by discounting its average wholesale price. It does so every time it confirms its participation in the 340B program, which requires such discounting.

110.    Lilly has also represented to the federal government, through its PPA with the Secretary of HHS, that covered entities' purchases of eligible products from Lilly would be discounted according to program rules.

111.    Despite these representations, Lilly does not offer its products at the requisite 340B ceiling price to all covered entities, now that it has cut off those that do not comply with Lilly's extra-legal data demands. Since cutting off TGH, TGH has been required to pay wholesale acquisition cost—approximately 25-50% above the 340B ceiling price, and in some cases substantially more—for all Lilly products, because Lilly directed McKesson to remove TGH's 340B pricing eligibility.

112.    Lilly's representations regarding the availability of discounting pricing for covered entities are false and/or misleading. Lilly does not in fact offer discounted pricing to all covered entities. The incontestable fact that Lilly

has cut off TGH, a covered entity, from 340B pricing, establishes the falsity of its representations.

113. Lilly's misrepresentations are material. The 340B program chiefly concerns discounted prices for drugs. Misrepresentations regarding the availability of discounts are necessarily material.

114. Reasonable purchasers would believe Lilly's representations regarding the availability of 340B discounts for covered entities. Lilly made them repeatedly to the market, every time it confirmed its participation in the program, and represented the same to the federal government in its PPA agreement. Lilly has not invoked the audit and ADR mechanisms Congress created to address diversion and duplicate discounts, even though those mechanisms exist precisely for this purpose, so has no justification for not abiding by its representations and providing access to the promised discounts.

115. Lilly's misrepresentations have caused TGH injury. Lilly has refused to make 340B ceiling prices available to TGH—despite its statutory and contractual obligation to do so—and has conditioned access to those prices on TGH's submission of claims-level data through a manufacturer-designated third-party platform. As a direct result, TGH is compelled to purchase Lilly products at wholesale acquisition cost, a price that exceeds the statutory ceiling price by approximately $2,058,572 per month. Lilly's failure to offer

covered entities like TGH the discounts it promises constitutes an unfair trade practice under FDUTPA.

### 2.   *Lilly's Failure to Comply with 340B Requirements Is a Per Se Violation of FDUTPA*

116.   Lilly's conduct offends public policy. The laws of numerous states prohibit conditioning 340B discounts on claims-data submission. Thus, Lilly's data collection policy and threatened cutoff do not apply to providers in Colorado, Maine, Nebraska, Oregon, Rhode Island, South Dakota, Tennessee, and Vermont, along with federally qualified health centers in New Mexico.[9]

117.   The existence of these laws—enacted through ordinary legislative processes—confirms a widely recognized public policy that manufacturers may not use data demands as a mechanism to circumvent statutory pricing obligations.

---

[9] *See* COLO. REV. STAT. ANN. § 6-29-105(1)(b) (West 2026); ME. REV. STAT. ANN. tit. 24-A, § 7754 (West 2025); NEB. REV. STAT. ANN. § 44-4620 (West 2025); N.D. CENT. CODE ANN. § 43-15.3-08(3)(b)(3) (West 2026), invalidated by AbbVie, Inc. v. Wrigley, No. 1:25-CV-00081, 2026 WL 1133457, at *15 (D.N.D. Apr. 27, 2026); OR. REV. STAT. ANN. § 689.818(2)(b) (West 2026); R.I. GEN. LAWS ANN. § 5-19.3-3(a)(5) (West 2026); S.D. CODIFIED LAWS § 58-29G-3 (2026); TENN. CODE ANN. § 47-18-136 (West 2026); VT. STAT. ANN. tit. 18 § 4682(b) (West 2026); W. VA. CODE ANN. § 60A-8-6a(b)(2) (West 2026) (enforcement preliminarily enjoined by Pharm. Rsch. & Mfrs. of Am. v. McCuskey, 171 F.4th 675, 697 (4th Cir.), reh'g en banc granted, 176 F.4th 830 (4th Cir. 2026)); N.M. STAT. ANN. § 59A-61-9(B)(4)(c) (West 2026).

118.  Federal policy, likewise, in the form of the 340B program, protects consumers like TGH from the exploitation of market power and high prices branded drug manufacturers like Lilly are able to charge, given demand for critical, even life-saving, medicines, patent protection, barriers to entry, and lack of competition.

119.  FDUTPA protects the same interests, as it is informed by Section 5 of the FTC Act, which patrols the use of market and monopoly power, and deployment of predatory acts, to exploit consumers and raise prices. By violating established public policy devoted to protecting consumers, Lilly's conduct automatically violates FDUTPA's bar on unfair trade practices.

