**THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

FLORIDA HEALTH SCIENCES CENTER, INC. d/b/a TAMPA GENERAL HOSPITAL,

Plaintiff,

v.

ELI LILLY AND COMPANY; and LILLY USA, LLC,

Defendants.

Case No. 8:26-cv-01918-WFJ-LSG

**MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND AS-APPLIED CHALLENGE TO THE CONSTITUTIONALITY OF FLA. STAT. ANN. §§ 501.201–501.213.**

# TABLE OF CONTENTS

**Page**


INTRODUCTION......1

LEGAL STANDARD......3

BACKGROUND......4

A. Legal Background......4

B. Factual Background......9

ARGUMENT......10

I. *Astra* Bars TGH's Claims......10

II. The Supremacy Clause Bars TGH's Claims......13

A. TGH's claims conflict with federal law......14

B. TGH's claims intrude into a federal field......17

C. The intergovernmental immunity doctrine applies......19

III. Lilly's Conduct Falls within FDUTPA's Safe Harbor......20

IV. Each of TGH's Counts Fails to State a Claim......23

A. TGH fails to adequately allege misrepresentation (Count II)......24

B. TGH fails to state a per se claim (Count III)......31

C. TGH fails to state an unfair-competition claim (Count I)......33

CONCLUSION......35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Drummond*,
808 F. Supp. 3d 1266 (W.D. Okla. 2025) ....................21

*Aids Healthcare Foundation v. Apexus*,
2024 WL 3886974 (9th Cir. Aug. 21, 2024) .................... 11, 12

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Miami*,
637 F.3d 1178 (11th Cir. 2011) ....................3

*American Hospital Association v. HHS*,
2021 WL 616323 (N.D. Cal. Feb. 17, 2021) ....................11

*Arizona v. United States*,
567 U.S. 387 (2012) .................... 16, 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................3

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) .................... *passim*

*Athos Overseas, Ltd. v. Youtube, Inc.*,
2022 WL 910272 (S.D. Fla. Mar. 29, 2022) ....................35

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................3

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) .................... 14, 15

*City of Brunswick v. Honeywell Int'l, Inc.*,
184 F.4th 1230 (11th Cir. 2026) ....................14

*Cnty. of Santa Clara v. Astra USA, Inc.*,
No. 05-CV-3740 (N.D. Cal. Dec. 23, 2008) ....................10

*Coast Pump & Supply Co. v. Franklin Elec. Co.*,
2025 WL 1394260 (M.D. Fla. May 13, 2025) ....................24

*Corsello v. Lincare, Inc.*,
428 F.3d 1008 (11th Cir. 2005)....................................................................4, 25

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ...........................................................................................14

*Cummings v. Premier Rehab Keller, PLLC*,
596 U.S. 212 (2022) .............................................................................................5

*Eli Lilly & Co. v. Kennedy*,
2025 WL 1423630 (D.D.C. May 15, 2025)..........................................................7

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990)...............................................................................................17

*Evolution Fast Food Gen. P'ship v. HVFG, LLC*,
2017 WL 4516821 (S.D.N.Y. Sept. 27, 2017).....................................................32

*Feheley v. LAI Games Sales, Inc.*,
2009 WL 2474061 (S.D. Fla. Aug. 11, 2009)................................................ 31, 32

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) ...........................................................................................28

*Godelia v. Doe 1*,
881 F.3d 1309 (11th Cir. 2018)...........................................................................28

*Helpling v. Rheem Mfg., Inc.*,
2016 WL 1222264 (N.D. Ga. Mar. 23, 2016) .....................................................29

*Hoffman v. Bennett*,
477 So. 2d 43 (Fla. 3d DCA 1985) .....................................................................28

*In re Jan. 2021 Short Squeeze Trading Litig.*,
105 F.4th 1346 (11th Cir. 2024) .........................................................................34

*JES Props. v. USA Equestrian*,
253 F. Supp. 2d 1273 (M.D. Fla. 2003) ..............................................................34

*JES Props. v. USA Equestrian*,
2005 WL 1126665 (M.D. Fla. May 9, 2005)................................................. 34, 35

*Kiobel v. Royal Dutch Petroleum Co.*,
569 U.S. 108 (2013) ...........................................................................................33

*Kuenzig v. Hormel Foods*,
505 F. App'x 937 (11th Cir. 2013) .......... 20

*Kurimski v. Shell Oil Co.*,
2022 WL 2913742 (S.D. Fla. June 30, 2022) .......... 26, 27

*Landor v. Louisiana Dep't of Corr. & Pub. Safety*,
146 S. Ct. 1931 (2026) .......... 16

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
469 U.S. 256 (1985) .......... 16

*Levine v. Centr. Fla. Med. Affiliates*,
72 F.3d 1538 (11th Cir. 1996) .......... 34

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......... 28

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 23

*Markland v. Insys Therapeutics*,
758 Fed. App'x 777 (11th Cir. 2018) .......... 15

*Marrache v. Bacardi U.S.A., Inc.*,
17 F.4th 1084 (11th Cir. 2021) .......... 24, 26

*McCulloch v. Maryland*,
17 U.S. 316 (1819) .......... 19

*McFalls v. NCH Healthcare Sys., Inc.*,
2026 WL 1498251 (M.D. Fla. May 28, 2026) .......... 26

*Molina v. Aurora Loan Servs., LLC*,
635 F. App'x 618 (11th Cir. 2015) .......... 29

*Morris Commc'ns Corp. v. PGA Tour*,
364 F.3d 1288 (11th Cir. 2004) .......... 34

*MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*,
722 F. Supp. 3d 1296 (S.D. Fla. 2024) .......... 28

*Novartis Pharms. Corp. v. Espinosa*,
2021 WL 5161783 (D.D.C. 2021) .......... 7

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) ........................................................... *passim*

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
715 F.3d 1268 (11th Cir. 2013)............................................................. 14

*PhRMA v. Morrisey*,
760 F. Supp. 3d 439 (S.D. W.Va. 2024) ................................................. 17

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
842 So. 2d 773 (Fla. 2003) ..................................................................... 29

*Pop v. LuliFama.com LLC*,
145 F.4th 1285 (11th Cir. 2025) ......................................................3, 4, 24, 25

*QSGI, Inc. v. IBM Glob. Fin.*,
2012 WL 1150402 (S.D. Fla. Mar. 14, 2012)........................................... 35

*Rubis v. Motorsports of Stuart, LLC*,
2026 WL 1729569 (S.D. Fla. June 15, 2026) ........................................... 32

*Sagebrush Health Services v. Amgen Inc.*,
2026 WL 1030817 (C.D. Cal. Apr. 15, 2026) ...................................... 11, 13

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023) ................................................................ 8, 22

*Schering-Plough Corp. v. F.T.C.*,
402 F.3d 1056 (11th Cir. 2005)............................................................. 35

*Schneidewind v. ANR Pipeline Co.*,
485 U.S. 293 (1988) ............................................................................. 19

*Se. Fisheries Ass'n v. Dep't of Nat. Res.*,
453 So. 2d 1351 (Fla. 1984)................................................................... 33

*Smith v. Ford Motor Co.*,
462 F. App'x 660 (9th Cir. 2011)........................................................... 32

*Smith v. Verra Mobility Corp.*,
2026 WL 1145788 (M.D. Fla. Apr. 28, 2026)........................................... 20

*United States v. Washington*,
596 U.S. 832 (2022) ......................................................................... 19, 20

*Van Slyke v. Cap. One Bank*,
2007 WL 3343943 (N.D. Cal. Nov. 7, 2007) ....................................................32

*Wesley Fin. Grp., LLC v. Westgate Resorts, Ltd.*,
746 F. Supp. 3d 1342 (M.D. Fla. 2024) ..........................................................30

*Young v. Cmty. Health Sys., Inc.*,
2023 WL 6121795 (11th Cir. Sept. 19, 2023) ..........................................20, 21, 23

*Zlotnick v. Premier Sales Grp., Inc.*,
480 F.3d 1281 (11th Cir. 2007).................................................................... 27, 28

**Constitutional Provisions and Statutes**

U.S. Const., art. VI, cl. 2 ...........................................................................14

42 U.S.C. § 256b........................................................................................*passim*

42 U.S.C. § 1320f..........................................................................................21

42 U.S.C. § 1320f-2.......................................................................................21

Cal. Bus. & Prof. Code § 16600.1(a)...............................................................33

Fla. Stat. Ann. § 501.204(1) ...........................................................................24

