**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

FLORIDA HEALTH SCIENCES CENTER, INC. d/b/a TAMPA GENERAL HOSPITAL,

Plaintiff,

v.

ELI LILLY AND COMPANY; and LILLY USA, LLC,

Defendants.

Case No. 8:26-cv-01918-WFJ-LSG

**BRIEF OF PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## INTEREST OF *AMICUS CURIAE*[1]

Pharmaceutical Research and Manufacturers of America ("PhRMA") is a voluntary nonprofit association representing the country's leading innovative biopharmaceutical research companies, which are focused on developing innovative medicines that transform lives and create a healthier world. PhRMA advocates for public policies to ensure patients can access and afford medicines that prevent, treat, and cure disease. PhRMA member companies have invested over $900 billion in the search for new treatments and cures over the last decade.[2]

This case raises questions of critical importance for PhRMA. PhRMA's members participate in the 340B Drug Pricing Program ("340B Program"). They face direct harm from duplicate discounting (where a manufacturer is forced to provide 340B pricing and additional rebates under Medicaid on the same drug), as well as the improper transfer and sale of 340B drugs—both of which are prohibited under federal law. PhRMA's members are committed to the long-term sustainability of 340B and believe that honoring the limits Congress chose to impose on 340B ensures fidelity to Congress's vision for the program, while also safeguarding the delicate balance essential to promote further innovation and research. Plaintiff's suit, however, seeks

[1] No party's counsel authored this brief; no party or party's counsel contributed money intended to fund its preparation or submission; and no person other than *amicus curiae*, its members, and its counsel contributed money intended to fund its preparation or submission. Eli Lilly and Company is a PhRMA member but did not directly contribute financially to the brief's preparation or submission.

[2] *See* PhRMA, *ICYMI: Biopharmaceutical companies in America hit new investment milestone* (Aug. 14, 2026), https://tinyurl.com/5buy8t2p.

to deploy state law to upend the federal law that applies to a wholly federal program—thereby replacing the balance Congress struck in 340B with state-by-state regimes.

## INTRODUCTION

Congress created the 340B Program using its Article I Spending Power. With that power, it struck a specific bargain with manufacturers: Manufacturers agree to "offer" certain drugs at 340B prices, which are sometimes as little as a "penny per unit," to 15 statutorily specified types of healthcare providers known as "covered entities." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024). In exchange, manufacturers' drugs will be eligible for reimbursement under Medicare Part B and Medicaid. *Id.* Because it is a Spending Power program, any obligations that the 340B Program imposes on manufacturers must be "unambiguously" imposed by Congress and agreed to in advance by manufacturers. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("The legitimacy of" such laws "thus rests on whether the [recipient] voluntarily and knowingly accepts the terms of the 'contract.'"); *Landor v. La. Dep't of Corrs. & Pub. Safety*, 146 S. Ct. 1931, 1941 (2026).

Congress intended, and manufacturers agreed to participate in, a program that was limited in scope. As the federal government has explained, Congress sought to ensure that 340B did not become so onerous that manufacturers would opt out and, in the process, leave Medicaid and Medicare Part B. Despite Congress's intention to keep the program limited to maintain that balance, 340B has now ballooned into the second-largest federal drug program. Purchases of 340B-priced drugs have risen dramatically, from $6.6 billion in 2010 to a staggering $179.5 **billion** at list prices in

2025.[3] This massive growth reflects the steady circumvention of the limits Congress imposed on covered entities, such as the prohibitions on obtaining 340B pricing on drugs that are subject to a Medicaid rebate ("duplicate discounting") and transferring or selling 340B-priced drugs to persons who are not their own patients ("diversion").

To maintain Congress's initial intent for the 340B Program, many manufacturers, including Defendants (collectively, "Eli Lilly"), have instituted terms and conditions on their 340B offers to further program integrity. The type of condition at issue in this case, a claims data condition, simply seeks basic information about a prescription for which the reduced price is claimed. This claims data consists of standard information documenting a dispense, such as the medicine and quantity dispensed and the date of dispense. *See* 91 Fed. Reg. at 48,897; Dkt. 20 at 8. Two federal appellate courts have already evaluated the legality of such claims data conditions and held that the 340B statute gives manufacturers the latitude to impose those kinds of reasonable conditions on their offers to sell drugs at 340B prices. *Novartis*, 102 F.4th at 460; *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703-04 (3d Cir. 2023).