120.  Lilly's conduct is also unethical, oppressive, unscrupulous, and substantially injurious to consumers. The 340B program is funded by drug companies like Lilly. As a condition of participating, Lilly promised to extend 340B pricing to covered entities in exchange for access to an enormous population of patients. Through self-help, it still has access to those patients, but is no longer offering the requisite discounts.  In the course of doing so, it has broken its promise to the federal government, violated its word to covered entities, and justified its conduct through pretext. Such conduct is unscrupulous and unethical, especially given the *object* of Lilly's efforts: to deny TGH and other safety-net hospitals the resources they rely on to serve the underprivileged.

## M.    Lilly's Conduct Is Unconscionable

121.    The 340B Drug Pricing Program is in place to help the needy acquire healthcare, and to help defray the costs imposed on nonprofit entities, like TGH, that provide significant amounts of free care, services, and medicines. Lilly's price gouging in *this* marketplace—despite promising the government, and representing to hospitals, that it would not do so—affronts a sense of justice, decency, and reasonableness, and exceeds the bounds of ordinary unfairness.

122.    Lilly has a market cap of around $1 trillion. Yet it has devoted itself to getting even richer at the expense of often very stretched covered entities and their patients, including their most vulnerable. Lilly is a Goliath fighting a war of choice against safety-net hospitals and the poor.

123.    The effect of Lilly's conduct, which transfers wealth from nonprofits like TGH to Lilly, a trillion-dollar company, presents a textbook case of unconscionable conduct. It is far outside the kind of aggressive, lawful business conduct that benefits consumers. Consumers do not benefit from Lilly's actions, misrepresentations, broken promises, or bullying. They do not benefit from Lilly cutting off TGH's discounts. Lilly's conduct is pernicious and greedy, beyond the bounds of acceptable business conduct and common decency.

-46-

124. The most valuable pharmaceutical company in the world is engaged in a campaign to transfer dollars earmarked for charitable purposes into its own pocket. The direct and inevitable result of Lilly's actions is reduced health care for poor people. Its actions shock the conscience and are self-evidently unconscionable.

**N.   Lilly's Conduct is Ongoing and Causing Significant and Irreparable Harm**

125. By denying TGH access to 340B pricing, Lilly is causing TGH ongoing economic harm. Based on a three month sample of Lilly purchases, TGH estimates it will lose approximately $24.7 million over the coming year because of Lilly's actions, based on a product-by-product analysis of TGH's March through May 2026 purchasing data across all Lilly products purchased.

126. Lilly's actions are also harming TGH's patients, who are being forced, and will be forced, to pay higher prices for Lilly drugs sourced through TGH.

127. Lilly is also causing irreparable harm. TGH devotes its 340B savings to extend access to health care and to improve health outcomes for the underprivileged and uninsured, its most vulnerable patients. Monetary relief cannot remedy loss of those funds, because health is not static. Foregone vaccines, breast cancer treatments, insulin doses, STD drug prescriptions, etc., cannot be made up for later, with money.  Once a patient misses a cancer

treatment, insulin therapy, biologic medication, or other medically necessary drug because assistance resources have been reduced, that lost opportunity for treatment cannot be fully remedied through a later monetary award. Similarly, reductions in clinical pharmacy interventions, medication counseling, and care coordination cannot be recreated after the fact. The resulting deterioration in patient health, increased complications, and lost opportunities to prevent disease progression constitute irreparable harm.

128.    Unless arrested, the irreparable harm Lilly is causing, along with the monetary harm, will persist indefinitely.

## II.    CLAIMS FOR RELIEF

### COUNT I

**UNFAIR METHOD OF COMPETITION IN VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, Fla. Stat. § 501.204, *et. seq.***

129.    Section 501.204(1), Florida Statutes, prohibits "[u]nfair methods of competition, … in the conduct of any trade or commerce."

130.    TGH is a "consumer" within the meaning of Fla. Stat. § 501.203(7), as it is a corporation.

131.    Lilly has engaged in trade or commerce within the meaning of § 501.203(8), Fla. Stat. because it advertises and sells pharmaceuticals.

132.    Lilly's portfolio provides it with significant monopoly power or market power in numerous markets.

133. Lilly's power over price is directly shown by its ability to persistently charge prices above competitive levels for sustained periods of time, and its unilateral raising of prices across its portfolio of products to TGH and other customers.

134. Lilly is abusing its market power and monopoly power by denying TGH access to discounted pricing, causing TGH injury.

135. Lilly's exercise of market power artificially reduces output in pharmaceutical markets, and also injures competition among health care providers, by raising their costs and depriving them of resources to expand access to healthcare, improve their facilities, attract better practitioners, and improve health outcomes.

136. There are no procompetitive benefits to Lilly's conduct. A wealth transfer from nonprofit TGH to Lilly does not benefit competition or consumers.

137. Lilly's unfair method of competition is the direct and proximate cause of TGH's injury. Lilly cut off TGH from 340B pricing, causing TGH damages, and making TGH an "aggrieved" party under Fla. Stat. § 501.995.

138. TGH is entitled to actual damages, injunctive and declaratory relief, attorneys' fees, and costs under §§ 501.2105, 501.211(2), Fla. Stat.