Fla. Stat. Ann. § 501.212(1) ...................................................................... 20, 21

Fla. Stat. Ann. § 501.203(3)(c) .................................................................. 31, 33

Fla. Stat. Ann. § 542.335(1) ...........................................................................33

**Rules, Regulations, and Other Sources**

42 C.F.R. § 10.20.............................................................................................18

42 C.F.R. § 10.21....................................................................................... 6, 15, 18

42 C.F.R. § 10.22.............................................................................................18

42 C.F.R. § 10.23.............................................................................................18

42 C.F.R. § 10.24.............................................................................................18

42 C.F.R. § 10.25.............................................................................................18

59 Fed. Reg. 25,110 (May 13, 1994)......................................................... 23, 27

61 Fed. Reg. 65,406 (Dec. 12, 1996) ........ 17, 18

85 Fed. Reg. 80,632 (Dec. 14, 2020) ........ 6, 13

91 Fed. Reg. 48,883 (Aug. 3, 2026) ........ *passim*

Amicus Brief of the U.S. submitted in *PhRMA v. Neronha*,
2026 WL 527776 (1st Cir. Feb. 25, 2026) ........ *passim*

Centers for Medicare and Medicaid Services, Medicare Drug Pricing
Negotiation Final Guidance (Sept. 30, 2025) ........ 21

Federal Rule of Civil Procedure 9(b) ........ 3, 24, 25

H.R. Rep. No. 102-384(II) ........ 4

## INTRODUCTION

The federal 340B Drug Pricing Program has become what the Secretary of Health and Human Services has described as a "boondoggle" that hospitals "are taking advantage of" to effectuate a "systematic and perverse transfer of wealth from rural America to more affluent areas."[1] This lawsuit seeks to perpetuate that abuse by weaponizing the Florida Deceptive and Unfair Trade Practice Act (FDUTPA) to obstruct modest transparency measures. But the asserted claims cannot proceed in this Court and, even if they could, they fail as a matter of law.

Under § 340B, manufacturers participating in Medicare and Medicaid enter an agreement with U.S. Department of Health and Human Services (HHS), under which they "offer" covered out-patient medicines to specific hospitals, clinics, and other entities designated by Congress (covered entities) at federally mandated reduced prices, sometimes as low as a penny. 42 U.S.C. § 256b(a)(1). Unfortunately, § 340B's attempt to help needy patients has led to widespread and well-documented abuse, to the tune of billions of dollars. Years ago, in response to that abuse, Lilly and other medicine manufacturers began requiring pharmacies to submit "claims data"—standard information necessarily maintained for insurance and Medicaid reimbursement—to ensure compliance with the 340B statute. As the federal government recently

[1] Hearing Before the H. Comm. on Energy & Commerce, 119th Cong. at 1:20:59–1:22:28 (Apr. 21, 2026) (testimony of Sec. Robert F. Kennedy, Jr.), https://tinyurl.com/4rcvk2st; Hearing Before the H. Comm. on Ways & Means, 119th Cong. at 4:21:10–4:23:10 (Apr. 16, 2026) (testimony of Sec. Robert F. Kennedy, Jr.), https://tinyurl.com/2huetz3f (collectively, Congressional Hearings).

explained, this exact data is vital to "ensuring program integrity, duplicate discount prevention, and coordination across federal pricing programs." Notice Regarding 340B Rebate Model Pilot Program, 91 Fed. Reg. 48,883, 48,896 (Aug. 3, 2026).

This case arises from Tampa General Hospital's refusal to provide claims data, which is a condition of Lilly's federal 340B "offers." Tampa General Hospital (TGH) alleges that Lilly's claims-data condition "violat[es]" the federal 340B statute and "Section 340B's pricing mandate." Compl. ¶¶ 9, 60. But instead of raising that complaint with HHS—the exclusive enforcer of the 340B statute—TGH brought a private action that dresses up a 340B dispute in state-law consumer protection claims.

Those claims cannot proceed in this Court. Section 340B "centralized enforcement in the [federal] government," "assign[ing] no auxiliary enforcement role to covered entities." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 117-18, 120 (2011). As the Supreme Court recognized, private enforcement of § 340B would "spawn a multitude of dispersed and uncoordinated lawsuits by 340B entities," which would result in "conflicting adjudications" that "undermine [HHS's] efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.* at 120. "[P]rivate suits" to enforce § 340B are foreclosed because they are simply "incompatib[le] … with the statute Congress enacted." *Id.* at 121.

In any event, the complaint fails to state a viable claim. The claims are preempted multiple times over because they conflict with federal law, interfere with (indeed, subvert) manufacturer participation in the federal 340B program, impair Lilly from fulfilling federal functions and obligations, and invade the congressionally

created field of 340B pricing and enforcement. For similar reasons, FDUTPA's safe harbor provision applies because federal law permits Lilly to impose claims-data conditions on its 340B offers. TGH may not use FDUTPA to second-guess *how* Lilly complies with a federal mandate under a federal agreement. And each claim fails on its own terms: TGH's misrepresentation claim is deficient under Rule 9(b)'s heightened pleading standard and identifies no misrepresentation; the per se claim does not identify any Florida or federal law that Lilly violated; and the unfair-competition claim is an antitrust claim missing antitrust allegations.

The Court should grant Lilly's motion and dismiss with prejudice.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "requires more than labels and conclusions"; it requires factual allegations that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Without *facts* that "support recovery under some viable legal theory," *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011), Plaintiff cannot proceed to "discovery, cabined or otherwise." *Iqbal*, 556 U.S. at 686.

FDUTPA claims that "sound in fraud" are subject to Rule 9(b)'s heightened pleading standard. *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1292-94 (11th Cir. 2025). Rule 9(b) requires the complaint to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To meet this standard, a plaintiff must allege

"(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the [p]laintiff[]; and (4) what the defendants gained by the alleged fraud." *Pop*, 145 F.4th at 1296 (quotations omitted). "Failure to satisfy [these requirements] is a ground for dismissal of a complaint." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005).

## BACKGROUND

### A. Legal Background

***The Section 340B Program.*** Before 1990, Lilly and many other medicine manufacturers voluntarily offered reduced prices to certain entities serving needy patients. Congress inadvertently interrupted that practice by enacting the Medicaid Drug Rebate Program, which required participants to offer Medicaid the "best price" given to any other purchaser. H.R. Rep. No. 102-384(II), at 9-10. Because sales to some safety-net providers were the lowest price available, they were manufacturers' "best price" and increased their Medicaid liability, resulting in many manufacturers discontinuing the discounts they had offered before. *See id.* To solve that problem, Congress enacted Section 340B, 42 U.S.C. § 256b, which not only exempted sales to a very limited group of federally-designated medical providers from the Medicaid "best price" calculation, but mandated reduced prices for those entities as a condition of manufacturers' participation in Medicaid and Medicare Part B.

As a result, manufacturers participating in the 340B program must enter into a "Pharmaceutical Pricing Agreement" ("PPA") with HHS. As with other Spending

Clause legislation, in return for federal benefits, manufacturers "agree to comply with federally imposed conditions." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022). The PPA expressly delineates the participant's 340B obligations and operationalizes how the federal government enables discounted outpatient medicines to covered entities. Specifically, as a condition of the agreement with HHS, manufacturers "offer" covered medicines to federally-designated "covered entities" at a federally-determined "ceiling price." 42 U.S.C. § 256b(a)(1).

Critically, Congress also imposed important limitations on covered entities to ensure program integrity and made clear that a facility is eligible to become (and remain) a covered entity only if it "meets the requirements described" in § 340B. 42 U.S.C. § 256b(a)(4), (5)(A)-(B). Specifically, § 340B "prohibits covered entities from receiving the section 340B discount on drugs also subject to a Medicaid rebate," *i.e.*, duplicate discounts. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024) (citing 42 U.S.C. § 256b(a)(5)(A)(i)). And it "prohibits 'diversion,' which occurs when covered entities 'resell or otherwise transfer the drug to a person who is not a patient of the entity.'" *Id.* (quoting 42 U.S.C. § 256b(a)(5)(B)).