That is unsurprising given the vital role claims data plays in preventing fraud and abuse, and the minimal burden it imposes. If a manufacturer suspects a covered entity is engaged in diversion or has sought a duplicate discount, the federal agency

[3] *See* Rory Martin et al., IQVIA, *The Size and Growth of the 340B Program in 2025*, at 3 (June 4, 2026) ("IQVIA"), https://tinyurl.com/y6tmpjnv; 91 Fed. Reg. 48,883, 48,886-87 (Aug. 3, 2026); Rebecca Sachs & Joshua Varcie, Cong. Budget Off., *Spending in the 340B Drug Pricing Program, 2010 to 2021*, at 2 (June 17, 2024), https://tinyurl.com/ykt2d4v9.

overseeing the program, the U.S. Department of Health and Human Services ("HHS"), first requires that the manufacturer establish reasonable cause to audit the entity. Then, following that audit, the manufacturer can proceed to Administrative Dispute Resolution ("ADR") against the covered entity. Because covered entities, and not manufacturers, possess the relevant records, claims data is a vital tool to obtain the "reasonable cause" needed to audit. *See Eli Lilly & Co. v. Kennedy*, 2025 WL 1423630, at *13 (D.D.C. May 15, 2025) (affirming manufacturers' right to "impose data-reporting conditions on covered entities" and explaining why claims data is important to program integrity). Nor does the submission of claims data impose an undue burden. The submission of claims data is neither new nor novel: healthcare entities have long collected and submitted such data. Providing such data is not difficult—it imposes a "minimal burden." *Novartis*, 102 F.4th at 463; 90 Fed. Reg. 36,163, 36,165 (Aug. 1, 2025) (referring to claims data as "readily available").

Tampa General Hospital's ("TGH's") complaint ignores all of that. It seeks, via *state* consumer protection law, to compel a manufacturer to sell drugs at the federal 340B price on the *hospital's* preferred terms—not those agreed to between manufacturers and the federal government. And it seeks to compel that result without abiding by the modest transparency condition that both the D.C. Circuit and the Third Circuit have already explicitly held permissible under federal law. Those claims fail as a matter of law and should be dismissed.

In an effort to circumvent the clear holdings of the D.C. and Third Circuits on the lawfulness of claims data conditions, TGH seeks to use state law, contending that

Eli Lilly's claims data condition prevents it from accessing the 340B price and "effectively increase[s] the cost of covered outpatient drugs above the 340B ceiling price." Dkt. 1 ¶¶ 8-9, 111. But that walks TGH squarely into another issue: As the Supreme Court made clear, Congress vested *HHS* with the authority to oversee manufacturers' compliance with 340B, including the pricing obligation. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 117 (2011). *Astra* teaches that a covered entity's eligibility for 340B pricing is a creature of federal law and enforceable only under the terms federal law provides, which means TGH's state-law claims are barred. *Id.*

The Supreme Court further explained *why* Congress gave HHS this exclusive "control rein": The program's survival depends on a "unitary administrative and enforcement scheme" that balances the interests of covered entities, manufacturers, and patients. *Id.* at 120. Supplanting federal law with state law would upend that balance, inviting a tidal wave of state-law actions by covered entities determined to escape the federal limits that accompany the federal pricing benefit. The stakes thus reach far beyond these parties: If state law can supply the rule of decision for a federal 340B pricing dispute, 50 state-law regimes will displace the single federal standard Congress wrote. *Id.* (decrying the possibility of "a multitude of dispersed and uncoordinated lawsuits"). And manufacturers may face state-law damages across the country for conduct federal law expressly permits. *But see id.* at 121-22 (noting that Congress chose to make federal "adjudicative framework the proper remedy for covered entities"). This type of outcome, directly contrary to *Astra*'s call for 340B to be uniform and balanced, would exponentially increase the costs of participating in

the 340B Program and bring about the very harm that *Astra* warned against.

TGH cannot use state law to seize the benefits of a federal program while shedding its conditions. Allowing TGH's state-law claims to proceed would reward that maneuver and dismantle the transparency tools that work to further program integrity. PhRMA respectfully requests that the Court grant Eli Lilly's motion.