## COUNT II

## UNFAIR TRADE PRACTICE IN VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, Fla. Stat. § 501.204, *et. seq.*

139.  Section 501.204(1), Florida Statutes, prohibits "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

140.  TGH is a "consumer" within the meaning of Fla. Stat. § 501.203(7), as it is a corporation.

141.  Lilly has engaged in trade or commerce within the meaning of § 501.203(8), Fla. Stat. because it advertises and sells pharmaceuticals.

142.  Lilly represents to the market and to the federal government that it offers 340B discounts to covered entities. It does so merely by noting its participation in the program, as 340B discounts are fundamental to it.

143.  Lilly's representations, which are ongoing, are false and misleading. Lilly does not, in fact, offer 340B discounts to all covered entities.

144.  Lilly further misleads the market with its pretextual excuses for failing to deliver the promised discounts.

145.  Lilly's misrepresentations are material because they concern its discounting practices, which are fundamental to the 340B program.

146.  Lilly's misrepresentations have caused TGH injury. TGH has been denied access to 340B discounts because Lilly broke its word.

147. Lilly's actions are unconscionable. The 340B program is intended to extend access to healthcare to the needy, and to improve health outcomes for the underprivileged and uninsured. Lilly is confiscating funds meant to reduce the load on nonprofit entities like TGH that offer free and/or subsidized services and medicine to a significant portion of their patient base, by helping to defray the cost of those services.

148. Especially in light of Lilly's status as the first trillion-dollar pharmaceutical company, and the purpose of these funds, Lilly's actions affront a sense of justice, decency, and reasonableness, and exceed the bounds of ordinary unfairness.

149. Lilly's unfair trade practices are the direct and proximate cause of TGH's injury. Lilly cut off TGH from 340B pricing, causing its injury and making TGH an "aggrieved" party under Fla. Stat. § 501.995.

150. TGH is entitled to actual damages, injunctive and declaratory relief, attorneys' fees, and costs under §§ 501.2105, 501.211(2), Fla. Stat.

-51-

## COUNT III

**PER SE VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, Fla. Stat. § 501.201, *et seq.***

151. Section 501.203(3), Florida Statutes, makes it a violation of FDUTPA if a defendant transgresses "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices."

152. TGH is a "consumer" within the meaning of Fla. Stat. § 501.203(7), as it is a corporation.

153. Lilly has engaged in trade or commerce within the meaning of § 501.203(8), Fla. Stat. because it advertises and sells pharmaceuticals.

154. State law in Colorado, Maine, Nebraska, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, and New Mexico protect consumers by making the conditioning of access to 340B discounts on satisfaction of data requests an unfair trade practice.

155. Section 340B, in addition, protects consumers from raw displays of market or monopoly power. Branded pharmaceutical companies are rewarded for their innovations with patent protection, which may enable monopoly level or supracompetitive pricing. Through Section 340B, Congress restrained such pricing, mandating the offer of discounts to covered entities.

156. Lilly's actions violate established consumer protection policy and injure consumers. Its actions violate FDUTPA and have caused TGH's injury, and make TGH an "aggrieved" party under Fla. Stat. § 501.995.

157. TGH is entitled to actual damages, injunctive and declaratory relief, attorneys' fees, and costs under §§ 501.2105, 501.211(2), Fla. Stat.

## III. PRAYER FOR RELIEF

TGH respectfully requests that the Court enter judgment in favor of TGH, and against Lilly, and award the following relief:

1. A declaration that Lilly's conduct violates FDUTPA;

2. An order requiring Lilly to immediately cease its conduct;

3. An award of the actual damages TGH has sustained as a result of Lilly's conduct;

4. An award of the costs of this action under § 501.2105;

5. An award of reasonable attorneys' fees under § 501.2105; and

6. Grant such other equitable relief and pre-judgment and post-judgment interest as the Court may deem just and proper.

## IV. DEMAND FOR JURY TRIAL

TGH demands a jury trial on all issues so triable.

Dated:  July 2, 2026                                    Respectfully submitted,

/s/  *Jon T. Gatto*
Jon T. Gatto, Bar No. 0547328
CARLTON FIELDS, P.A.
4221 W. Boy Scout Blvd., Suite 1000
Tampa, Florida 33607-5780
Telephone: (813) 229-4141
Fax: (813) 229-4133
jgatto@carltonfields.com

Scott M. Abeles*
CARLTON FIELDS, P.A.
1625 Eye Street, NW, Suite 800
Washington, DC 20006
Telephone:  (202) 965-8189
Fax:  (202) 965-8104
sabeles@carltonfields.com

Jayashree Mitra*
CARLTON FIELDS, P.A.
730 3rd Avenue, 19th Floor
New York, New York 10017
Telephone:(212)380-9605
Fax:  (212)785-5203
jmitra@carltonfields.com

*pro hac vice application to follow*

*Counsel for Plaintiff*
*Tampa General Hospital*

-54-