In 2010, Congress directed the Secretary of HHS to develop procedures for the resolution of disputes between manufacturers and covered entities. 42 U.S.C. § 256b(d)(3)(A). Pursuant to that direction, the Health Resources and Services Administration (HRSA) set up an Administrative Dispute Resolution (ADR) scheme for 340B disputes between covered entities and manufacturers—including disputes about "overcharges" (*i.e.*, claims by a covered entity that it has been improperly denied

the 340B price). 85 Fed. Reg. 80,632, 80,632-33 (Dec. 14, 2020). Covered entities *must* bring any "overcharge" claims in ADR, including (according to HRSA) "claims that a manufacturer has limited [their] ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1). The 340B statute authorizes HRSA to audit manufacturers for compliance with 340B pricing requirements, and manufacturers that "knowingly and intentionally" charge covered entities more than the 340B price face civil monetary penalties. 42 U.S.C. § 256b(d)(1)(B)(v)-(vi).

***The Growth—and Abuse—of the 340B Program.*** At its inception, the 340B program "operated as a relatively simple pricing requirement" with "limited participants and relatively simple distribution arrangements." 91 Fed. Reg. at 48,886. In the early stages, covered entities often "maintained separate physical inventories of 340B drugs for eligible patients" apart from market-price drugs for "ineligible patients." *Id.* at 48,885-86. Covered entities would generally verify a given prescription's eligibility for 340B pricing when dispensed and fill eligible prescriptions using their 340B-specific inventories, ensuring compliance with § 340B's prohibitions against both duplicate discounting and diversion. *See id.* at 48,886.

But every 340B sale presents a revenue-generating opportunity: Covered entities can buy 340B medicines from manufacturers at substantial discounts but charge standard prices to patients and their insurers (e.g., private insurers, state Medicaid, and Medicare)—and pocket the difference. So covered entities partnered with for-profit entities, including contract pharmacies like Walgreens and CVS, to design new ways to maximize profit from federal 340B pricing. From 2010 to 2019 alone, "the number

of contract pharmacies participating in the program increased from about 1,300 to 23,000." *Novartis*, 102 F.4th at 457. The use of these pharmacies "increased the potential for fraud," and raised "legitimate concern[] about the operation of the 340B program." *Novartis Pharms. Corp. v. Espinosa*, 2021 WL 5161783, at *9 (D.D.C. 2021).

At the same time, covered entities increasingly turned to a complex "replenishment" model. Under this model, covered entities and contract pharmacies buy medicines at commercial prices and dispense them to customers. Weeks or even months later, third parties retroactively identify which prescriptions were purportedly 340B-eligible. Then, covered entities "replenish[]" their inventory with medicine purchased at 340B prices, using "[s]pecialized software"—kept secret from manufacturers—to "capture[] the 340B discount retroactively on drugs already" sold at full price. *See* 91 Fed. Reg. at 48,885-86. "The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate," creating "a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457-58.

Unsurprisingly, the 340B program mutated into what the HHS Secretary characterizes as a "boondoggle." *Supra* n.1. From 2010 to 2026, the 340B program went from a $6.6 billion program to over a $100 billion program, becoming the second largest federal drug program, 91 Fed. Reg. at 48,884, with "widely documented" "unlawful diversion and duplicate discounts," *Eli Lilly & Co. v. Kennedy*, 2025 WL 1423630, at *12 (D.D.C. May 15, 2025) (quotations omitted). "[M]ultiple reports by Congress and governmental agencies not[e] the exponential growth of the Program;

the difficulty of enforcing the prohibition on duplicate discounts; and concerns surrounding diversion." 91 Fed. Reg. at 48,887 (internal footnotes omitted); *see, e.g.*, GAO, GAO18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 35-39 (June 2018). It is now "difficult to ensure that discounted purchases are accurately matched to qualifying patients," and it's much more likely "that the same transaction could be counted toward both a 340B discount and a Medicaid rebate." 91 Fed. Reg. at 48,886.

***Court- and Agency-Approved Transparency Measures.*** In response to this widespread abuse, manufacturers began including modest conditions on their 340B offers, such as requiring submission of certain claims-level data for contract pharmacy dispenses. Claims data is standard information that documents a prescription—such as the healthcare provider's ID number, the medicine quantity, and the date of dispense. This data is "already generated, maintained, and routinely transmitted by covered entities and their contract pharmacy partners in the ordinary course of billing and reimbursement across Medicare, Medicaid, and commercial payers." *Id.* at 48,894. And it helps determine whether a transaction qualifies for a federal discount. For that reason, claims data is essential to "ensuring program integrity, duplicate discount prevention, and coordination across federal pricing programs." *Id.* at 48,896.

Courts of appeals have unanimously approved claims-data requirements as "reasonable conditions" on manufacturers' offers. *Novartis*, 102 F.4th at 461; *see Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023). The D.C. Circuit explained that "the burden of providing the claims data is 'minimal,'" and held that "340B does

not categorically prohibit manufacturers from imposing conditions on the distribution of covered drugs to covered entities." *Novartis*, 102 F.4th at 463-64. More recently, HRSA announced covered entities must submit to manufacturers "claims-level data" for its 340B rebate pilot program, recognizing that the burden of submitting that data is "minimal" and "justified" to support "program integrity." 91 Fed. Reg. at 48,896.

### B. Factual Background

Since December 2021, consistent with decisions from the D.C. and Third Circuits, Lilly has required covered entities to submit standard claims data for 340B dispenses at contract pharmacies. Compl. ¶ 69. In January 2026, Lilly announced it would extend its long-standing claims-data condition to in-house dispenses. Compl. ¶ 68. Under Lilly's condition, covered entities would be required to provide the very same data that their contract pharmacies had been submitting to Lilly for years, and that in-house pharmacies *already* collect and submit to Medicare, Medicaid, and commercial insurers. The only change is that, now, they would provide Lilly with that standard data for all 340B dispenses. Ex. A (referenced in Compl. ¶ 68).

Most covered entities accepted Lilly's offer and continue purchasing 340B-priced medicines at the federal ceiling price without issue. Ex. B (referenced in Compl. ¶¶ 83-84). Indeed, nearly 70 percent of covered entities purchasing Lilly medicines—totaling approximately 2,350 entities—have submitted in-house claims data. *Id.*

TGH is one of the few holdouts. Instead of accepting the terms of Lilly's federal 340B offer, it voluntarily declined and sued Lilly under FDUTPA. *See* Compl. ¶¶ 14, 89. Acknowledging Lilly's policy as a "condition" on its offer to sell TGH medicines

at the heavily discounted federal 340B price, TGH contends that "Lilly cannot condition sales in [this] manner." *Id.* ¶ 7. By its own terms, TGH seeks to use FDUTPA to police a "violation of Section 340B's pricing mandate." *Id.* ¶ 9.

## ARGUMENT

### I. *Astra* Bars TGH's Claims.

TGH's claims cannot proceed in this Court. *Astra* held that private parties cannot bring "suits to enforce § 340B"—"no matter the clothing in which [they] dress their claims." 563 U.S. at 113-14. Each of TGH's claims rests on a supposed "violation of Section 340B's pricing mandate." Compl. ¶ 9. TGH's suit is thus "in essence a suit to enforce the [§ 340] statute itself," *Astra*, 563 U.S. at 118, and must be dismissed.

*Astra* set a clear rule that forecloses TGH's claims: Private parties cannot assert claims that seek to enforce § 340B's requirements. There, Santa Clara County (which operated several 340B entities) sued various manufacturers on the theory that they were improperly "charg[ing] more than the § 340B ceiling price." *Id.* at 118. The County claimed it was entitled to 340B pricing and asserted breach-of-contract claims challenging the manufacturers' failure to provide the 340B discount. Third Amended Complaint, *Cnty. of Santa Clara v. Astra USA, Inc.*, No. 05-CV-3740 (N.D. Cal. Dec. 23, 2008), ECF No. 284 ¶¶ 28, 38, 41, 72-79.

The Supreme Court unanimously rejected the attempt to privately "enforce § 340B," recognizing the "incompatibility of private suits with the statute Congress enacted." *Astra*, 563 U.S. at 114, 121. The Court explained that Congress opted to "centralize[] enforcement in the [federal] government," "vest[ing] authority to oversee

compliance with the 340B Program in HHS." *Id.* at 117 (quotations omitted). It highlighted that Congress made the conscious choice *not* to provide "a private right to enforce the statutory ceiling-price obligations," "assign[ing] no auxiliary enforcement role to covered entities." *Id.* at 117-18. And it emphasized that private enforcement, like TGH's suit here, would "spawn a multitude of dispersed and uncoordinated lawsuits by 340B entities," which would result in "conflicting adjudications" that would "undermine [HRSA's] efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.* at 120. To avoid that chaos, Congress opted for a centralized "formal dispute resolution procedure" within HHS and foreclosed any private suit "complaining of 'overcharges and other violations of the discounted pricing requirements,'"—again, "[n]o matter the clothing in which [covered] entities dress their claims." *Id.* at 114, 121-22 (quotations omitted).