## BACKGROUND

### A. Congress Sought To Maintain A Careful Balance In The 340B Program

The 340B Program is directly connected to two vital nationwide drug programs, Medicare Part B and Medicaid. As the United States explained, "340B requires pharmaceutical manufacturers participating in Medicaid and Medicare Part B to sign agreements with the Secretary of [HHS], under which they agree to offer to sell drugs at reduced prices to certain healthcare providers known as 'covered entities.'" Br. for the U.S. as *Amicus Curiae* at 1, *Pharm. Rsch. & Mfrs. of Am. v. Neronha*, No. 26-1039 (1st Cir. Feb. 25, 2026) ("U.S. *Neronha* Br."). A manufacturer must generally participate in 340B "[i]n order for payment to be available" for its drugs under Medicaid or Medicare Part B. 42 U.S.C. § 1396r-8(a)(1), (a)(5)(A).

Because that participation is voluntary, Congress calibrated the bargain with care: "Congress limited the scope of the 340B Program to ensure that the price of admission wasn't too high, which might have the deleterious effect of causing drug manufacturers to opt out of Medicaid and Medicare Part B." Br. for the U.S. as *Amicus Curiae* at 16, *AstraZeneca Pharms. LP v. Drummond*, No. 25-6183 (10th Cir. Mar. 30, 2026) ("U.S. *Drummond* Br."). Congress drew those limits precisely: manufacturers

need to sell drugs at the 340B price only to covered entities and, in turn, covered entities must abide by federal law prohibitions on diversion and duplicate discounting, among other constraints and requirements. 42 U.S.C. § 256b(a)(4), (a)(5)(A)-(C).

The United States has warned what would follow if that balance is disturbed. "Manufacturers make a business decision to participate," and when they do, "the manufacturers, the federal government, and millions of patients end up better off." U.S. *Neronha* Br. 16. "If the costs of participating in these programs outstrip the benefits, however, rational manufacturers can be expected to withdraw from them." *Id*. That risk is real: Bausch Health recently withdrew from Medicaid and the 340B Program, and dozens of drugs it had supplied are now "no longer available through Medicaid." *Id.* at 16-17. As the United States has cautioned, "[i]f the costs of participation continue to rise, other manufacturers might also withdraw." *Id.* at 17. To ensure the program properly balances these risks and advances Congress's objectives, the determination of what conditions to impose on 340B-participating manufacturers therefore "rests with Congress [and HHS], not the States." *Id.*

B. The Program Has Grown Far Beyond The Agreed Bargain

Driven by profit incentives, the program has grown far beyond what Congress originally envisioned and to which manufacturers agreed. Covered entities currently extract massive profits from the 340B Program by buying 340B-eligible drugs at the reduced 340B price and then selling those drugs at or near full price, pocketing the

difference.[4] This "spread" generates profits for covered entities, while uninsured or low-income patients whom the program was originally intended to help may receive little to no benefit.[5]

Those profit incentives have led to massive growth in the program. At its founding, Congress anticipated a modest program, with roughly 90 participating hospitals and a limited range of clinics. H.R. Rep. No. 102-384, pt. 2, at 13 (1992). But the program has left that modest foundation far behind: As of April 1, 2026, the program encompassed 15,249 covered entities and 49,214 associated sites, and now includes large medical centers and integrated health systems. 91 Fed. Reg. at 48,884. And those covered entities have, in increasing numbers, sought to partner with for-profit pharmacy chains and other pharmacies to dispense drugs to their purported patients (known as "contract pharmacies"). While such arrangements were initially barred (or capped at one per covered entity), now there are almost 240,000 contract pharmacy arrangements, spanning 31,593 pharmacy locations or nearly 60% of all United States pharmacy locations.[6] This all translates into an ever-increasing financial

---

[4] Ryan Long et al., *Cui Bono? Misaligned Incentives in the 340B Program*, at 4 (USC Schaeffer Ctr. for Health Pol'y & Econ.) (2025) ("USC Paper"), https://tinyurl.com/5n6sdbzh; Ellen Gabler, *How a Company Makes Millions Off a Hospital Program Meant to Help the Poor*, N.Y. Times (Jan. 15, 2025), https://tinyurl.com/2pe76dss.