In the wake of the *Astra* decision, courts have repeatedly rebuffed private attempts to enforce § 340B through state law claims. For example, in *Sagebrush Health Services v. Amgen Inc.*, the court dismissed multiple claims "dressed … in the clothing of California law" because they were "rooted in Plaintiff's assertion that it is entitled to purchase drugs at 340B discounted prices." 2026 WL 1030817, at *1, *6 (C.D. Cal. Apr. 15, 2026). In *American Hospital Association v. HHS*, the court dismissed APA claims that sought relief "entirely premised on the enforcement of the 340B Program requirements." 2021 WL 616323, at *5 (N.D. Cal. Feb. 17, 2021). And in *Aids Healthcare Foundation v. Apexus*, the Ninth Circuit rejected a covered entity's attempt to

use California contract and unfair-competition claims to enforce an agreement between a 340B vendor and HRSA. 2024 WL 3886974, at *2 (9th Cir. Aug. 21, 2024). The court explained that although the case was not quite "*Astra* redux," if allowed to proceed, it too would "undermine the [government's] efforts to administer both Medicaid and § 340B … on a uniform, nationwide basis." *Id.* (quotations omitted).

These decisions mandate dismissal of TGH's claims, each of which rests on a supposed "violation of the 340B statute" and "Section 340B's pricing mandate." Compl. ¶¶ 9, 60. The crux of TGH's complaint is that "Lilly cut off TGH's 340B pricing." *Id.* ¶ 86. And repeated statements in the Complaint make clear that TGH seeks to enforce a *federal* claim to 340B pricing, not some independent state-law right. *See id.* ¶ 2 (Lilly "cut TGH off from discounted pricing it had promised"); ¶ 73 (Lilly required covered entities to "pay[] commercial prices instead of the statutory ceiling price"); ¶ 87 ("Lilly has denied access to 340B pricing."); ¶ 88 (TGH was "denied access to 340B discounts"); ¶ 99 ("Lilly's refusal to provide lawful 340B pricing"); ¶ 109 (Lilly falsely represents "that covered entities can purchase Lilly products at the requisite 340B ceiling price"); ¶ 117 (Lilly "circumvent[s] statutory pricing obligations"); *see also id.* ¶¶ 6, 7, 8, 10, 13, 15, 33, 55, 58, 59, 60, 74, 75, 76, 84, 85, 89, 103, 105, 110, 114, 115, 123. What's more, TGH's own allegations seek to establish *federal* violations—namely, that Lilly's offer violates its PPA with the federal government, *see id.* ¶¶ 7, 55-57, 110, 114, violates regulations enforcing § 340B, *see id.* ¶¶ 7, 12, 46, 52, and is inconsistent with HRSA's enforcement actions concerning § 340B, *see* Compl. ¶¶ 7, 60-67. Simply put, these are 340B claims dressed in state-law

clothing—but that is exactly what Congress exclusively committed to HHS.

TGH's claimed harm and requested remedies likewise "confirm that [it] is in essence seeking to enforce the 340B Program." *Sagebrush*, 2026 WL 1030817, at *8. TGH asserts that it has a "need for drugs at 340B prices." Compl. ¶ 30. And, on its telling, it was Lilly's decision to "cut off TGH from 340B pricing" that "caus[ed] its injury." *Id.* ¶ 149; *see also id.* ¶¶ 83-92, 99, 125. To remedy that alleged harm, TGH seeks damages for the 340B discount it believes it should have received. *See id.* ¶¶ 88, 115, 125. TGH also seeks an injunction to remedy alleged harm flowing directly from its lost "340B savings." *Id.* ¶¶ 127-28. This is *exactly* what *Astra* forbids. TGH's remedies are directly "tied to its right to purchase drugs at 340B discounted prices," further showing that "its claims are actually a covert attempt to manufacture a private right of action to enforce the 340B Program." *Sagebrush*, 2026 WL 1030817, at *8. Congress chose to vest HHS with exclusive authority to address precisely such claims in the first instance. 85 Fed. Reg. at 80,632-33; *Astra*, 563 U.S. at 121.

At bottom, just like the plaintiff in *Astra* claimed "that the manufacturers charged [it] more than the § 340B ceiling price," 563 U.S. at 118-19, TGH here claims that Lilly charged it more than "the requisite 340B ceiling price." Compl. ¶ 111. Although "dress[ed]" in consumer-protection clothing, the claims "in essence … enforce [§ 340B] itself." *Astra*, 563 U.S. at 114, 118. The Court should dismiss.

## II. The Supremacy Clause Bars TGH's Claims.

*Astra* forecloses this suit entirely. Moreover, its reasoning as well as other precedents demonstrate that the Supremacy Clause bars TGH's specific claims here.

The Supremacy Clause establishes that "the Laws of the United States ... shall be the supreme Law of the Land." U.S. Const., art. VI, cl. 2. In accordance with that principle, a state law claim must give way when it conflicts with federal law or intrudes into an exclusively federal field. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). And state claims cannot subject the federal government or those with whom it deals to special obligations. TGH's claims do all of the above.

**A. TGH's claims conflict with federal law.**

TGH's claims should be dismissed because they conflict with § 340B. Conflict preemption occurs when either "(1) it is impossible for a party to comply with both state and federal law, or (2) the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *City of Brunswick v. Honeywell Int'l, Inc.*, 184 F.4th 1230, 1251 (11th Cir. 2026) (quotations omitted). To determine whether state law poses "a sufficient obstacle," courts "examin[e] the federal statute as a whole and identify[] its purpose and intended effects." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1274 (11th Cir. 2013).

Here, TGH's state law claims "frustrate" and "undermine[] the full purposes and objectives" of federal law in several ways. *Odebrecht*, 715 F.3d at 1287; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). *First*, allowing TGH's claims to proceed would undercut the "unitary administrative and enforcement scheme" set out in § 340B. *Astra*, 563 U.S. at 120. Instead of "centralized enforcement in the [federal] government," *id.* at 119 (quotations omitted), there would be "a multitude of dispersed and uncoordinated lawsuits by 340B entities" that create a "risk of conflicting

adjudications" and "undermine the [HHS's] efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.* at 120. That's why the Supreme Court recognized "the incompatibility of private suits with the statute Congress enacted." *Id.* at 121. And it's why the Department of Justice has explained that, "'[f]ar from assisting HHS,' resort to state law remedies to resolve 340B disputes 'would undermine' Congress's intent to create a uniform system." Amicus Brief of the U.S., *PhRMA v. Neronha*, 2026 WL 527776, at *15 (1st Cir. Feb. 25, 2026) (U.S. Brief).

*Second*, and relatedly, TGH's claims would circumvent Congress's intent that § 340B claims "be enforced exclusively by the Federal Government." *Buckman*, 531 U.S. at 352. When Congress empowers an agency to enforce federal law "consistently with [the agency's] judgment," competing state-law claims are preempted. *Id.* at 350. This rule extends to claims that "can only be established by pointing to federal law" where "Congress [has] made a specific choice to allow only the government to enforce the [statute's] requirements." *Markland v. Insys Therapeutics*, 758 Fed. App'x 777, 779, 780 (11th Cir. 2018) (citing *Buckman*, 531 U.S. at 348-51).

That describes TGH's claims and § 340B. "Congress placed the Secretary (acting through [his] designate, HRSA) in control of § 340B's drug-price prescriptions" and "overcharge[]" disputes. *Astra*, 563 U.S. at 114; 42 U.S.C. § 256b(d)(3). Covered entities "claim[ing] that a manufacturer has limited the[ir] … ability to purchase covered outpatient drugs at or below the 340B ceiling price" therefore must bring those claims to HRSA. 42 C.F.R. § 10.21(a)(1). In fact, hospitals have already recognized HRSA as the proper venue to challenge manufacturers' conditions on their offers. *See*

HRSA, *ADR Decision Summaries* (July 16, 2026) https://tinyurl.com/yybjmha3. Allowing TGH to end-run HRSA and "impose [state-law] penalties for the [alleged] federal offenses here would conflict with the careful framework Congress adopted." *Arizona v. United States*, 567 U.S. 387, 402 (2012). And it fundamentally changes the bargain the federal government struck in its 340B agreement with Lilly, altering the incentives for 340B participation and thwarting Congress's objective to have manufacturers administer the 340B Program. *See* U.S. Brief, 2026 WL 527776, at *16-17. Allowing private parties to assert FDUTPA claims to enforce § 340B "conflicts with the scheme Congress designed" because "enforcement authority … properly belongs to the federal government alone." *Id.* at *15.