[5] USC Paper at 4; S. Comm. on Health, Educ., Lab. & Pensions, *Congress Must Act To Bring Needed Reforms to the 340B Drug Pricing Program*, at 2 (Apr. 2025) ("Senate Report"), https://tinyurl.com/4dv7tsz2 (acknowledging that studies suggest the 340B benefit "does not translate into increased charity care or lower costs for vulnerable populations" and that a 2014 analysis from HHS found that 27% of covered entities do not offer the discounted 340B price to uninsured patients at any of their contract pharmacies).

[6] Adam J. Fein & Greis Kapexhiu, *The 340B Contract Pharmacy Market in 2026: A Maturing Industry Dominated by Big Chains and PBMs*, Drug Channels (June 2, 2026), https://tinyurl.com/4352ctnu.

cost to manufacturers: In 2010, total 340B spending was about $6.6 billion. By 2025, discounted purchases reached approximately $100 billion, or $179.5 billion at list prices. IQVIA at 3.

## ARGUMENT

### I. Claims Data Conditions Are Permissible Under Federal Law And Support Program Integrity

TGH's position, that it should not have to provide the claims data underlying its 340B-priced purchases, cannot be squared with federal law and has already been rejected by two federal courts of appeals. It also disregards that furnishing claims data is ubiquitous in the industry and imposes a minimal burden while helping to safeguard program integrity.

Under the 340B Program, manufacturers are required to "offer" drugs "at or below" the 340B price to covered entities. 42 U.S.C. § 256b(a)(1). As the D.C. Circuit explained, the statute "merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount." *Novartis*, 102 F.4th at 460. The court then evaluated whether a manufacturer could condition its 340B offer on covered entities "provid[ing] 'claims data associated with all 340B contract pharmacy orders' to a third-party platform" to curb duplicate discounts and diversion. *Id.* at 458. The court held that the statute requires only that a manufacturer "'offer each covered entity covered outpatient drugs for purchase' at or below a specified ceiling 'price,'" and it "preserves—rather than abrogates—the ability of sellers to impose" reasonable conditions. *Id.* at 460; *id.* (stating "including such terms is fully

consistent with making an 'offer' at a specified 'price'"). The court thus held that conditions like requiring the provision of claims data are permissible so long as the 340B offer remains "bona fide." *Id.* at 460, 462. Indeed, the D.C. Circuit noted that HRSA guidance had long allowed manufacturers to require "'standard information'" and obliged covered entities to "maintain auditable records." *Id.* at 463. The court reserved the question of whether "other, more onerous conditions might violate the statute," itself a question of federal law. *Id.* at 464. The Third Circuit ruled similarly. There, manufacturers challenged HRSA enforcement letters aimed at, *inter alia*, policies conditioning 340B pricing on submission of claims data to a third-party platform. *Sanofi*, 58 F.4th at 700-01. Surveying the statute's text, context, and history, the court held such conditions were lawful. *Id.* at 705-06.

Moreover, as the D.C. Circuit recognized, claims data serves important purposes, including to verify "compliance with 340B requirements." *Novartis*, 102 F.4th at 463; *Novartis Pharms. Corp. v. Espinosa*, 2021 WL 5161783, at *8 (D.D.C. Nov. 5, 2021) ("[The manufacturer] convincingly argues that the claims data conditions that it has added to its new 340B policy will enable it to better utilize the anti-fraud audit and ADR procedures that Congress established for manufacturers in Section 340B."). Covered entities and their for-profit pharmacy partners have "a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457-58. As the program has grown, the sheer volume of 340B transactions has outstripped anyone's ability to verify that the claims are valid. *See* Senate Report at 3 (noting that the dramatic increase in covered entities and contract pharmacies "has

amplified the complexity of 340B Program oversight"). Just last month, HRSA sounded the alarm that the fundamental "integrity" of the 340B Program is at "growing risk." 91 Fed. Reg. at 48,887.