Recognizing sole enforcement authority here is consistent with the general rule that Congress is the proper decisionmaker of "conditions on the receipt of federal funds" in spending-power contexts. *Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 269-70 (1985) (rejecting state limitation). If States could add conditions to participation in federal spending programs, that would destroy the principle that "conditions attached to federal funds … apply only to those who have knowingly and voluntarily agreed to them." *Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1941 (2026). And it would "risk disincentivizing Medicare and Medicaid participation" by increasing "the costs of participation"—an issue within the federal government's claimed domain. U.S. Brief, 2026 WL 527776, at *15-16.

*Third*, prohibiting claims-data conditions in manufacturers' 340B offers conflicts with and thwarts § 340B's anti-abuse mechanisms. Section 340B "prohibits covered

entities from receiving the section 340B discount on drugs also subject to a Medicaid rebate." *Novartis*, 102 F.4th at 456 (citing 42 U.S.C. § 256b(a)(5)(A)(i)). And it prohibits covered entities from "'resell[ing] or otherwise transfer[ing] the drug to a person who is not a patient of the entity.'" *Id.* (quoting 42 U.S.C. § 256b(a)(5)(B)). The statute "effectuate[s]" those provisions by allowing manufacturers to audit covered entities. *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 452 (S.D. W.Va. 2024), *en banc* review granted, 147 F.4th 830; 42 U.S.C. § 256b(a)(5)(A)-(D). But a manufacturer may initiate an audit only when there is "reasonable cause" to believe a § 340B violation occurred. 61 Fed. Reg. 65,406, 65,409-10 (Dec. 12, 1996). Claims data is "necessary to support program integrity," 91 Fed. Reg. at 48,898, in part because it allows manufacturers like Lilly to make that reasonable-cause showing. A state law prohibition on claims-data conditions thus "frustrates drug manufacturers' ability" to establish the reasonable cause needed "to start the very audit required to access the [federal] alternative dispute resolution system." *PhRMA*, 760 F. Supp. 3d at 453.

On any of these three grounds, TGH's claims are conflict preempted.

**B. TGH's claims intrude into a federal field.**

TGH's claims are also field preempted. The 340B program is "unlike other federal health programs like Medicaid, which give[] the States substantial discretion in determining how to operate a cooperative endeavor with the federal government." U.S. Brief, 2026 WL 527776, at *11 n.4 (quotations omitted). It is a field that Congress created and "intended the Federal Government to occupy exclusively." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Field preemption therefore applies for two

independent reasons: (1) There is a "scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," and (2) § 340B enforcement is both exclusively a creature of Congress, and "a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.*

First, there is a "pervasive" "scheme of federal regulation." *Id.* Federal law not only regulates, it literally created every aspect of the 340B Program—including pricing formulas, covered-entity eligibility, qualifying transactions, and dispute resolution. *See, e.g.*, 42 U.S.C. §§ 256b(a)(1)-(7), (b)(1), (d)(3)(A), (e); 42 C.F.R. §§ 10.20-25; 61 Fed. Reg. at 65,412. TGH admits that "[t]he 340B statute establishes a *comprehensive*, HHS administered enforcement architecture." Compl. ¶ 39 (emphasis added). Put simply, Congress gave HHS the "control rein" over 340B drug pricing enforcement, *Astra*, 563 U.S. at 120, and its regulatory framework leaves "no room for the States to supplement it." *Arizona*, 567 U.S. at 399; *see* U.S. Brief, 2026 WL 527776, at *11 (reasoning that state laws cannot prohibit claims-data conditions because "Congress left no role for States in determining manufacturers' 340B obligations").

Second, "the federal interest in" maintaining exclusive enforcement authority over the 340B Program "could hardly be stronger." U.S. Brief, 2026 WL 527776, at *21. Congress not only created this entire program, it "centralized [§ 340B] enforcement in the government," creating a "unitary administrative and enforcement scheme." *Astra*, 563 U.S. at 119-20. That makes sense. Manufacturers' obligations only arise from their *affirmative agreement* with the federal government under their

PPAs. It is for HHS—the counterparty to that agreement—to assess compliance. Section 340B is linked with other important federal programs—like the Medicaid Drug Rebate Program—so private or state enforcement risks "undermin[ing] [HRSA]'s efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.* at 120. And allowing a patchwork of state-law 340B challenges inevitably "risk[s] disincentivizing Medicare and Medicaid participation." U.S. Brief, 2026 WL 527776, at *15-16. This is a field "where the federal interest … is sufficiently dominant" to infer Congress's "intent to occupy [the] field" it created "to the exclusion of state law." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988).

### C. The intergovernmental immunity doctrine applies.

TGH's claims are also barred by the intergovernmental immunity doctrine. That doctrine recognizes that, under the Supremacy Clause, "states have no power … to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by [C]ongress[.]" *McCulloch v. Maryland*, 17 U.S. 316, 436 (1819). It follows that States may not single out for special obligations or prohibitions either "the Federal Government *or those with whom it deals* (e.g., contractors)." *United States v. Washington*, 596 U.S. 832, 838 (2022) (emphasis added and quotations omitted).

TGH's consumer-protection claims do just that. TGH could not attach liability to manufacturers that do not participate in the 340B Program for refusing to provide their medicines at a price below market value. Yet TGH seeks to hold Lilly liable for refusing to do so, based on the 340B PPA between HHS and Lilly. The claims thus "impermissibly target[] and discriminate[] against" Lilly for "participat[ing] in a

federal program." U.S. Brief, 2026 WL 527776, at *12. Lilly "subjects itself to the [FDUTPA claims] only so long as it participates in the 340B Program; if it opts out of the 340B Program, it frees itself from the constraints of the Act"—highlighting that the claims "discriminate[] against manufacturers who have 340B agreements with the federal government." *Id.* In offering 340B pricing, Lilly is solely performing a federal function under its agreement with HHS—nothing more; it otherwise has no duty to offer or provide 340B prices to anyone. TGH's claims take issue with *how* Lilly is performing this exclusively federal function under its PPA. That is foreclosed by intergovernmental immunity. *See Washington*, 596 U.S. at 838.

Because TGH's FDUTPA claims "treat[] manufacturers with 340B agreements worse than manufacturers who do not participate in the 340B Program," they run afoul of the intergovernmental immunity doctrine. U.S. Brief, 2026 WL 527776, at *13-14.

**III. Lilly's Conduct Falls within FDUTPA's Safe Harbor.**

FDUTPA's safe harbor provision also bars TGH's claims. That provision, Fla. Stat. Ann. § 501.212(1), prohibits a plaintiff from using FDUTPA to impose liability on actions required by federal law or "to create new obligations, or to broaden existing obligations, when a defendant's conduct is already in compliance with federal law." *Young v. Cmty. Health Sys., Inc.*, 2023 WL 6121795, at *3 (11th Cir. Sept. 19, 2023) (per curiam) (quotations omitted); *Smith v. Verra Mobility Corp.*, 2026 WL 1145788, at *14 (M.D. Fla. Apr. 28, 2026). That is precisely what TGH seeks to do—force Lilly to sell medicines at 340B discounts without any conditions. The safe harbor provision thus requires "dismiss[al]." *Kuenzig v. Hormel Foods,* 505 F. App'x 937, 939 (11th Cir. 2013).

*First,* claims-data conditions fall within the safe harbor, Fla. Stat. Ann. § 501.212(1), because collecting claims data is "*the* way" for manufacturers to identify the "diversion or double-dipping on discounts" prevented by § 340B and "necessary to establish the reasonable cause required to trigger an audit" as required by federal regulators. *AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266, 1278 (W.D. Okla. 2025). On top of that, the new obligations under the Inflation Reduction Act require manufacturers to (a) determine if a given prescription is subject to a specific price requirement (called the "maximum fair price") and (b) charge the lesser of the "maximum fair price" and the 340B price, 42 U.S.C. §§ 1320f, 1320f-2(d)—a determination that necessarily requires claims data. CMS, Medicare Drug Pricing Negotiation Final Guidance, at 59-64 (discussing section 40.4.3), 114-26 (discussing section 90), 238-40 (Sept. 30, 2025), https://tinyurl.com/CMSFinalGuidance. So claims data is both "necessary to support program integrity," and necessary to prevent "overlapping price concessions across Programs." 91 Fed. Reg. at 48,898, 48,900.