Claims data helps solve that problem. It provides information for manufacturers to access the fraud and abuse remedies Congress provided. Under federal law, manufacturers cannot participate in ADR unless they first audit a covered entity. 42 U.S.C. § 256b(d)(3)(B)(iv). But to conduct an audit, HHS asserts that a manufacturer must submit "documentation which indicates that there is reasonable cause" to believe a statutory violation occurred. 61 Fed. Reg. 65,406, 65,409-10 (Dec. 12, 1996). And agency guidelines impose a high threshold to audit. They require manufacturers to submit a detailed audit plan that "set[s] forth a clear description of [their] reasonable cause," identifies "sufficient facts and evidence," and supplies supporting documentation. *Id.*

Because only covered entities (and their pharmacy partners, perhaps) hold the prescription-level records, a manufacturer denied claims data faces a daunting burden to establish that "reasonable cause." For example, to audit for diversion, a manufacturer would need to know if the prescriptions were, in fact, provided to a patient of the covered entity. As to duplicate discounts, a manufacturer would need information about the prescriptions at issue to determine if a Medicaid rebate was sought on a 340B drug. *Id.*; *Kennedy*, 2025 WL 1423630, at *13. Claims data policies provide the method by which to gather that crucial information. Without such data, manufacturers face significant and potentially insurmountable obstacles to accessing

the methods of redress that Congress provided.

Claims data is also critical to ensuring that manufacturers are not required to provide duplicate discounts under the Inflation Reduction Act ("IRA"). The IRA established the Medicare Drug Price Negotiation Program, under which HHS "negotiate[s]" with manufacturers to set "maximum fair price[s]" ("MFPs") for selected drugs. 42 U.S.C. § 1320f-3(a). Manufacturers must provide access to these so-called MFPs for selected drugs, except when the 340B price is lower than the maximum fair price. *Id.* § 1320f-2(d). That is, manufacturers are statutorily protected and need not offer duplicate 340B and "maximum fair price" discounts on the same drug. *Id.* To avoid this IRA duplicate discounting, this scheme necessarily requires identifying when a drug subject to the MFP is dispensed as a 340B drug.

The federal government has purported to place this burden squarely on manufacturers: "CMS is not charged with verifying or otherwise reviewing whether a particular drug claim is a 340B-eligible claim and will not, at this time, assume responsibility for nonduplication of discounts between the 340B ceiling price and MFP." Ctrs. for Medicare & Medicaid Servs., *Medicare Drug Pricing Negotiation Final Guidance*, at 65 (Sept. 30, 2025), https://tinyurl.com/2m8wfzn9; *id.* at 66 (similar). Thus, to avoid paying duplicate discounts under 340B and the IRA, manufacturers must present "[d]ocumentation demonstrating that the claim is 340B-eligible," and "a provider or prescriber ID alone . . . generally will not constitute sufficient evidence that a Part D claim was 340B-eligible." *Id.* at 325.

Nor is the submission of claims data overly burdensome, as TGH alleges.

Claims data is entirely ordinary in the healthcare industry. Prescription-level information of the kind Eli Lilly requires is generated and maintained in the ordinary course of pharmacy and medical billing, and covered entities and their third-party administrators already transmit it routinely to commercial insurers, to Medicare, and to state Medicaid agencies, and exchange it among themselves to administer their own contract pharmacy arrangements.[7] Indeed, the "burden of providing the claims data is minimal." *Novartis,* 102 F.4th at 463. And, consistent with that reality, the federal agency overseeing 340B has long understood that manufacturers may require "standard information" from covered entities. *Id.* (quoting 59 Fed. Reg. 25,110, 25,114 (May 13, 1994)); *see also Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 451 (S.D. W. Va. 2024) (noting that use of claims data is "widespread"). The agency has expressly stated that "claims-level information . . . is already generated and maintained in the ordinary course of pharmacy and medical billing and . . ., in many cases, is already exchanged through existing payer, [third-party administrator], or contract pharmacy relationships." 91 Fed. Reg. at 48,896. Indeed, HRSA mandates the submission of claims data to manufacturers in its new 340B Rebate Model Pilot