*Second*, the safe harbor provision "prohibit[s]" TGH from using FDUTPA to "create [a] new obligation[]" to sell medicine at 340B prices without any conditions—a requirement nowhere found in federal law. *Young*, 2023 WL 6121795 at *3. "[I]f a defendant complies with federal … laws or regulations, then no FDUTPA claim lies." *Id*. (quotations omitted). Lilly's claims-data condition "complies" with § 340B. *Id.*

The text of § 340B permits non-price conditions on 340B offers and has been interpreted by the D.C. Circuit and Third Circuits specifically to permit claims-data conditions. The statute provides that manufacturers must "offer each covered entity

covered outpatient drugs for purchase at or below the applicable ceiling price." 42 U.S.C. § 256b(a)(1). "*Offer* means '[t]o present for acceptance or rejection.'" *Novartis*, 102 F.4th at 460 (quoting *American Heritage Dictionary of the English Language* 1255 (3d ed. 1992)); *see Sanofi*, 58 F.4th at 703 (similar). "And *price* means '[t]he amount … of money … asked for or given in exchange for something else.'" *Novartis*, 102 F.4th at 460 (quoting *American Heritage Dictionary*, *supra*, at 1437). By its terms, then, § 340B "merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount" and permits "reasonable" *non*-price "conditions" on those offers. *Id.* at 460-61.

"[B]ackground contract principles" confirm what the text provides. *Id.* at 460. When construing the word "offer," courts "consider its meaning in the law of contracts." *Id.* And it is black letter law that an offer "may contain both price and non-price terms." *Id.* (citing 1 *Corbin on Contracts* § 1.11 (2023)). Indeed, "an offer often *must* contain some terms beyond the mere price to be definite enough to bind the contracting parties." *Id.* (emphasis added). So attaching *non*-price conditions, as Lilly does, "is fully consistent with making an 'offer' at a specified 'price,'" as multiple courts have recognized. *Id.*; *see also Sanofi*, 58 F.4th at 703, 706.

Regulatory guidance, too, supports manufacturers' ability to attach reasonable non-price conditions to their 340B offers. "For almost three decades" following the creation of the 340B Program, "HRSA construed the statute to allow manufacturers to insist on at least some reasonable conditions." *Novartis*, 102 F.4th at 460-61. For

example, just two years after § 340B's enactment, HRSA authorized manufacturers to "include provisions that address customary business practice, request standard information, or include other appropriate contract provisions." 59 Fed. Reg. 25,110, 25,114 (May 13, 1994). That interpretation, while not binding, is "especially useful in determining [§ 340B's] meaning," as it was "issued contemporaneously with the statute" and remained largely "consistent" over the past 32 years. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024); *see* 91 Fed. Reg. at 48,890 (returning to longstanding position after a short hiatus). And HRSA has applied its longstanding view—consistent with the Third and D.C. Circuits—to uphold claims-data and other conditions. HRSA, *340B ADR Decision Summaries*, https://tinyurl.com/4mw8sysj.

Just like the conditions courts and HRSA have blessed, Lilly's policy requests standard claims data. This information is "already generated, maintained, and routinely transmitted by covered entities … in the ordinary course of billing and reimbursement across Medicare, Medicaid, and commercial payers." 91 Fed. Reg. at 48,894. And as HRSA recently explained, the data is critical to "ensuring program integrity [and] duplicate discount prevention." 91 Fed. Reg. at 48,896.

In sum, TGH cannot use FDUTPA to "create [a] new obligation[]"—a condition-less 340B offer—found nowhere in the federal regime. *Young*, 2023 WL 6121795, at *3. TGH's claims are "barred by the safe harbor" provision. *Id.*

## IV. Each of TGH's Counts Fails to State a Claim.

In addition to being barred multiple times over, TGH's counts do not allege facts sufficient to state a claim. A private FDUTPA claim has "three elements": "(1)

a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1097 (11th Cir. 2021) (quotations omitted); *see* Fla. Stat. Ann. § 501.204(1). All three of TGH's counts fail to allege a deceptive or unfair practice, and the second count fails to allege causation, too.

**A. TGH fails to adequately allege misrepresentation (Count II).**

**1.** TGH states no viable FDUTPA claim based on Lilly's alleged "false and misleading" representations "to the market and to the federal government that it offers 340B discounts to covered entities." Compl. ¶¶ 142-43.

***First***, TGH fails to satisfy Rule 9(b)'s heightened pleading standard. A claim that "sound[s] in fraud must comply with Rule 9(b)." *Pop*, 145 F.4th at 1294. This includes claims that the defendant made "affirmative misrepresentations" or "misrepresentations by omission" concerning "material facts." *Id.* at 1295 (quotations omitted). This District "has consistently held that … FDUTPA claims that hinge on allegations of misrepresentation are 'grounded in fraud' and are therefore governed by Rule 9(b)'s heightened pleading requirements." *Coast Pump & Supply Co. v. Franklin Elec. Co.*, 2025 WL 1394260, at *2 n.2 (M.D. Fla. May 13, 2025) (quotations omitted). Count II asserts that "Lilly's representations … are false and misleading," that "Lilly's misrepresentations are material" and "Lilly's misrepresentations have caused TGH injury." Compl. ¶¶ 143, 145-46. Rule 9(b)'s heightened pleading standard applies.

But TGH's Complaint falls far short of meeting that standard. TGH alleges two buckets of misrepresentations: (1) Lilly's statements to the federal government agreeing to offer covered medicines to covered entities at or below the 340B ceiling

price, Compl. ¶¶ 55-56, and (2) Lilly's statements to "the market that it offers discounts to covered entities for their 340B purchases by noting its participation in the 340B program," *id.*¶ 58. Under either theory, TGH's allegations are not pled with particularity (and as discussed below, neither bucket contains misrepresentations at all).

Start with Lilly's statements to the government. TGH does not allege "the time" of these statements or "when [it] saw them." *Pop*, 145 F.4th at 1296-97. Nor does TGH allege that it "relied on" any statement Lilly made to the government. *Id.* The "who, what, when[,] where, and how" necessary to satisfy Rule 9(b) is simply missing for Lilly's alleged statements to the government. *Id.* (quotations omitted).

TGH's allegations regarding Lilly's statements to the market fare no better. TGH does not allege "the precise statements, documents, or misrepresentations made." *Id.* at 1296. Instead, it vaguely refers to Lilly "noting its participation in the 340B program" and "confirm[ing] it participates in 340B." Compl. ¶ 58. TGH includes a footnote with links to four websites (none of which work)—but does not specify what "the precise [false] statements" are. *Pop*, 145 F.4th at 1296. Moreover, the Complaint does not allege "when [TGH] saw" the statements, "if [TGH] saw those specific [statements] before" receiving or declining Lilly's offer, or "how those [statements] caused [TGH] to" detrimentally "rel[y]" on them. *Id.* at 1296-97. On that basis, alone, TGH's misrepresentation claim warrants "dismissal." *Corsello*, 428 F.3d at 1012.

***Second***, even aside from Rule 9(b), TGH fails to allege any deceptive statements. Courts use an "objective test" to determine whether an act or statement "is deceptive under FDUTPA, and the plaintiff must show that the alleged practice was likely to

deceive a consumer acting reasonably in the same circumstances." *Marrache*, 17 F.4th at 1098. "In determining whether a representation is likely to mislead consumers acting reasonably, courts consider the net impression created." *McFalls v. NCH Healthcare Sys., Inc.*, 2026 WL 1498251, at *7 (M.D. Fla. May 28, 2026) (quotations omitted). "The standard requires a showing of 'probable, not possible, deception.'" *Id.*

The complaint identifies no misrepresentation. TGH alleges that, by entering into the required 340B PPA contract with the government and by "noting its participation in the [340B] program," Lilly has represented to "the market and to the federal government that it offers 340B discounts to covered entities." Compl. ¶ 142. This representation is true: Lilly *does* offer 340B discounts to covered entities at or below the ceiling price. TGH admits as much; it just takes issue with what TGH admits is a "condition" on Lilly's "340B pricing offer," Compl. ¶¶ 7, 75; *see supra* Part III.