[7] 91 Fed. Reg. at 48,894 (noting the "core data elements required for rebate processing, namely, standardized pharmacy and medical claims data, are already generated, maintained, and routinely transmitted by covered entities and their [third-party administrators] in the ordinary course of billing and reimbursement across Medicare, Medicaid, and commercial payers"); App. 1585-86, *AbbVie v. Weiser*, No. 25-cv-1439 (10th Cir. Feb. 19, 2026), Dkt. 26-7 (testimony that claims data is "ubiquitous" in the healthcare industry and noting that State Medicaid "requires claims for reprocessing"); Paluzzi Decl. ¶ 17, *Am. Hosp. Ass'n v. Kennedy,* No. 25-cv-00600 (D. Me. Dec. 10, 2025), Dkt. 45-2 ("Claims data is commonplace and widely used healthcare data that covered entities already generate and share with payers and other government programs."); PhRMA Comment at 17-19 (Apr. 2026), https://tinyurl.com/4w4ryah8 (explaining that this type of data is already "necessary for billing both private and government insurance payers and inventory management").

Program. *Id.* at 48,890. Far from an unreasonable or unlawful burden, then, claims data submission is standard industry practice endorsed by courts and HRSA.

## II. Under *Astra*, 340B Pricing Disputes Must Be Resolved Under Federal Law

Considering the above and for a host of additional reasons, PhRMA agrees with Eli Lilly that TGH's complaint must be dismissed, including especially that TGH's claims are barred under the Supreme Court's decision in *Astra*. TGH seeks damages and permanent injunctive relief under state law because Eli Lilly allegedly "cut off TGH's access to 340B discounts on all of Lilly's 340B-eligible products." Dkt. 1 ¶ 8, Prayer for Relief. *Astra* squarely forbids seeking to enforce the federal price outside of Congress's specified remedial regime, so TGH's claims are barred at the threshold.

### A. *Astra* Holds That Access To 340B Pricing Is Governed By Federal Law

*Astra*'s holding follows directly from the statutory text. The statute sets forth the obligation (to "offer" drugs at the 340B price) and to whom such offers must be made. *See* 42 U.S.C. §§ 256b(a)(1), (4)-(5). And again, under that statutory text, manufacturers may include claims data conditions in their 340B offers, so long as the offer remains "bona fide." *Novartis*, 102 F.4th at 460-62. Congress vested "the Secretary" of HHS with the exclusive authority to provide for "compliance by manufacturers" with 340B "discounted pricing requirements." 42 U.S.C. § 256b(d)(1)(A). TGH cannot replace that authority with state alternatives.

In *Astra*, the Supreme Court held that covered entities suing manufacturers for purportedly impermissibly charging more than the 340B ceiling price could not maintain their claims. 563 U.S. at 113. The covered entities there sought to enforce,

as third-party beneficiaries, the Pharmaceutical Pricing Agreements ("PPAs") that manufacturers sign with the federal government. *Id.* at 116. The Court held that the suit was "incompatible with the statutory regime" because the covered entities had no private right of action. *Id.* at 113; *id.* at 117 ("Congress vested authority to oversee compliance with the 340B Program in HHS and assigned no auxiliary enforcement role to covered entities."). The statute, the Court explained, required HHS to implement "formal procedures for resolving overcharge claims," which covered entities were exclusively required to use. *Id.* at 116.

TGH's claims are substantively indistinguishable from those forbidden in *Astra*. There, the covered entities tried to end-run Congress's decision to withhold a private right of action by suing as "third party beneficiaries of the PPAs to which the manufacturers subscribed." *Id.* at 113. The Court unanimously rejected that attempt. What mattered was substance: The suit rested on allegations that the manufacturers were not providing the 340B ceiling price. So covered entities had to proceed through Congress's specified remedial regime. *Id.* at 121-22 (Congress chose "to make the new adjudicative framework the proper remedy for covered entities complaining of 'overcharges and other violations of the discounted pricing requirements'"). As a result, the covered entities' suit was barred. *Id.*

So too here. TGH alleges that Eli Lilly has unlawfully "cut off" TGH's "access" to "340B discounts," and it pleads that as a result, it "must spend an average of 25-50% more" for Eli Lilly's 340B-eligible products. Dkt. 1 ¶ 8; *id.* ¶ 111 ("TGH has been required to pay wholesale acquisition cost."). Every element of that grievance, the

purported entitlement, the price, and the asserted injury (paying more than the federally specified price), derives from the 340B statute and must be adjudicated according to its terms and through the specified federal regime. *Astra*, 563 U.S. at 114 ("Congress placed the Secretary . . . in control of § 340B's drug-price prescriptions."); 42 C.F.R. § 10.21(a)(1) (covering claims that a manufacturer allegedly "overcharged . . . for a covered outpatient drug" or "limited the covered entity's ability to purchase covered outpatient drugs at . . . the 340B ceiling price").