And Lilly specifically disclosed that pricing condition: Months before enforcing its condition against TGH, Lilly specifically told TGH several times that Lilly requires claims data as a condition of receiving the 340B discount on Lilly's medicines. Compl. ¶¶ 68-70, 75, 82-85. Lilly also openly announced the challenged claims-data condition to the public and to the federal government. *Id.* TGH may not like Lilly's claims-data condition, but it cannot allege a "misrepresentation" when Lilly disclosed its new policy to TGH, the public, and the government, in detail, many times over. Those disclosures, alone, doom TGH's bid to identify a misrepresentation, as the "presence of true information or a disclaimer can rebut a claim of deception." *Kurimski v. Shell Oil Co.*, 2022 WL 2913742, at *7 (S.D. Fla. June 30, 2022) (quotations omitted). When

conditions on an agreement are "clearly expressed," there can be no deception about those conditions, and no claim under FDUTPA. *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284-86 (11th Cir. 2007).

Even if Lilly hadn't disclosed its claims-data condition, no reasonable consumer would understand Lilly's statement that it "offers discounts to covered entities" to mean that it makes offers with no conditions whatsoever, as TGH suggests. Compl. ¶ 58. Courts must "take into account all the information available to consumers" and the surrounding "context." *Kurimski*, 2022 WL 2913742, at *5 (quotations omitted). And "an offer often must contain some terms beyond the mere price to be definite enough to bind the contracting parties"—such as "provisions about the place or manner of delivery" or conditions on payment within a certain time, e.g., 90 days. *Novartis*, 102 F.4th at 460 (quotations omitted). "[I]ncluding such terms is fully consistent with making an 'offer' at a specified 'price.'" *Id.*

What is true for offers generally also applies for 340B offers. *Id.* From 340B's inception, HRSA has blessed conditions on manufacturers' offers to covered entities. *See* 59 Fed. Reg. at 25,114. Lilly has included a claims-data condition in its offers to covered entities using contract pharmacies for years. Compl. ¶¶ 60-64, 69. And, as TGH itself acknowledges, other manufacturers have likewise implemented similar conditions. *Id.* ¶¶ 65-67. Against this backdrop, no reasonable consumer would be deceived into thinking that Lilly's statement that it "offers discounts to covered entities," *id.* ¶ 58, means that it does so without requesting any information whatsoever regarding eligibility. And, again, because Lilly's claims-data condition was

"specified," both in pre-offer statements and "in the express terms of" the offer itself, "a reasonable purchaser would not likely be misled." *Zlotnick*, 480 F.3d at 1286-87.

***Third***, even assuming Lilly's statements are false (they are not), the statements did not cause any harm to TGH. "[P]roximate causation" is "required for consumer protection claims." *MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*, 722 F. Supp. 3d 1296, 1320 (S.D. Fla. 2024). To establish proximate cause, the plaintiff must prove, among other things, "causation in fact, *i.e.* [that] the defendant's conduct was a substantial factor in producing the result." *Hoffman v. Bennett*, 477 So. 2d 43, 44 (Fla. 3d DCA 1985). Count II fails to satisfy that standard because Lilly's *statements* did not cause TGH to suffer any harm. TGH did not rely on the purported misrepresentation to its detriment, *e.g.*, *Godelia v. Doe 1*, 881 F.3d 1309, 1321 (11th Cir. 2018); TGH was not defamed, *e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974); and Lilly's statements did not cause consumers to disfavor TGH's products or services, *e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). Moreover, TGH did not rely on the purported statements with respect to any past purchases—only purchases made *after* being notified of Lilly's updated offer, at which point TGH had the choice to accept or decline Lilly's offer. The complaint simply contains no harm connected to the alleged misrepresentation.

Instead, TGH claims harm from the loss of discounts: It alleges that "Lilly cut off TGH from 340B pricing, causing its injury." Compl. ¶ 149. But that harm (loss of 340B pricing) results from Lilly's *conduct* in making a claims-data condition part of its

offer, not from any other *statement* Lilly made. Without a causal link *between the purported misrepresentation and the alleged harm*, TGH's misrepresentation claim must be dismissed. *See Molina v. Aurora Loan Servs., LLC*, 635 F. App'x 618, 627 (11th Cir. 2015); *Helpling v. Rheem Mfg., Inc.*, 2016 WL 1222264, at *15 (N.D. Ga. Mar. 23, 2016).

**2.** To the extent that Count II also includes a claim that Lilly's claims-data condition was an unfair practice, not simply deceptive, that theory fails too. *See* Compl. ¶¶ 147-48. A practice is unfair if it (1) "offends established public policy" and is (2) "immoral, unethical, oppressive, unscrupulous," or (3) "substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (quotations omitted). TGH's Complaint fails to satisfy that test.

For one, Lilly's conduct does not violate public policy. As explained, Lilly's policy requiring claims data fully complies with federal law—and, indeed, makes compliance with federal law possible by allowing Lilly to verify that particular dispenses are lawful. *Supra* Part III. Lilly's policy does not violate any Florida statute or regulation either. And as explained in more detail below, TGH cannot rely on the public policy of a smattering of *other* States to substantiate its claim under *Florida's* unfair competition statute. *Infra* Part IV.B. Moreover, Florida's choice not to enact a restriction on claims-data conditions (as other States have done) shows that there is no Florida public policy against including such conditions. *See infra* 32.

For another, Lilly's conduct—requiring claims data—cannot violate public policy because the federal government has precisely the same requirement. Medicare

and Medicaid already require the submission of claims data. 91 Fed. Reg. at 48,894. And HRSA recently announced that it will require the submission of "claims-level data" as part of its 340B pilot program, which it will use to "improve transparency" and "reduc[e] the incidence of duplicate discounts and related disputes." *Id.* at 48,889. It cannot violate public policy to impose a condition mirroring the one imposed by federal regulators charged with enforcing the program.

It is not somehow immoral, unethical, oppressive, or unscrupulous to include a lawful condition on an offer of a substantial discount. Generally, "businesses are free to choose the parties with whom they will deal, as well as the prices, *terms*, *and conditions* of that dealing." *Wesley Fin. Grp., LLC v. Westgate Resorts, Ltd.*, 746 F. Supp. 3d 1342, 1357 (M.D. Fla. 2024) (quotations omitted and emphasis added). Making a conditional offer "is not an unfair trade practice." *Id.* And it is not immoral, in response to documented fraud and abuse, to take measures supporting transparency—especially when the government has taken those very measures and recognizes them as "necessary to support program integrity." 91 Fed. Reg. at 48,898.

Finally, Lilly's conduct does not injure covered entities like TGH. Lilly's policy simply requires covered entities to provide claims data to prevent unlawful 340B discounts (for instance, duplicate discounts), as TGH will have to do anyway under HRSA's new pilot program. *See supra* 8-9. If TGH provides data, then it will receive 340B discounts. The alleged injury—"higher prices," Compl. ¶ 11—results from *TGH's own decision* not to provide that data. And to the extent Lilly's policy "harms" TGH by reducing the number of unlawful discounts it receives (i.e., reduces the

amount of duplicate discounting and diversion), that harm is not cognizable, because the excluded discounts were never lawful in the first place. *Cf.* Compl. ¶ 103.

**B. TGH fails to state a per se claim (Count III).**

Count III alleges that Lilly's claims-data condition constitutes a per se unfair trade practice under FDUTPA. But a per se violation of FDUTPA must be based on a violation of some other law that proscribes unfair competition and applies in Florida. Because TGH has failed to allege that Lilly's conduct violates any law barring unfair competition that applies in Florida, its per se claim must be dismissed.

"*Per se* violations of FDUTPA stem from the transgression of '[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.'" *Feheley v. LAI Games Sales, Inc.*, 2009 WL 2474061, at *4 (S.D. Fla. Aug. 11, 2009) (quoting Fla. Stat. § 501.203(3)(c)). A law may serve as a per se predicate if it "expressly" declares that it is a "*per se* violation of FDUTPA." *Id.* at *4 & n.23. Alternatively, a law may "serve as an implied FDUTPA predicate" if it includes an "explicit declaration that a violation constitutes an unfair, unconscionable, or deceptive trade practice." *Id.* at *4 (quotations omitted).

TGH has not identified any federal law that could serve as a FDUTPA predicate. As already explained, Lilly's claims-data condition does not violate § 340B, *supra* Part III, and even if it did, § 340B is not a proper FDUTPA predicate because it does not expressly "proscribe[] unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." *Feheley*, 2009 WL 2474061, at *4 (quotations omitted).