TGH cannot evade *Astra* by relying on the fact that its claims purportedly arise under state law: Federal courts have refused to let plaintiffs seek to enforce the federal 340B benefit using state-law claims, as TGH seeks to do here. In *Sagebrush Health Services v. Amgen Inc.*, a district court applied *Astra* and dismissed a covered entity's state-law claims that a manufacturer had unlawfully clawed back its reduced 340B prices. No. 26-cv-00466, 2026 WL 1030817, at *5-8 (C.D. Cal. Apr. 15, 2026). The court noted that the plaintiff "ha[d] dressed its claims in the clothing of California law." *Id.* at *6. But, in substance, those claims were "all rooted in [p]laintiff's assertion that it is entitled to purchase drugs at 340B discounted prices." *Id.* So, the covered entity's suit was "nothing more than an attempt to enforce its right to purchase Defendant's drugs at 340B prices." *Id.* And, under *Astra*, such suits are barred. *Id.* at *6-7 (concluding such a suit would also "work directly against the unitary enforcement mechanism Congress designed"). The court also rejected the plaintiff's effort to limit *Astra*'s holding to "third-party beneficiary contract claims," noting that *Astra*'s reasoning was equally applicable to the state-law claims before it. *Id.* at *7. Along

similar lines, in *AIDS Healthcare Foundation v. Apexus, LLC*, the Ninth Circuit affirmed dismissal of a covered entity's claim under California's Unfair Competition Law against the 340B Prime Vendor for failing to negotiate drug prices, again relying on *Astra*. 2024 WL 3886974, at *2 (9th Cir. Aug. 21, 2024) ("[Section] 340B evinces no Congressional intent to permit covered entities to directly enforce those statutory obligations in federal court.").[8] TGH's claims, which are self-admittedly about access to the 340B price and designed to obtain that price, are barred by *Astra*.

B. Substituting 50 State-Law Regimes Would Destabilize The Program

*Astra*'s reasoning confirms why it must apply with full force here: Congress vested exclusive enforcement authority in HHS because a program of this scale can function only through "centralized enforcement" via a "unitary administrative and enforcement scheme." 563 U.S. at 120. Allowing covered entities to convert state law into private rights of action Congress withheld poses a "substantial" risk of "spawn[ing] a multitude of dispersed and uncoordinated lawsuits by 340B entities" and of "conflicting adjudications" that threaten the program's survival. *Id.*

340B rests on a bargain, not a mandate. As explained above, manufacturers do not have to participate. Congress thus recognized that it had to offer manufacturers a "strong incentive[]" to participate, because rational economic actors would not otherwise sell their products at steeply reduced prices. It supplied that incentive by

[8] *Astra*'s application outside the 340B context further confirms it controls here. *See SpecialtyCare Inc. v. Meritain Health, Inc.*, 2026 WL 353259, at *5, 7 (D. Del. Feb. 9, 2026) (applying *Astra* to dispute resolution award under the federal No Surprises Act); *Bauer v. Elrich*, 8 F.4th 291, 300 & n.6 (4th Cir. 2021).

conditioning Medicaid and Medicare Part B coverage of a manufacturer's drugs on the manufacturer's participation in 340B. 42 U.S.C. §§ 1396r-8(a)(1), 256b(a). Congress calibrated that bargain carefully, striking a "delicate balance" to preserve the "bargain between drug manufacturers and the federal government." *AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266, 1277 (W.D. Okla. 2025). As *Astra* recognized, the Medicaid Drug Rebate Program and the 340B Program are "interdependent," meaning an "adjudication of rights under one program must proceed with an eye towards any implications for the other." 563 U.S. at 120. The Court thus held that HHS, as the administrator of both, is best positioned to address issues that arise and to maintain overall balance. Among other things, effective administration of that balance, between the federal government and manufacturers, and between 340B and Medicaid/Medicare Part B, depends on the federal government's ability to control participants' economic incentives. The passage of the IRA, as discussed above, further compounds these issues.