Nor does TGH allege that Lilly's conduct violates any Florida law that would

supply a per se predicate. In fact, the Florida legislature has affirmatively declined to enact a law imposing restrictions tied to the 340B Program. *See* H.B. 1281, 2026 Leg., Reg. Sess. (Fla. 2026) (failed); S.B. 1638, 2026 Leg., Reg. Sess. (Fla. 2026) (failed).

With no federal or Florida law, TGH points to laws in a small number of far-flung States, like Colorado, Maine, Oregon, and South Dakota. Compl. ¶¶ 151, 154-56. But TGH cannot import the laws of *other States* to establish a violation of *Florida's* public policy, particularly when Florida has declined to enact such measures. FDUTPA predicates must come from Florida or federal law. *See, e.g.*, *Rubis v. Motorsports of Stuart, LLC*, 2026 WL 1729569, at *4 (S.D. Fla. June 15, 2026); *Feheley*, 2009 WL 2474061, at *3-4 & nn.23-24. Courts considering analogous consumer-protection statutes have held that "a foreign state's law" may not "serve as a predicate" for a per se violation. *Evolution Fast Food Gen. P'ship v. HVFG, LLC*, 2017 WL 4516821, at *5 (S.D.N.Y. Sept. 27, 2017); *see Smith v. Ford Motor Co.*, 462 F. App'x 660, 665 (9th Cir. 2011). In fact, "[n]o decision … has been found that allows a plaintiff to import either statutes or precedent from *another state* as an unlawful business practice." *Van Slyke v. Cap. One Bank*, 2007 WL 3343943, at *14 (N.D. Cal. Nov. 7, 2007).

That's unsurprising. It makes no sense to consider other States' laws as per-se predicates for Florida's consumer protection statute. Other States' laws do not apply in Florida and thus do not represent the policy of Florida. Nor should courts interpret § 501.203(3)(c), the source of per-se violations of FDUTPA, to have an extraterritorial scope that incorporates the laws of all 50 states (and perhaps all foreign nations?), as it "gives no clear indication of an extraterritorial application." *Kiobel v. Royal Dutch*

*Petroleum Co.*, 569 U.S. 108, 115 (2013) (quotations omitted); *see Se. Fisheries Ass'n v. Dep't of Nat. Res.*, 453 So. 2d 1351, 1355 (Fla. 1984). Each State is its own sovereign, with authority to determine its own public policy through its own laws.

If the inquiry becomes divorced from the statutes enacted by the Florida legislature, as TGH's approach suggests, then FDUTPA would undermine Florida's sovereignty by outsourcing policymaking to other States. Consider one example: California generally makes it "unlawful to include a noncompete clause in an employment contract," considering them an unfair trade practice. *See* Cal. Bus. & Prof. Code § 16600.1(a); *id.* § 16600.1(c) (making a violation of that section "an act of unfair competition"). Florida, however, has not gone so far as to totally ban non-compete agreements. Fla. Stat. § 542.335(1) (allowing when "reasonable in time, area, and line of business"). Could Plaintiffs use FDUTPA to supplement existing Florida law and state a per se claim based on California's prohibition, even though there is no similar prohibition in Florida? Of course not. Yet, that's exactly what TGH's theory suggests—underscoring the far-reaching effects of adopting TGH's position.

**C. TGH fails to state an unfair-competition claim (Count I).**

TGH's first count—alleging "[u]nfair methods of competition," Compl. ¶ 129—fails to state a viable antitrust claim and thus fails to state a FDUTPA claim. Count I is an antitrust claim repackaged under FDUTPA. TGH alleges that Lilly has "significant monopoly power or market power," *Id.* ¶ 132 and that Lilly's "abus[e]" of that power "reduces output" and "injures competition," *id.* ¶¶ 134-35, without any "procompetitive benefits," *id.* ¶ 136. These allegations sound in antitrust law. *See JES*

*Props. v. USA Equestrian*, 253 F. Supp. 2d 1273, 1284 (M.D. Fla. 2003).

As a threshold matter, TGH never coherently explains how Lilly is engaging in "unfair competition." For one thing, TGH points to no authority saying that it is "unfair competition" to sell products at market prices. Lilly is charging TGH *the same market price* it charges entities that are not covered entities under § 340B. *See* Compl. ¶ 104. There's nothing "unfair" about that. And there's nothing "unfair" about imposing a condition on a commercial offer. TGH's contrary suggestion would transform every commercial negotiation into a potential FDUTPA claim. Nor has TGH plausibly alleged Lilly's claims-data condition "reduces output," Compl. ¶ 135, or affects output at all—it merely determines whether covered entities purchase Lilly's medicines at reduced prices (if they accept Lilly's offer) or market prices (if they don't).

Regardless, TGH cannot allege that Lilly possesses "monopoly power in the relevant market," *Morris Commc'ns Corp. v. PGA Tour*, 364 F.3d 1288, 1293-94 (11th Cir. 2004), without first "adequately defin[ing] the relevant market," *Levine v. Centr. Fla. Med. Affiliates*, 72 F.3d 1538, 1556 (11th Cir. 1996). At the pleading stage, that means TGH "must present enough information in their complaint to plausibly suggest the contours of th[e] relevant market." *In re Jan. 2021 Short Squeeze Trading Litig.*, 105 F.4th 1346, 1355 (11th Cir. 2024) (alterations omitted). The complaint fails to do so. It states that Lilly has power "in numerous markets"—without defining the market. Compl. ¶ 132. That defect is fatal to TGH's claim, "because '[w]ithout a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition.'" *In re Jan. 2021 Short Squeeze*, 105 F.4th at 1355 (quotations omitted).

It is of no moment that TGH declined to separately plead a violation of the antitrust laws. FDUTPA merely provides a secondary cause of action to pursue existing antitrust claims. *Cf. JES Props. v. USA Equestrian*, 2005 WL 1126665, at *19 (M.D. Fla. May 9, 2005). The two are inextricably intertwined: where a plaintiff's "antitrust claim fails, so too does its FDUTPA claim." *Athos Overseas, Ltd. v. Youtube, Inc.*, 2022 WL 910272, at *4 (S.D. Fla. Mar. 29, 2022) (quotations omitted) (same). If it were otherwise, no plaintiff would bother to bring antitrust claims at all, when it could simply proceed under FDUTPA and avoid the strictures of antitrust doctrine. TGH's "failure to establish a violation of antitrust law is sufficient to conclude that the plaintiff has also failed to state a FDUTPA claim." *QSGI, Inc. v. IBM Glob. Fin.*, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012) (quotations omitted).

In any event, an antitrust claim is improper when, as here, Lilly allegedly has "what amounts to a permissible monopoly" on account of valid patents. *Schering-Plough Corp. v. F.T.C.*, 402 F.3d 1056, 1066 (11th Cir. 2005) (quotations omitted).

And, to be clear, TGH's complaint is not that Lilly is charging above-market prices (which, in any event, would not on its own suffice to make out an antitrust claim). Instead, TGH's complaint is that Lilly is requiring the submission of standard claims data for TGH to take advantage of 340B discounted pricing, which is significantly below market prices. Whatever that is, it is not an antitrust claim.

## **CONCLUSION**

The Court should dismiss TGH's Complaint with prejudice.

## LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g), counsel for Defendants conferred with Plaintiff's counsel on September 18, 2026, by email in a good-faith effort to resolve the issues raised by the motion. Plaintiff opposes the relief sought in the motion.

Respectfully submitted,

/s/ A. Lee Bentley, III
A. Lee Bentley, III, Lead Counsel
Giovanni P. Giarratana
**BRADLEY ARANT BOULT CUMMINGS LLP**
1001 Water Street, Suite 1000
Tampa, FL 33602
Telephone: (813) 559-5500
lbentley@bradley.com
ggiarratana@bradley.com

/s/ John O'Quinn
John O'Quinn, P.C.
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.,
Washington, D.C. 20004
Telephone: (202) 389-5191
john.oquinn@kirkland.com

J. Matthew Rice
**KIRKLAND & ELLIS LLP**
150 3rd Ave S.
Nashville, TN 37201
Telephone: (629) 222-0165
matthew.rice@kirkland.com

Marianna C. Chapleau
Dayron Silverio
**KIRKLAND & ELLIS LLP**
830 Brickell Plaza,
Miami, FL 33131
Telephone: (305) 432-5687
mchapleau@kirkland.com
dayron.silverio@kirkland.com

**CERTIFICATE OF SERVICE**

I certify that on September 21, 2026, I electronically filed the foregoing with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

/s/ A. Lee Bentley, III
Counsel of Record