TGH's claims would upend these federal statutory frameworks. Manufacturer conditions requiring claims data have been consistently upheld in the federal remedial process.[9] A November 2025 ADR Panel Decision, for example, dismissed a covered entity's petition challenging a manufacturer's claims data condition.[10] Applying *Novartis*, the Panel held that 340B "does not categorically prohibit manufacturers from

[9] HHS, Health Res. & Servs. Admin., 340B ADR Decision Summaries (July 16, 2026), https://tinyurl.com/3wzcjk78.

[10] Nov. 2025 Decision at 1; *Novartis v. Drummond*, No. 25-6182 (10th Cir. Mar. 24, 2026), Dkt. 62-3.

imposing conditions on the distribution of covered drugs to covered entities," and that the claims data condition was permissible. *Id.* at 2. TGH does not like the answer federal law supplies, so it asks this Court to supply a different one under state law.

But if covered entities may weaponize state consumer protection law to circumvent 340B's terms, the economic calculus of participation changes for every manufacturer. Manufacturers will no longer have clear notice up front of what obligations they take on via participation in the 340B Program, and every additional state-imposed obligation will further skew the economics of participation. Indeed, this case itself illustrates the danger. Eli Lilly agreed to participate in 340B, with its defined set of obligations and remedies. Now, Eli Lilly is being forced to defend itself in court on *state law* claims—wholly outside of the scope of the bargained-for agreement with the federal government. The relief Plaintiff seeks further underscores the threat. TGH seeks compensatory damages, injunctive and declaratory relief, attorneys' fees and costs, pre- and post-judgment interest, all outside of the federal system. *Compare* Dkt. 1 Prayer for Relief, ¶¶ 1-6, *with* 42 U.S.C. § 256b(d)(1)(B)(vi)(II)-(III) (authorizing only "sanctions in the form of civil monetary penalties" that "shall not exceed $5,000 for each instance of overcharging," and only for intentional conduct).

Permitting these types of state-law suits would accordingly expose 340B manufacturers to the very disorder Congress sought to avoid. They could face a tidal wave of litigation in 50 jurisdictions seeking damages under disparate consumer protection and other state-law theories for conduct federal law permits. *See Astra*, 563 U.S. at 120 (warning that private enforcement suits by 340B entities seeking to

circumvent the statutory channels for relief "could spawn a multitude of dispersed and uncoordinated lawsuits by 340B entities"); *Sagebrush*, 2026 WL 1030817, at *6 ("If a covered entity could avoid HRSA's ADR process by suing to recover discounts to which it claims entitlement under a tort theory like conversion . . . every covered entity would file separate lawsuits[.]").

Manufacturers would then face a stark choice. Manufacturers consider "costs cumulatively when deciding whether to participate in Medicare and Medicaid." Br. for the U.S. as *Amicus Curiae* at 20-22, *Pharm. Rsch. & Mfrs. of Am. v. McCuskey*, No. 25-1054 (4th Cir. July 10, 2026), Dkt. 178-1 ("U.S. *McCuskey* Br."). Indeed, one manufacturer has already withdrawn. *See* U.S. *Neronha* Br. 16.[11] As the United States recognized, rising costs of participation may prompt other manufacturers to do the same. *Id.* at 16-17. To safeguard against such an outcome and the resulting severe consequences, "[t]he determination of what conditions to impose on 340B-participating manufacturers rests with Congress, not the States. Only the federal government can determine the extent to which it will tolerate the risk of manufacturer withdrawal." U.S. *McCuskey* Br. 21. *Astra* thus compels a single conclusion: Because TGH's suit centers on access to the 340B price, its claims must be resolved via the federal remedial regime under federal law, not under TGH's state-law theories.

## CONCLUSION

PhRMA respectfully urges the Court to grant Eli Lilly's motion.

[11] Although *Neronha* involves a challenge to a state statutory law, the United States' concerns about the rising costs of participation remain applicable here.

September 28, 2026

Respectfully submitted,

*/s/ Jonathan L. Williams*
Jonathan L. Williams
Andrew D. Prins (*pro hac vice* pending)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Tel. (202) 637-2200
jonathan.williams@lw.com
andrew.prins@lw.com

*Attorneys for Amicus Curiae*
*Pharmaceutical Research and*
*Manufacturers of America*