**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

FLORIDA HEALTH SCIENCES CENTER, INC. d/b/a TAMPA GENERAL HOSPITAL,

Plaintiff,

v.

ELI LILLY AND COMPANY; and LILLY USA, LLC,

Defendants.
_______________________________/

Case No. 8:26-cv-01918-WFJ-LSG

Jury Trial Demanded

**TAMPA GENERAL HOSPITAL'S OPPOSITION TO**
**ELI LILLY'S MOTION TO DISMISS**

# TABLE OF CONTENTS

*Page*


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

RELEVANT BACKGROUND .......... 1

A. TGH, Lilly's Claims-Data Demands, and TGH's Complaint .......... 1

B. Section 340B And Its Legal And Regulatory Landscape .......... 3

LEGAL STANDARD .......... 7

ARGUMENT .......... 7

I. *ASTRA* DOES NOT BAR TGH'S CLAIMS .......... 7

A. Astra Does Not Govern Independently Arising State Law Claims .......... 8

B. TGH's Declaratory and Injunctive Claims Do Not Fall Under Astra .......... 10

C. TGH's Actual Damages Claims Do Not Fall Under Astra .......... 11

II. THE CLAIMS ARE NOT PREEMPTED .......... 15

A. There Is No Conflict Between the Application of FDUTPA and Federal Law .......... 15

B. Congress Has Not Displaced State Law Touching the Field of 340B Pricing .......... 18

III. INTERGOVERNMENTAL IMMUNITY DOES NOT APPLY .......... 19

IV. TGH'S UNFAIR TRADE PRACTICES CLAIM IS WELL PLED .......... 20

A. The Complaint Alleges Unconscionable Conduct .......... 20

B. The Complaint Alleges Deceptive Conduct .......... 22

**TABLE OF CONTENTS**
(continued)

*Page*

C. The Complaint Alleges Unfair Conduct ........................................... 26

V. TGH'S UNFAIR COMPETITION CLAIM IS WELL PLED .................... 27

VI. LILLY'S CONDUCT IS NOT WITHIN FDUTPA'S SAFE HARBOR ..... 32

CONCLUSION ........................................................................................ 35

# TABLE OF AUTHORITIES

*Page*

**Cases**

*AbbVie Inc. v. Jackley*,
2026 WL 2280929 (D.S.D. Aug. 7, 2026) ............ 16, 19

*AbbVie, Inc. v. Fitch*,
152 F.4th 635 (5th Cir. 2025) ............ 7, 16-18

*AbbVie, Inc. v. Murrill*,
180 F.4th 747 (5th Cir. 2026) ............ 20

*AbbVie, Inc. v. Weiser*,
811 F. Supp. 3d 1264 (D. Colo. 2025) ............ 18

*AIDS Healthcare Foundation v. Apexus, LLC*,
2024 WL 3886974 (9th Cir. Aug. 21, 2024) ............ 8

*American Hospital Association v. Department of Health & Human Services*,
2021 WL 616323 (N.D. Cal. Feb. 17, 2021) ............ 14

*American Hospital Association v. Hargan*,
289 F. Supp. 3d 45 (D.D.C. 2017) ............ 17

*American Hospital Association v. Kennedy*,
2026 WL 372131 (D. Me. Feb. 10, 2026) ............ 6

*American Hospital Association v. Kennedy*,
820 F. Supp. 3d 30 (D. Me. 2025) ............ 6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............ 7

*Astra USA, Inc. v. Santa Clara County, California*,
563 U.S. 110 (2011) ............ *passim*

*Basulto v. Hialeah Automotive*,
141 So. 3d 1145 (Fla. 2014) ............ 21

*Bristol Myers Squibb Co. v. Becerra*,
2024 WL 1855054 (D.N.J. Apr. 29, 2024) ............ 3

**TABLE OF AUTHORITIES**
(continued)

Page

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) .......... 29

*Buckman Co. v. Plaintiffs' Legal Committee*,
531 U.S. 341 (2001) .......... 17-18

*California v. ARC America Corp.*,
490 U.S. 93 (1989) .......... 17

*Carriuolo v. General Motors Co.*,
823 F.3d 977 (11th Cir. 2016) .......... 12

*City & County of San Francisco v. Purdue Pharma L.P.*,
491 F. Supp. 3d 610 (N.D. Cal. 2020) .......... 9

*Clipper Marine, Ltd. v. Marlow-Hunter, LLC*,
2014 WL 7178105 (M.D. Fla. Dec. 16, 2014) .......... 23-24

*Coast Pump & Supply Co. v. Franklin Electric Co.*,
2025 WL 2676430 (M.D. Fla. Sep. 18, 2025) .......... 12, 25-26

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*,
79 F.3d 182 (1st Cir. 1996) .......... 29

*Coffey v. WCW & Air, Inc.*,
2020 WL 3250744 (N.D. Fla. Mar. 25, 2020) .......... 21

*Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*,
332 F. App'x 565 (11th Cir. 2009) .......... 23

*CRMSuite Corp. v. General Motors Co.*,
2021 WL 914170 (M.D. Fla. Mar. 10, 2021) .......... 23-24

*Dawson v. Steager*,
586 U.S. 171 (2019) .......... 20

*DeCurtis LLC v. Carnival Corp.*,
2021 WL 7539904 (S.D. Fla. Feb. 9, 2021) .......... 29

**TABLE OF AUTHORITIES**
(continued)

Page

*Degutis v. Financial Freedom, LLC*,
978 F. Supp. 2d 1243 (M.D. Fla. 2013) .......... 15-16

*Deltona Transformer Corp. v. NOCO Co.*,
186 F.4th 1313 (11th Cir. 2026) .......... 10, 12

*Eli Lilly & Co. v. United States Department of Health & Human Services*,
2021 WL 5039566 (S.D. Ind. Oct. 29, 2021) .......... 32

*Fields v. United Network for Organ Sharing*,
2025 WL 1309807 (M.D. Fla. May 6, 2025) .......... 6 n.1

*Fitzpatrick v. General Mills, Inc.*,
635 F.3d 1279 (11th Cir. 2011) .......... 23, 25

*Fox v. Ritz-Carlton Hotel Co., LLC*,
2022 WL 6566991 (S.D. Fla. Aug. 11, 2022) .......... 32

*Federal Trade Commission v. Actavis, Inc.*,
570 U.S. 136 (2013) .......... 31-32

*Federal Trade Commission v. Roca Labs, Inc.*,
345 F. Supp. 3d. 1375 (M.D. Fla. 2018) .......... 24

*Federal Trade Commission v. Simple Health Plans LLC*,
379 F. Supp. 3d 1346 (S.D. Fla. 2019) .......... 24

*Federal Trade Commission v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972) .......... 27-28

*Guerrero v. Target Corp.*,
889 F. Supp. 2d 1348 (S.D. Fla. 2012) .......... 25

*Harrod v. Express Scripts, Inc.*,
2017 WL 11615769 (M.D. Fla. Nov. 27, 2017) .......... 24

*Herazo v. Whole Foods Market, Inc.*,
2015 WL 4514510 (S.D. Fla. July 24, 2015) .......... 34

**TABLE OF AUTHORITIES**
(continued)

Page


*Kukorinis v. Walmart, Inc.*,
2023 WL 4364454 (M.D. Fla. July 6, 2023) .... 24

*Lendinara v. Swedish Match North America, LLC*,
2025 WL 3699694 (S.D. Fla. Dec. 15, 2025) .... 22

*Mack v. Bristol-Myers Squibb Co.*,
673 So. 2d 100 (Fla. 1st DCA 1996) .... 27

*Marrache v. Bacardi U.S.A., Inc.*,
17 F.4th 1084 (11th Cir. 2021) .... 15, 18

*Martorella v. Deutsche Bank National Trust Co.*,
2015 WL 11347664 (S.D. Fla. Aug. 6, 2015) .... 26

*McWane, Inc. v. Federal Trade Commission*,
783 F.3d 814 (11th Cir. 2015) .... 29-30

*Millennium Communications & Fulfillment, Inc. v. Office of Attorney General, Department of Legal Affairs, State of Florida*,
761 So. 2d 1256 (Fla. 3d DCA 2000) .... 27

*Mink v. Smith & Nephew, Inc.*,
860 F.3d 1319 (11th Cir.2017) .... 9

*MJS Music Publications, LLC v. Hal Leonard Corp*,
2006 WL 1208015 (M.D. Fla. May 4, 2006) .... 25-26

*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*,
156 F.4th 68 (2d Cir. 2025) .... 9, 11, 13

*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*,
2026 WL 1842636 (W.D.N.Y. June 26, 2026) .... 13

*Moss v. Walgreen Co.*,
765 F. Supp. 2d 1363 (S.D. Fla. 2011) .... 10

**TABLE OF AUTHORITIES**
(continued)

Page

*Murphy v. National Collegiate Athletic Association*,
584 U.S. 453 (2018) .......... 18

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) .......... 32

*North Dakota v. United States*,
495 U.S. 423 (1990) .......... 19

*Novartis Pharmaceuticals Corp. v. Brown*,
2026 WL 1660347 (W.D. Wash. June 9, 2026) .......... 3

*Novartis Pharmaceuticals Corp. v. Espinosa*,
2021 WL 5161783 (D.D.C. Nov. 5, 2021) .......... 5

*Novartis Pharmaceuticals Corp. v. Frey*,
2025 WL 2813787 (D. Me. Sep. 23, 2025) .......... 16

*Novartis Pharmaceuticals Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) .......... 5, 32

*Novartis Pharmaceuticals Corp. v. Kennedy*,
182 F.4th 1027 (D.C. Cir. 2026) .......... 6

*O'Melveny & Myers v. FDIC*,
512 U.S. 79 (1994) .......... 17, 19

*Ong v. Brown, Rudnick, Freed, Gesmer, P.A.*,
No. 94-478-CIV, 1994 WL 143075 (M.D. Fla. Apr. 12, 1994) .......... 22-23

*Oregon Health & Science University v. Engels*,
2025 WL 1707630 (D.D.C. June 17, 2025) .......... 4

*Pharmaceutical Research & Manufacturers of America v. Frey*,
2026 WL 184504 (D. Me. Jan. 23, 2026) .......... 5, 7, 19

*Pharmaceutical Research & Manufacturers of America v. McClain*,
95 F.4th 1136 (8th Cir. 2024) .......... 18

**TABLE OF AUTHORITIES**
(continued)

Page

*Pop v. LuliFama.com LLC*,
145 F.4th 1285 (11th Cir. 2025) ........ 22

*Prates v. Westgate Resorts, Ltd.*,
2016 WL 11774203 (M.D. Fla. Aug. 4, 2016) ........ 24

*Regeneron Pharmaceuticals., Inc. v. Novartis Pharma AG*,
96 F.4th 327 (2d Cir. 2024) ........ 30-31

*Sagebrush Health Services v. Amgen Inc.*,
2026 WL 1030817 (C.D. Cal. Apr. 15, 2026) ........ 13-14

*Sanofi-Aventis U.S. LLC v. United States Department of Health & Human Services*,
58 F.4th 696 (3d Cir. 2023) ........ 33

*Schering-Plough Corp. v. Federal Trade Commission*,
402 F.3d 1056 (11th Cir. 2005) ........ 32

*Schojan v. Papa Johns International, Inc.*,
2014 WL 6886041 (M.D. Fla. Dec. 8, 2014) ........ 26

*State of Florida, Office of Attorney General, Department of Legal Affairs v. Commerce Commercial Leasing, LLC*,
946 So. 2d 1253 (Fla. 1st DCA 2007) ........ 21

*State of Florida, Office of Attorney General, Department of Legal Affairs v. Tenet Healthcare Corp.*,
420 F. Supp. 2d 1288 (S.D. Fla. 2005) ........ 34

*Stuart Roofing, Inc. v. Thomas*,
372 So. 3d 298 (Fla. 4th DCA 2023) ........ 12

*Thompson Nation Holdings LLC v. Gonzalez*,
419 So. 3d 1203 (Fla. 3d DCA 2025) ........ 10

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ........ 30

**TABLE OF AUTHORITIES**
(continued)

*Page*

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) .......... 31

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .......... 28

*United States v. Visa U.S.A., Inc.*,
344 F.3d 229 (2d Cir. 2003) .......... 28

*United States v. Washington*,
596 U.S. 832 (2022) .......... 19-20

*United States Equal Employment Opportunity Commission v. Princess Martha, LLC*,
2025 WL 1101476 (M.D. Fla. Apr. 14, 2025) .......... 6 n.1

*Valiente v. Unilever United States, Inc.*,
2022 WL 18587887 (S.D. Fla. Dec. 8, 2022) .......... 34

*Wyeth v. Levine*,
555 U.S. 555 (2009) .......... 17

*Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*,
123 So. 3d 1149 (Fla. 5th DCA 2012) .......... 10

*Ziemba v. Cascade International, Inc.*,
256 F.3d 1194 (11th Cir. 2001) .......... 23

**Statutes**

42 U.S.C. § 256b .......... 3-4, 16, 34

Fla. Stat. § 501.202 .......... 7

Fla. Stat. § 501.204 .......... *passim*

Fla. Stat. § 501.211 .......... 7, 10, 12

# TABLE OF AUTHORITIES
(continued)

*Page*

Fla. Stat. § 501.212 .......... 32

Fla. Stat. § 817.41 .......... 1

**Other Authorities**

59 Fed. Reg. 25,110 (May 13, 1994) .......... 33

61 Fed. Reg. 65,406 (Dec. 12, 1996) .......... 4, 33

89 Fed. Reg. 28,643 (April 19, 2024) .......... 4

91 Fed. Reg. 48,883 (Aug. 3, 2026) .......... 6

H.R. Rep. No. 102-384 (1992) .......... 3

## INTRODUCTION

The Court should deny Lilly's Motion as to Counts I and II. Lilly recasts those counts as an effort to enforce the federal 340B statute through a side door. They are not. TGH sues under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) for Lilly's own sales and marketing conduct. FDUTPA bars deceptive, unfair, anticompetitive, and unconscionable practices by sellers of regulated and unregulated products alike, and protects Florida consumers like TGH when a manufacturer like Lilly flouts the requisite standards of fair play.

Lilly's argument reduces to the untenable proposition that because federal regulation touches a drug's price, the manufacturer may experiment at will with delivery, sales, and marketing while states stand powerless when consumers are harmed. To the contrary, Section 340B is limited in scope: it governs the prices at which covered drugs are sold, who may buy them, and an administrative process for resolving pricing, diversion, and duplicate-discount disputes. It does not regulate manufacturer-participants' sales and marketing practices, and nothing in it suggests Congress meant to bar states from addressing those practices.

TGH admits that it has not adequately alleged a statutory predicate for a *per se* violation of FDUTPA under Count III. TGH requests leave to amend that count, as a viable predicate may exist under Fla. Stat. § 817.41 (misleading advertising).

## RELEVANT BACKGROUND

### *A. TGH, Lilly's Claims-Data Demands, and TGH's Complaint*

TGH is a Florida nonprofit operating one of the state's most comprehensive

medical facilities, with nearly 1,000 licensed beds and the region's only Level 1 Trauma Center. Compl. ¶ 17. It is a federally designated disproportionate share hospital that treats patients regardless of ability to pay, and it participates in the 340B Program to serve them. *Id.* ¶¶ 17, 28. TGH purchases millions of dollars of Lilly drugs, many indispensable to patients. *Id.* ¶¶ 32, 77, 81.

In January 2026, Lilly announced that, effective February 1, every covered entity would have to submit claims-level data, including in-house pharmacy dispensing and medical claims across Lilly's entire portfolio, through a single Lilly-designated platform, or lose 340B pricing. *Id.* ¶¶ 6, 68. Given the burden, TGH sought to understand the demands and develop a solution, to no avail. *Id.* ¶¶ 71-75, 82.

On June 1, 2026, Lilly sent TGH a "Final Notice" giving TGH five business days to comply or be cut off and subjected to millions in financial penalties. *Id.* ¶ 83. TGH stated that it was not rejecting Lilly's demands but requested an extension to conduct due diligence on their legal, operational, and privacy implications. *Id.* ¶ 85.

TGH sent another letter, also ignored, and on or about June 18, 2026, Lilly cut off TGH's 340B pricing for its full line, including products without substitutes. *Id.* ¶¶ 85, 86. Prices rose immediately: a unit of Mounjaro jumped from $750.52 to $1,019.74, a 35.9% increase, with comparable hikes across the line. *Id.* ¶¶ 86-87. The cutoff will cost TGH roughly $24.7 million a year. *Id.* ¶¶ 88-89, 115, 125.

On July 2, 2026, TGH filed this FDUTPA action for actual damages and declaratory and injunctive relief, alleging that Lilly's conduct is an unfair method of competition and an unfair, deceptive, and unconscionable trade practice. *Id.* ¶¶ 101-55

& Prayer for Relief.

### *B. Section 340B And Its Legal And Regulatory Landscape*

**A Program Born of Manufacturers' Manipulation.** Manufacturers voluntarily participate in Medicare and Medicaid, which cover "almost half the domestic" drug market. *Bristol Myers Squibb Co. v. Becerra*, No. 23-3335, 2024 WL 1855054, at *7 (D.N.J. Apr. 29, 2024). Pre-1990, Medicaid paid full price while private buyers got discounts, so Congress enacted the Medicaid Drug Rebate Program, requiring rebates based on the "best price" given other purchasers. Compl. ¶ 23. Manufacturers then "promptly cancelled discount contracts, terminated special-price practices, and raised the prices they charged public hospitals." H.R. Rep. No. 102-384, at 10 (1992). Congress enacted the 340B Program in response. Compl. ¶ 23.

**The Program**. The 340B Program lets "covered entities," including qualifying hospitals with a high share of low-income patients, buy certain outpatient medicines at reduced cost and use the savings to expand access for vulnerable populations. *Id.* ¶¶ 4, 24, 26. For almost 30 years, covered entities have received point-of-sale discounts to manage acquisition costs. *Id.* ¶ 5. TGH is a covered entity. *Id.* ¶ 28.

Manufacturers enter Pharmaceutical Pricing Agreements ("PPAs") with HHS that "memorialize the parties' 340B obligations[.]" *Novartis Pharmaceuticals Corp. v. Brown*, No. 3:26-cv-05302, 2026 WL 1660347, at *1 (W.D. Wash. June 9, 2026) (citing 42 U.S.C. § 256b(a)(1)). The PPAs require manufacturers to "offer each covered entity covered outpatient drugs . . . at or below the applicable ceiling price if" the drugs are available to "any other purchaser at any price." Compl. ¶ 25. Lilly signed a PPA. *Id.*

¶¶ 7, 55-58.

**<u>Audits and ADR</u>**. The Health Resources and Services Administration (HRSA), not manufacturers like Lilly, oversees 340B compliance. *Id.* ¶ 37. That includes manufacturer-initiated audits (by independent accountants under HRSA-approved plans) on a showing of reasonable cause to suspect noncompliance, *id.* ¶¶ 44-47, and alternative dispute resolution (ADR) to resolve (i) overcharge claims and (ii) post-audit claims of duplication or diversion. *Id.* ¶¶ 49-52.

The audit-triggering standard is met when "a reasonable person *could* believe that a covered entity *may have* violated" the statute. HRSA, *Manufacturer Audit Guidelines and Dispute Resolution Process*, 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). It is satisfied by "[s]ignificant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity." *Id.* at 65,406; *Or. Health & Sci. Univ. v. Engels*, No. 24-2184, 2025 WL 1707630, at *2 (D.D.C. June 17, 2025).

Obtaining an audit does not require conscripting data. Congress lets manufacturers access records through the audit, 42 U.S.C. § 256b(a)(5)(C), where parties may "gather needed information" to establish claims. 89 Fed. Reg. 28,643, 28,652 (April 19, 2024). The Complaint alleges Lilly never invoked this process as to TGH, instead demanding a standing, prescription-by-prescription data feed for every sale. Compl. ¶¶ 44-47, 53-54. TGH does not ask the Court to decide whether Lilly can show reasonable cause; the point is only that the audit-then-ADR mechanism

remained an available alternative to self-help. *See Pharm. Rsch. & Mfrs. of Am. v. Frey*, No. 1:25-cv-00469, 2026 WL 184504, at *14 (D. Me. Jan. 23, 2026), *appeal filed* No. 26-1099 (1st Cir.) (rejecting challenge to state ban on demands like Lilly's).

**Rejection of Unilateral Drug-Maker Conditions and Restrictions**. Courts and HRSA have rejected manufacturers' unilateral restrictions. Compl. ¶¶ 60-64. Courts have also routinely upheld state bans on limiting delivery or conditioning discounts on data production. *Frey*, 2026 WL 184504, at *4 (noting roughly 20 states enacting, and at least nine courts declining to enjoin the enforcement of statutes prohibiting limits on contract pharmacies or data demands).

Lilly cites *Novartis Pharmaceuticals Corp. v. Johnson*, Mot. at 16-17, where the court rejected HRSA's sweeping position that "Section 340B prohibits drug manufacturers from imposing *any* conditions on the distribution of discounted drugs to covered entities." 102 F.4th 452, 459 (D.C. Cir. 2024). But it declined to "foreclose the possibility that other, more onerous conditions . . . might violate the statute." *Id.* at 464. And *Johnson* arose from restrictions on contract-pharmacy use, where the stakes were "your data or your right to use multiple contract pharmacies instead of just one," not the much more severe "your data or your discount" condition here. No case Lilly cites approves a "your data or your discount" policy, and TGH does not allege it uses contract pharmacies, so those cases are inapposite. *See, e.g.*, *Novartis Pharms. Corp. v. Espinosa*, No. 21-cv-1479, 2021 WL 5161783, at *9 (D.D.C. Nov. 5, 2021).

**Proposed Pilot 340B Rebate Program**. Lilly invokes HRSA's pilot rebate

program,[1] which a district court previously preliminarily enjoined for failing to weigh covered entities' burden and reliance interests and HRSA vacated. *Am. Hosp. Ass'n v. Kennedy*, 820 F. Supp. 3d 30, 45-48 (D. Me. 2025); *Am. Hosp. Ass'n v. Kennedy*, 2026 WL 372131, at *1 (D. Me. Feb. 10, 2026) (upholding preliminary injunction).

HRSA later issued a Notice Regarding 340B Rebate Model, identifying a limited set of the costliest and most widely used drugs, none from Lilly, for a trial beginning January 1, 2027. 91 Fed. Reg. 48,883 (Aug. 3, 2026). The notice does not support Lilly's self-help approach: it reaches less than 5.5% of 340B drugs, not *all* drugs, *id.*, and "*decline[s] . . . to require additional data elements proposed by manufacturers* including purchasing data, encounter data, invoice-level information, and patient level information." *Id.* at 48,896. It also proposes penalties on manufacturers who fail to timely pay or unjustifiably deny transactions. *Id.* at 48,895. Moreover, the notice relied upon by Lilly is now subject to a pending challenge seeking injunctive relief. *See* Compl., *Am. Hosp. Ass'n v. Kennedy*, No. 1:26-cv-00515 (D. Me. Oct. 9, 2026).

A court also rejected manufacturers' unilateral rebate models, holding that "the statute places the Secretary, not the manufacturers, in the driver's seat." *Novartis Pharmaceuticals Corp. v. Kennedy*, 182 F.4th 1027, 1035 (D.C. Cir. 2026).

**State Remedies Remain Available to Consumers.** Lilly's premise that covered

[1] Lilly asks the court to rely on its interpretation of the substance of Federal Register publications, but the court should not do so if their meaning is contested, as it is here. *See Fields v. United Network for Organ Sharing*, 2025 WL 1309807, at *2 (M.D. Fla. May 6, 2025) (declining judicial notice request because mere fact that information appeared in Federal Register did not mean it was not subject to reasonable dispute); *EEOC v. Princess Martha, LLC*, 2025 WL 1101476, at *2 (M.D. Fla. Apr. 14, 2025) (judicial notice inappropriate where Federal Register regulation did not establish the fact at issue).

entities "must" bring every grievance to HRSA while manufacturers police compliance by self-help, Mot. at 6, finds no support in the 340B statute. Where Section 340B has not "provide[d] a full set of standards governing" conduct, States may supply additional standards in "traditional general areas of state regulation and police power: public health and consumer protection." *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 646 (5th Cir. 2025). *Frey* rejected preemption of state law applied to similar demands and refusals to deal, holding Congress's silence does not confer on manufacturers "a right to be free from all state law requirements regarding" distribution of 340B drugs "and collection of claims data." 2026 WL 184504, at *15.

## LEGAL STANDARD

FDUTPA declares "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices" to be "unlawful," Fla. Stat. § 501.204(1), and authorizes aggrieved consumers to sue. *Id.* § 501.211. It must "be construed liberally to promote" its policy of protecting "the consuming public and legitimate business enterprises from" unfair and deceptive practices. *Id.* §§ 501.202, 501.202(2). Lilly moves under Rule 12(b)(6), and the Court must credit TGH's well-pled allegations in deciding whether it has plausibly pled that Lilly violated FDUTPA in one or more of the ways alleged. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I. *ASTRA* DOES NOT BAR TGH'S CLAIMS

Lilly contends that *Astra USA, Inc. v. Santa Clara County* "forecloses TGH's claims" entirely. Mot. at 10. Its reading stretches *Astra* well beyond its limits.

### A. *Astra Does Not Govern Independently Arising State Law Claims*

In *Astra*, a county operating several covered entities sued manufacturers for overcharging. 563 U.S. 110, 116 (2011). The county claimed that covered entities could enforce the PPAs as third-party beneficiaries. *Id.* at 117. Because the PPAs incorporated statutory obligations, contained "no negotiable terms," and served only as the means by which manufacturers opted into the scheme, the Court held that "[a] third-party suit to enforce" a PPA was "in essence a suit to enforce the statute itself," the statutory and contractual obligations being "one and the same." *Id.* at 118. The county had alleged that manufacturers "charged more than the § 340B ceiling price," not that they breached any obligation "arising only from the PPAs." *Id.* at 118-19.

The Court also held that Congress placed the HHS Secretary "in control of § 340B's drug-price prescriptions," and that control "could not be maintained" if thousands of covered entities could "bring suits alleging *errors in manufacturers' price calculations*." *Id.* at 114. If such entities cannot sue directly under the statute, they cannot sue on a "form contract" setting out identical terms, "no matter the clothing in which 340B entities dress their claims." *Id.*; *see also AIDS Healthcare Found. v. Apexus*, No. 23-55425, 2024 WL 3886974, at *2 (9th Cir. Aug. 21, 2024) (seeking enforcement of a different HRSA agreement).

TGH does not seek to enforce Lilly's PPA, and *Astra* does not preclude claims resting on a duty on which Section 340B is silent and that would exist without any alleged ceiling-price violation. TGH does not ask the Court to decide whether Lilly violated Section 340B, and it does not dispute that HRSA alone enforces 340B pricing.

TGH's claims rest instead on independent Florida duties (not to deceive, not to act unconscionably, and not to abuse market power) that bind every seller in Florida and exist wholly apart from the 340B Program. *Astra* "did not deal with state law claims that exist separately and independently of the subject federal statute." *City & Cnty. of S.F. v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 665 n.29 (N.D. Cal. 2020).

The distinction between enforcing a federal statute and asserting an independent state-law duty is well rooted. In *Mink v. Smith & Nephew, Inc.*, the Eleventh Circuit held that traditional state-law claims were "common law causes of action, *not* private rights of action enforcing the violation of a statute," and were not preempted merely because the conduct implicated a federal scheme. 860 F.3d 1319, 1328 (11th Cir. 2017).

TGH's suit thus seeks to enforce Florida duties applicable to all who do business in the State, not the statute itself. Courts addressing 340B-related claims have applied this principle to let independent claims proceed. *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC* ("Mosaic Health I"), involving data requirements like Lilly's, held that *Astra* does not foreclose covered entities' claims where they "do not seek to enforce [340B] Discount mandates nor the [PPAs] to compel the drug manufacturers to offer the discounted drugs at a specific Section 340B ceiling price." 156 F.4th 68, 78 (2d Cir. 2025). Because the case did "not turn on the meaning of the Section 340B statute nor on a determination . . . as to whether Defendants violated Section 340B," it was no enforcement suit. *Id.* Congress vested HHS with authority to "oversee compliance with the [] Program and enforce the ceiling price contracts, not to police" independent violations such as anticompetitive conduct. *Id.* at 79.

### *B. TGH's Declaratory and Injunctive Claims Do Not Fall Under Astra*

FDUTPA supplies two distinct remedial tracks: declaratory and injunctive relief are available to "anyone aggrieved by a violation of" FDUTPA, Fla. Stat. § 501.211(1), while actual damages are available to any "person who has suffered a loss as a result of a violation." *Id.* § 501.211(2); s*ee also Deltona Transformer Corp. v. NOCO Co.*, 186 F.4th 1313, 1333 (11th Cir. 2026).

That "aggrieved" standard for prospective relief is broader than, and independent of, the actual-damages inquiry; a FDUTPA plaintiff may obtain declaratory and injunctive relief even recovering no damages, and need not show irreparable harm or an inadequate legal remedy. *See id.* at 1333-34; *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012) (injunctive relief under FDUTPA while refusing damages); *Thompson Nation Holdings LLC v. Gonzalez*, 419 So. 3d 1203, 1207-08 (Fla. 3d DCA 2025) ("There is nothing in the plain language of the statute that require[s] . . . any irreparable harm or lack of adequate alternative remedies to obtain injunctive relief.").

TGH's deceptive-practice claim turns on the truth of Lilly's representations to the market, not on Section 340B. It challenges identifiable misrepresentations, including Lilly's public statements about product availability and the legal basis for its claims-data demand. Compl. ¶¶ 58, 111-12, 142-43. Those statements would be actionable under Florida law even if Section 340B did not exist; their truth turns on Florida consumer-protection law, not federal law. *See Moss v. Walgreen Co.*, 765 F. Supp. 2d 1363, 1367-68 (S.D. Fla. 2011) (FDUTPA challenge to deceptive marketing

of a federally regulated drug was not a disguised FDCA-enforcement claim and not preempted, as it rested on the independent allegation that the marketing was false).

TGH's unconscionability claim likewise turns on the character of Lilly's conduct, whether it offends Florida's standards of fair dealing, independent of any entitlement to the Section 340B price. Compl. ¶¶ 121-24. So too its unfair-competition claim, which turns on Lilly's abuse of market power. *Id.* ¶¶ 101-08. Each satisfies the *Mosaic Health I* test: none "turn[s] on the meaning of the Section 340B statute nor on a determination . . . as to whether Defendants violated Section 340B." 156 F.4th at 78.

It is unnecessary to find TGH entitled to the 340B price to find it aggrieved under FDUTPA, which reaches prohibited practices "in the conduct of any trade or commerce" regardless of whether a product is regulated. Fla. Stat. § 501.204(1). Those duties bind all sellers doing business with Florida consumers, and the liability questions they raise are questions of Florida law that do not require the Court to amend or enforce Section 340B's ceiling price.

Importantly, TGH does not seek a mandatory injunction compelling Lilly to sell at the 340B price; it seeks a prohibitory injunction compelling Lilly to cease conduct FDUTPA prohibits. TGH's allegation that "Lilly is the party this Court must enjoin in order to restore TGH's access and remedy TGH's injury" describes hoped-for effects of a prohibitory injunction, Compl. ¶ 34, not a request for mandatory relief.

### *C. TGH's Actual Damages Claims Do Not Fall Under Astra*

TGH also seeks actual damages, Compl. Prayer for Relief ¶ 3, and the outcome is the same. Florida measures FDUTPA actual damages as "the difference in the

market value of the product . . . in the condition in which it was delivered and its market value in the condition in which it should have been delivered." *Deltona*, 186 F.4th at 1333 (quoting *Stuart Roofing, Inc. v. Thomas*, 372 So. 3d 298, 300 (Fla. 4th DCA 2023)); *Carriuolo v. General Motors Co.*, 823 F.3d 977, 986 (11th Cir. 2016).

When Lilly withdrew discounted pricing, TGH had to buy the identical Lilly drugs at Lilly's wholesale acquisition cost: a unit of Mounjaro TGH had bought at the 340B price of $750.52 cost $1,019.74 the next week, a 35.9% increase, with comparable spikes across the line and roughly $24.7 million in added annual cost. Compl. ¶¶ 86–88. That increase is a direct, out-of-pocket loss caused by Lilly's conduct and thus a cognizable measure of FDUTPA actual damages, which, between businesses, are "those directly caused by the unfair or deceptive acts." *Coast Pump & Supply Co. v. Franklin Elec. Co.*, 2:25-cv-99, 2025 WL 2676430, at *3 (M.D. Fla. Sep. 18, 2025).

TGH took delivery of the same drugs, but at Lilly's full price rather than the discounted price Lilly had in fact been charging; the difference is precisely that kind of direct loss. *Deltona* marks both the measure and its limits, distinguishing the recoverable *actual*-damages differential from *consequential* losses (reputation, goodwill, downstream business) that section 501.211(2) does not reach. 186 F.4th at 1333-34. TGH's claim rests on the compensable side of that line; its broader harms, including the strain on its ability to serve patients, Compl. ¶¶ 91-92, 98-100, go to causation and injury, not the measure of actual damages.

TGH seeks only the direct price difference, not the consequential or expectancy damages FDUTPA does not reach. The measure does not depend on the 340B label:

computed against either the price Lilly had been charging or the price Lilly represented it would charge, the result is the same, and neither requires the Court to adjudicate Section 340B. Either merely requires the Court to compute actual FDUTPA damages.

This case is thus analogous to the district court's decision after the Second Circuit's remand in *Mosaic Health I*, where the court held that "it is not necessary to find that Plaintiffs were entitled to the Section 340B price to use that price as the starting point for the status quo," because the claim does not "turn on the meaning of the Section 340B statute nor on a determination . . . as to whether Defendants violated Section 340B." *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, No. 6:21-CV-06507, 2026 WL 1842636, at *6 (W.D.N.Y. June 26, 2026). The 340B price serves only to identify what Lilly had in fact been charging TGH, a necessary input in computing FDUTPA damages, not a statutory entitlement TGH asks the Court to adjudicate.

*Sagebrush Health Services v. Amgen Inc.*, No. 2:26-cv-00466, 2026 WL 1030817, at *6 (C.D. Cal. Apr. 15, 2026), is not to the contrary; it proves the point. The claims there failed because they were "all rooted in Plaintiff's assertion that it is entitled to purchase drugs at 340B discounted prices," a right "wholly based in the 340B Program rather than some independent source," making the state-law labels "in essence an attempt to enforce the 340B program itself." *Id.* The remedies confirmed as much: restitution "not analytically distinct from . . . overcharges," plus a declaration and injunction compelling the manufacturer "to honor 340B pricing," "all tied to its right to purchase drugs at 340B discounted prices," which the court held "a covert attempt to manufacture a private right of action to enforce the 340B Program." *Id.* at *8.

Here, 340B pricing is the starting point for computing damages if TGH prevails, not the *sine qua non* of relief. Even if the drugs were not Section 340B-regulated and TGH's expectation were rooted in another body of law, contract, or course of dealing, TGH would still have a FDUTPA claim: a seller that deceives or coerces a buyer into paying more than the represented or previously-charged price commits a Florida consumer-protection wrong regardless of any statute. That is the dispositive difference.

Lilly's reliance on *American Hospital Association v. Department of Health & Human Services*, No. 4:20-cv-08806, 2021 WL 616323, at *5 (N.D. Cal. Feb. 17, 2021), further confirms the dividing line. There, the plaintiffs sued HHS under the APA, alleging HHS and its secretary "unlawfully have refused to take specific enforcement actions to block the manufacturers' changes" to their contract-pharmacy policies. *Id.* at *4.

The court dismissed for lack of subject-matter jurisdiction because, however the suit was recast, it was "nothing more than an indirect action against the drug manufacturers themselves," with "claims and the remedy sought . . . entirely premised on the enforcement of the 340B Program requirements," the very "private enforcement of 340B program requirements" that *Astra* forbids. *Id.* at *5. The plaintiffs sought, at bottom, "a generalized enforcement of the statutory scheme by HHS." *Id.* at *5 n.10.

TGH seeks nothing of the kind: it does not sue HHS, does not ask the Court to order any agency to enforce Section 340B, and does not ask the Court to decide whether Lilly violated the statute. It sues Lilly directly under Florida's independent consumer-protection duties, and the 340B ceiling price merely supplies a component of the measure of damages. As with *Sagebrush*, that difference is dispositive.

## II. THE CLAIMS ARE NOT PREEMPTED

The Eleventh Circuit requires "a high threshold . . . if a state law is to be preempted for conflicting with the purposes of a federal Act." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1094 (11th Cir. 2021). Two principles guide the analysis. *Id*. First, Congress's "purpose" is "the ultimate touchstone in every pre-emption case," discerned primarily from the statute and its framework. *Id*. Second, the "historic police powers of the States are not superseded unless" Congress makes that "manifest," *id*. at 1095, especially where "Congress has 'legislated . . . in a field which the States have traditionally occupied.'" Consumer protection is a classic example. *See Degutis v. Fin. Freedom, LLC*, 978 F. Supp. 2d 1243, 1256-57 (M.D. Fla. 2013) (FDUTPA claim not preempted; "consumer protection has traditionally been regulated by the states").

### *A. There Is No Conflict Between the Application of FDUTPA and Federal Law*

Conflict preemption arises "where (1) 'compliance with both federal and state regulations is a physical impossibility,' or (2) 'the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Marrache*, 17 F.4th at 1094. Lilly does not assert impossibility. It argues only that, as applied, FDUTPA interferes with its preferred response to alleged 340B abuse: its unilateral demand for comprehensive claims-level data from every purchaser for every sale. *See* Mot. at 8-9, 14-17.

Lilly argues TGH's claims "frustrate" and "undermine[]" the program's "purposes and objectives" in "several ways" and obstruct federal goals. *Id*. at 14. Its first two grounds are the same: that FDUTPA disrupts Congress' "unitary" and

"exclusive[]" enforcement scheme. Mot. at 14-15. Either way, Florida's regulation of sales and marketing aimed at its residents does not overlap with federal oversight of 340B pricing, eligibility, or anything else within Section 340B's scope.

"Section 340B is a drug *pricing* program" that "does *not* 'provide a full set of standards governing' discounted drugs for needy patients." *Fitch*, 152 F.4th at 646 (emphasis added). Its scope is modest: it "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," *Astra*, 563 U.S. at 113, capping covered-drug prices, 42 U.S.C. § 256b(a)(1); setting "covered entity" criteria, *id.* § 256b(a)(4); barring duplicate discounts and diversion, *id.* § 256b(a)(5)(A)-(B); and enforcing its caps and bars, *id.* § 256b(a)(5)(D), (d)(1)-(3).

It does not, moreover, regulate the sales and marketing practices of manufacturers selling at 340B prices, as courts have recognized. *See Novartis Pharms. Corp. v. Frey*, Nos. 1:25-cv-00407, 1:25-cv-00416, 2025 WL 2813787, at *12 (D. Me. Sep. 23, 2025), *appeal filed*, No. 25-1914 (1st Cir.) (rejecting manufacturers' claim that a state-law bar on claims-data requirements conflicts with 340B); *AbbVie, Inc. v. Jackley*, Nos. 3:25-CV-03006, 3:25-CV-03021, 4:25-CV-04156, 2026 WL 2280929, at *13-20, 22-25 (D.S.D. Aug. 7, 2026) (similar).

Restating TGH's claims apart from Lilly's characterization confirms that FDUTPA and Section 340B coexist. TGH's unfair-trade-practices claim rests on deceptive, unfair, and unconscionable conduct in the sales and marketing of products sold in Florida. Compl. ¶¶ 58, 111-12, 142-48. Protecting consumers from such conduct is a core state power. *See Degutis*, 978 F. Supp. 2d at 1256-57.

TGH's anticompetitive-conduct claim likewise does not frustrate federal enforcement of Section 340B's price caps. The statute does not purport to regulate anticompetitive conduct in the sales and marketing of 340B drugs, nor does it supply a "framework so pervasive that Congress left no room for state supplementation." *Fitch*, 152 F.4th at 646. "[M]atters left unaddressed" in a "comprehensive and detailed" federal scheme "are presumably left subject to the disposition provided by state law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994).

Far from frustrating any federal goal, TGH's claims advance Section 340B's aim of extending medicine to those who could not otherwise afford it. *See, e.g.*, *Am. Hosp. Ass'n v. Hargan*, 289 F. Supp. 3d 45, 47 (D.D.C. 2017), *aff'd sub nom. Am. Hosp. Ass'n v. Azar*, 895 F.3d 822 (D.C. Cir. 2018) (Section 340B enacted to help covered entities "'reach[] more eligible patients and provid[e] more comprehensive services.'").

Lilly's reliance on *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), is a stretch. *Buckman* concerned fraud on a *federal agency* (the FDA), not consumers. *See id.* at 347-48. Protecting against fraud on a federal agency is "hardly" a traditional *state* concern and is "*inherently* federal in character," so the presumption against preemption did not apply. *Id.*

TGH's claims involve "state regulation of health and safety," for which the presumption against preemption "*does* apply." *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009); *see also California v. ARC Am. Corp.*, 490 U.S. 93, 101-02 (1989) (applying the presumption to "unfair business practices" as "an area traditionally regulated by the

States”). *Buckman*, involving neither 340B nor consumer protection, is distinguishable.

Lilly posits that Florida law must yield to its self-selected tactics so long as they purportedly aim to curb improper billing. *See* Mot. at 17 (“[a] state-law prohibition on claims-data conditions [] ‘frustrates drug manufacturers’ ability’ to establish the reasonable cause needed” to trigger a Section 340B audit). But nothing in Section 340B empowers Lilly to investigate hospitals or audit files on its subjective belief that the program *writ large* is rife with fraud; Congress and HRSA set the standards and process for audits. *See* Background Part B. Lilly’s complaints about that framework belong before Congress or HRSA as policymakers, not this Court.

### *B. Congress Has Not Displaced State Law Touching the Field of 340B Pricing*

Lilly’s field-preemption claim overreaches. Mot. at 17-19. Field preemption exists only where “Congress determines that a certain field must be regulated exclusively by the federal government,” *Marrache*, 17 F.4th at 1094, and is rare. *E.g.*, *Murphy v. NCAA*, 584 U.S. 453, 479 (2018) (requiring a scheme “so comprehensive[] that it has left no room for supplementary state legislation”).

Congress did not occupy “every detail” of the 340B Program. *AbbVie, Inc. v. Weiser*, 811 F. Supp. 3d 1264, 1275 (D. Colo. 2025), *appeal filed*, No. 25-1439 (10th Cir.). Several circuits have found the statute “silent about delivery” and that it “regulates neither the distribution of drugs to patients nor the role of pharmacies,” so “matters left unaddressed . . . [are] presumably left subject to the disposition provided by state law.” *Id.* at 1275-76; *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024); *Fitch*, 152 F.4th at 646.

Lilly's argument reduces to the proposition that Section 340B preempts any state law touching 340B drugs. It does not. The statute says nothing about the sales-and-marketing conduct, unfair competition, or deceptive representations TGH challenges, and FDUTPA simply fills that gap. *See O'Melveny*, 512 U.S. at 85.

## III. INTERGOVERNMENTAL IMMUNITY DOES NOT APPLY

Lilly's intergovernmental immunity doctrine argument, Mot. at 19-20, fails. The doctrine invalidates a state law: (i) when the law "regulate[s] the United States directly" or (ii) when it "discriminate[s] against the Federal Government or its contractors." *United States v. Washington*, 596 U.S. 832, 833 (2022); *North Dakota v. United States*, 495 U.S. 423, 435 (1990). Neither situation applies here.

Lilly claims FDUTPA as applied falls into the second category, by "'discriminat[ing]' against Lilly," in part, because "[i]n offering 340B pricing, Lilly is solely performing a federal function under its agreement with HHS." Mot. at 19-20. But the PPA agreement does not make Lilly a federal contractor.

PPAs are not "ordinary 'transactional, bargained-for contracts'"; they "'have no negotiable terms' and merely 'serve as the means . . . manufacturers opt into the [] scheme,'" under which manufacturers "agree to provide discounts . . . to certain other private entities" but "do not agree to perform any function of the federal government or provide any goods or services to the federal government." *Frey*, 2026 WL 184504, at *6. And "mere participation in a regulatory program or receipt of government incentives" does not "confer[] on the participant a contractor status with the federal government." *Id.*; *Jackley*, 2026 WL 2280929, at *24 (similar). Lilly is not a contractor,

and its argument fails for this reason alone.

Lilly lastly contends that the claims "'target[] and discriminate[] against' Lilly for 'participat[ing] in a federal program.'" Mot. at 19-20. But FDUTPA binds every seller engaged in trade or commerce in Florida. TGH's claims apply to Lilly's operations, not government operations. Moreover, Lilly does not identify a favored class of similarly situated sellers that Florida treats more favorably. *See Dawson v. Steager*, 586 U.S. 171, 177 (2019) (whether a law is discriminatory under this doctrine "depends on how the State has defined the favored class").

FDUTPA draws no distinction based on 340B Program participation, and the non-participating manufacturers Lilly points to are not similarly situated. *See* Mot. at 20. The Fifth Circuit rejected this argument in the 340B context, holding that a state law applied to participating manufacturers does not "single out" or discriminate against them because they "opt into the 340B Program," so one who looks for "'discriminat[ion] against the Federal Government or those with whom it deals' . . . winds up empty-handed." *AbbVie, Inc. v. Murrill*, 180 F.4th 747, 758 n.38 (5th Cir. 2026) (quoting *Washington*, 596 U.S. at 838).

## IV. TGH'S UNFAIR TRADE PRACTICES CLAIM IS WELL PLED

TGH's Complaint adequately alleges FDUTPA claims premised on Lilly's unconscionable, unfair, and deceptive conduct, and placements of conditions on, and failure to deliver, promised 340B discounts. Compl. ¶¶ 142-43, 147-48.

### *A. The Complaint Alleges Unconscionable Conduct*

In policing unconscionable conduct, FDUTPA borrows common-law concepts,

including the standard in *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1157-58 (Fla. 2014):

> Unconscionability has generally been recognized to include an *absence of meaningful choice* on the part of one of the parties together with contract terms which are *unreasonably favorable to the other party*. . . . The absence of meaningful choice . . . is often referred to as procedural unconscionability, which "relates to the manner in which the contract was entered," and the unreasonableness of the terms is often referred to as substantive unconscionability.

Courts apply that procedural/substantive lens to FDUTPA. *Coffey v. WCW & Air, Inc.,* No. 3:17-cv-90, 2020 WL 3250744, at *3 (N.D. Fla. Mar. 25, 2020). Traditional forms of unconscionable business conduct, like price gouging and targeting the vulnerable, are unconscionable acts under FDUTPA, too. *State, Off. of Att'y Gen., Dep't of Legal Affs. v. Com. Com. Leasing, LLC*, 946 So. 2d 1253, 1258–59 (Fla. 1st DCA 2007) (reversing dismissal of FDUTPA unconscionability claim, where court failed to consider price gouging and targeting the unsophisticated); see also Compl. ¶¶ 121-24.

TGH's FDUTPA claim fits comfortably with these cases. It features Lilly's demand and the lack of meaningful choice that came with it, "your data or your discounts," coupled with oppressive purchasing terms, detailed at length throughout the Complaint and this brief. Compl. ¶¶ 6, 68, 83-87. That is procedural and substantive unconscionability under the law.

Lilly cannot escape by arguing unconscionability requires a negotiated contract: FDUTPA reaches "unconscionable acts or practices in the conduct of any trade or commerce," Fla. Stat. § 501.204(1), including a seller's unilateral take-it-or-leave-it terms. *See* Compl. ¶¶ 103, 147-48. The absence of meaningful choice is most acute

where a seller with market power dictates terms unilaterally. *See id.* ¶¶ 101-08. That this conduct arises in a program meant to aid safety-net hospitals and vulnerable patients, yet effects a reverse-Robin Hood transfer from the underserved to the world's most valuable pharmaceutical company, confirms what the State of Florida long ago decided: this activity does not belong here. Compl. ¶¶ 3, 14-16, 95-100, 121-24.

***B. The Complaint Alleges Deceptive Conduct***

**Heightened Pleading.** Lilly argues TGH's deceptive-practices claim "fails to satisfy Rule 9(b)'s heightened pleading standard." Mot. at 24. "FDUTPA claims that sound in fraud must comply with Rule 9(b)," *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1293 (11th Cir. 2025), but the Eleventh Circuit "did not categorically find that all FDUTPA claims are subject to the 9(b) particularity standard," *Lendinara v. Swedish Match N. Am., LLC*, No. 24-61371, 2025 WL 3699694, at *4 (S.D. Fla. Dec. 15, 2025); whether a claim "sounds in fraud" depends on its content. *Pop*, 145 F.4th at 1293-94.

Here, TGH's allegations "do not substantively track the elements" of "common law fraud" but "more closely track the elements of a FDUTPA claim, which requires (1) a deceptive or unfair trade practice; (2) causation; and (3) actual damages." *Lendinara*, 2025 WL 3699694, at *3-4. Lilly's conditioning of, and failure to deliver, promised discounts are unfair and deceptive trade practices and give rise to a "quintessential FDUTPA claim[]" that "sweep[s] far more broadly than . . . fraud." *Id.* at *4; *see also* Compl. ¶¶ 109-115.

If Rule 9(b) applies, it is satisfied. Its purpose is to give defendants "notice" and "a reasonable delineation" of the allegations, *Ong v. Brown, Rudnick, Freed, Gesmer,*

*P.A.*, No. 94-478-CIV, 1994 WL 143075, at *1-2 (M.D. Fla. Apr. 12, 1994), and Lilly's Motion betrays no ignorance of those allegations. *See also Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001). Lilly contends TGH omits the timing of its statements to the government. Mot. at 25. But TGH alleges Lilly "represented to the federal government, *through its PPA with the Secretary of HHS*, that" covered entities will receive its discounts, with pertinent details. Compl. ¶¶ 55, 110 (emphasis added). Other statements are pled with particularity: Lilly "represents to the market that covered entities can purchase Lilly products at the requisite 340B ceiling price . . . every time it confirms its participation in the 340B program," citing four examples. *Id.* ¶¶ 58, 109.

Lilly also faults TGH for not alleging "when [it] saw" or relied on the statements. Mot. at 25. But a FDUTPA "plaintiff need not prove reliance on the allegedly false statement," *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011), and need only show the practice "was likely to deceive a consumer acting reasonably in the same circumstances." *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009). TGH so alleges. Compl. ¶ 114.

**Deceptive Conduct.** Lilly essentially seeks a merits ruling on whether its conduct is deceptive. Mot. at 24-28. But "[w]hether conduct is unfair or deceptive is a question of fact" better suited to summary judgment or a jury, and courts routinely decline to prejudge it on the pleadings. *See Crmsuite Corp. v. Gen. Motors Co.*, No. 8:20-cv-762, 2021 WL 914170, at *6 (M.D. Fla. Mar. 10, 2021); *Clipper Marine v. Marlow-Hunter, LLC*, No. 8:14–cv–1559, 2014 WL 7178105, at *3 (M.D. Fla. Dec. 16, 2014).

Because Lilly's "deception arguments go to the merits . . . rather than the sufficiency of pleading, [they] do not warrant dismissal." *Harrod v. Express Scripts, Inc.*, No. 8:17-cv-1607, 2017 WL 11615769, at *5 (M.D. Fla. Nov. 27, 2017).

A plaintiff need only allege "sufficient facts to permit a reasonable inference of deception." *Prates v. Westgate Resorts, Ltd.*, No. 6:16-cv-217, 2016 WL 11774203, at *3 (M.D. Fla. Aug. 4, 2016). A "deceptive act" is "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to [her] detriment," construed liberally and "extremely broad[ly]." *Crmsuite*, 2021 WL 914170, at *6; *Clipper Marine*, 2014 WL 7178105, at *3.

TGH alleges that Lilly engaged in deception by failing to deliver promised 340B discounts to covered entities, despite contrary representations. Compl. ¶¶ 15, 142-46. It is well settled that failure to provide advertised discounts is a deceptive trade practice, even where conditions are disclosed in pre- or post-sale terms. *See FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d. 1375, 1385, 1391-92 (M.D. Fla. 2018); *Kukorinis v. Walmart, Inc.*, No. 8:22-cv-2402, 2023 WL 4364454, at *6-7 (M.D. Fla. July 6, 2023).

"Bait and switch schemes" are likewise deceptive where they "provide the net impression that [d]efendants will provide the promised services and results" and are "likely to mislead consumers." *FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1353-54, 1361 (S.D. Fla. 2019), *aff'd*, 801 F. App'x 685 (11th Cir. 2020); *see also* Compl. ¶¶ 111-14. Lilly's offers are not materially different, and its touted transparency does not help: after-the-fact disclaimers are no defense to misrepresentation; they are "the functional equivalent of 'small print.'" *Simple Health*, 379 F. Supp. 3d at 1361-62.

Contrary to Lilly's argument, Mot. at 20-21, a discount's link to a federal program does not immunize its marketing from state consumer-protection law. As addressed more fully in Section VI below, FDUTPA's safe harbor reaches only conduct a specific federal or state law "affirmatively authorized." *See Guerrero v. Target Corp.*, 889 F. Supp. 2d 1348, 1357-58 (S.D. Fla. 2012). There is no safe harbor or immunization for marketing or other activity that is merely linked to a federal program. And FDUTPA protects consumers and businesses alike. *See, e.g., Coast Pump*, 2025 WL 2676430, at *2; *MJS Music Publications, LLC v. Hal Leonard Corp*, No. 8:06-cv-488, 2006 WL 1208015, at *2 (M.D. Fla. May 4, 2006). TGH has sufficiently pled deception. *See MJS Music*, 2006 WL 1208015, at *2.

**Causation and Harm.** Lilly claims its "statements did not cause any harm to TGH," citing lack of reliance. Mot. at 28. Reliance is not required under the objective test, and TGH alleges Lilly's statements about 340B discounts are false, misleading, and likely to deceive objectively reasonable consumers. Compl. ¶¶ 58-59, 109-114.

Lilly's remaining argument that there is no "causal link" between its conduct and TGH's harm, Mot. at 28-29, misunderstands FDUTPA causation, which requires a direct connection between the practice and the injury, not reliance on a specific statement. *See Fitzpatrick*, 635 F.3d at 1283. That connection is direct here: Lilly conditioned 340B pricing on sweeping claims-data demands and then cut TGH off across its line; the immediate consequence was the price increases TGH now pays. Compl. ¶¶ 86-89. Because TGH devotes its 340B savings to patient care, the loss also strains its facilities and mission, and actual damages are adequately alleged as

established in Section I.C above. *Id.* ¶¶ 91-92, 98-100.

### *C. The Complaint Alleges Unfair Conduct*

FDUTPA is "'construed liberally'" to protect "'legitimate business enterprises from those who engage in . . . unfair acts or practices,'" a concept courts deem "extremely broad" and "a question of fact." *MJS Music*, 2006 WL 1208015, at *2; *Schojan v. Papa Johns Int'l, Inc.*, No. 8:14–cv–1218, 2014 WL 6886041, at *6 (M.D. Fla. Dec. 8, 2014). This Circuit uses two definitions of unfairness: the "historic" one, asking whether a practice "offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," *Coast Pump*, 2025 WL 2676430, at *1, and the "more recent" one, asking whether the injury is (1) "substantial," (2) not "outweighed by any countervailing benefits to consumers or competition," and (3) one "that consumers themselves could not reasonably have avoided." *Martorella v. Deutsche Bank Nat'l Tr. Co.*, No. 12-80372-CIV, 2015 WL 11347664, at *5 (S.D. Fla. Aug. 6, 2015). TGH satisfies both.

The Complaint details Lilly's conduct, showing it offends public policy, is not outweighed by countervailing benefits, and is "immoral, unethical, oppressive, unscrupulous, or substantially injurious." Compl. ¶¶ 2-16, 27-30, 33-36, 53-54, 82-100, 116-28, 147. Lilly goes outside the Complaint to say it "simply requires covered entities to provide claims data" to deter fraud, Mot. at 30, but TGH alleges those demands are pretextual, impractical, prohibitively costly, and fraught with regulatory, privacy, and data-governance concerns that could not reasonably be avoided. *Id.* ¶¶ 53-54, 71-76. Taking TGH's allegations as true, its unfair-trade-practice claim is well pled.

## V. TGH'S UNFAIR COMPETITION CLAIM IS WELL PLED

TGH alleges Lilly uses its monopoly power to force consumers into a Hobson's choice, "your data or your discounts," that harms them either way. Compl. ¶¶ 6, 83. The harms include higher costs, higher prices, and underconsumption of medicine. *Id.* ¶¶ 88-89, 98-100, 105, 125. Monopoly power, its abuse, and resulting consumer harm together violate FDUTPA's unfair-methods-of-competition prong.

FDUTPA's unfair-methods prohibition is based on, and targets the same conduct as, the FTC Act. *See Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen., Dep't of Legal Affs., State of Fla.*, 761 So. 2d 1256, 1260 (Fla. 3d DCA 2000) (FDUTPA "is patterned after the [FTC] Act"). FDUTPA thus requires that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1)" of the FTC Act. *See* Fla. Stat. § 501.204(2); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st DCA 1996). Section 5(a)(1), in turn, reaches both traditional Sherman Act doctrine and non-traditional unfair methods that may lack anticompetitive effects. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972).

Lilly first asserts TGH has not shown "how Lilly is engaging in 'unfair competition'" because there is "no authority saying that it is 'unfair competition' to sell products at market prices." Mot. at 34. TGH does not sue to enforce Section 340B's discounts or price caps. It uses what Lilly calls "market price," the Complaint's average wholesale cost, only as an input for *damages*, not to establish liability, which turns on whether Lilly engaged in unfair, anticompetitive, or unconscionable conduct.

Lilly next claims there is "nothing 'unfair' about imposing a condition on a commercial offer." Mot. at 34. That misframes both the claim and the statute. As explained, FDUTPA's unfair-methods prong reaches coercive and oppressive practices by a manufacturer with market power even absent anticompetitive effects. *Sperry & Hutchinson*, 405 U.S. at 244-45.

TGH does not allege that Lilly simply declined to deal. It alleges that Lilly, wielding market power, imposed a coercive, take-it-or-leave-it condition, "your data or your discounts," and continues to sell to TGH, at supracompetitive prices, on that condition. Compl. ¶¶ 6, 83, 103. A dominant seller's use of a coercive condition to extract concessions, and to raise the price charged to those who refuse, is a paradigmatic unfair method of competition under FDUTPA, whether or not it also satisfies the elements of a stand-alone antitrust offense.

Antitrust decisions confirm as much. Because FDUTPA's unfair-methods prong tracks Section 5 of the FTC Act, which in turn reaches traditional Sherman Act conduct, Fla. Stat. § 501.204(2), courts applying the antitrust laws have rejected the notion that a condition is beyond reproach simply because it is framed as a term of a commercial offer. To the contrary, they have condemned a dominant firm's take-it-or-leave-it conditions on access to products its customers cannot do without. *See United States v. Microsoft Corp.*, 253 F.3d 34, 59-64 (D.C. Cir. 2001) (conditions a monopolist attached to licenses for an indispensable product, imposed to protect its monopoly and unredeemed by any legitimate justification, were exclusionary); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242-43 (2d Cir. 2003) (dominant networks' uniform

conditions, enforced on pain of exclusion, unreasonably restrained trade). TGH need not, and does not, plead a stand-alone Sherman Act claim; these authorities show only that a condition imposed by a firm with market power can be unfair, which is all FDUTPA requires.

Lilly contends TGH has not plausibly alleged its "claims-data condition 'reduces output.'" Mot. at 34. Not so: TGH alleges Lilly's conduct forced TGH and its patients to pay higher prices for the same drugs they bought before the condition, and even to forgo purchases. Compl. ¶¶ 86-89, 98-100. When a monopolist imposes a condition that raises prices and costs, purchases (and thus output) fall below competitive levels. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993) ("Supracompetitive pricing entails a restriction in output").

Lilly argues that "TGH cannot allege that Lilly possesses 'monopoly power in the relevant market,' . . . without first 'adequately defin[ing] the relevant market.'" Mot. at 34. That is incorrect. A plaintiff may allege monopoly power *indirectly* (through a relevant market and estimated shares) or *directly*, through evidence of conduct consistent with monopoly power. "[A]n antitrust plaintiff is *not* required to rely on indirect evidence of a defendant's monopoly power, such as high market share within a defined market, when there is direct evidence that the defendant has actually set prices or excluded competition." *DeCurtis LLC v. Carnival Corp.*, No. 20-22945-CIV, 2021 WL 7539904, at *23 (S.D. Fla. Feb. 9, 2021) (citing *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196-97 (1st Cir. 1996)); *see also McWane, Inc. v. F.T.C.*, 783 F.3d 814, 830-31 (11th Cir. 2015).

TGH has alleged monopoly power directly. Its "market power is [] demonstrated by its conduct," including across-the-board price hikes, indicative of the "power over price" courts consider direct evidence of monopoly power. Compl. ¶ 103; *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) ("Monopoly power is the power to control prices or exclude competition.").

Moreover, Lilly's "'take it or leave it' offers of 340B pricing if its conditions are met, and denial of access otherwise, *to the entire marketplace*, is clear evidence of market power." Compl. ¶ 103. As a matter of economic logic, "[f]irms without market power cannot behave this way, or they would quickly be ejected from the market." *Id.* Courts find such conduct indicative of monopoly power. *See McWane*, 783 F.3d at 833-34 (monopoly power found where terms were "unilaterally imposed by fiat upon all distributors" via all-or-nothing, market-wide condition).

The absence of substitutes not only confirms Lilly's power but answers Lilly's market-definition demand on its own terms. TGH alleges that Lilly is the single-source supplier of numerous critical medicines, including Mounjaro, Zepbound, Kisunla, Verzenio, Retevmo, and Ebglyss, for which there is no therapeutic substitute, leaving covered entities and their patients nowhere to turn when Lilly raises the price. Compl. ¶¶ 77-80, 101-102. A product for which there is no reasonable substitute is itself a relevant product market, and the sole supplier of that product necessarily holds monopoly power within it. *See Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340-41 (2d Cir. 2024) (plaintiff plausibly alleged a single differentiated product as its own relevant antitrust market where it lacked economic substitutes). TGH thus

pleads cognizable relevant markets drug-by-drug: each single-source Lilly medicine for which no substitute exists.

In all events, market definition turns on the "commercial realities" faced by consumers and is a "deeply fact-intensive inquiry" in which courts "hesitate to grant motions to dismiss for failure to plead a relevant product market." *Regeneron*, 96 F.4th at 339. TGH has therefore not merely supplied direct evidence of monopoly power; it has also identified the relevant markets in which Lilly holds that power. Lilly's market-definition objection thus fails even under the standard it urges.

Nor does Lilly's fallback that any monopoly it holds is "what amounts to a permissible monopoly" resting on valid patents, Mot. at 35, immunize the conduct TGH challenges. TGH does not contend that Lilly's patents, or its lawful acquisition of monopoly power, are themselves unlawful. The wrong lies in the willful *exploitation* of that power, including the coercive "your data or your discounts" condition and the resulting supracompetitive prices, not in its mere possession. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (the Section 2 offense distinguishes "the willful acquisition or maintenance of that power" from "growth or development as a consequence of a superior product, business acumen, or historic accident").

A patent confers a right to exclude, but it does not license the holder to leverage that power through separate coercive conditions, and it confers no immunity from antitrust or unfair-competition scrutiny. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 147-48 (2013) (patent-derived power does not "immunize" conduct "from antitrust attack" merely because its anticompetitive effects "fall within the scope of the exclusionary

potential of the patent"); *see also New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (a patent affords "a temporary monopoly on individual drugs," not a right to use patents "as part of a scheme to interfere with competition 'beyond the limits of the patent monopoly'"). *Schering-Plough Corp. v. Federal Trade Commission*, 402 F.3d 1056 (11th Cir. 2005), on which Lilly relies, held only that the particular reverse-payment patent settlements before it did not restrain trade; it did not hold that patent-derived power immunizes a manufacturer's coercive commercial conditions, and the Supreme Court rejected that rationale in *FTC v. Actavis*, 570 U.S. at 147-48, abrogating *Schering-Plough*.

In sum, TGH has sufficiently alleged monopoly power and abuse of that market power, stating a claim under FDUTPA's unfair methods provision.

## VI. LILLY'S CONDUCT IS NOT WITHIN FDUTPA'S SAFE HARBOR

FDUTPA's safe harbor exempts only conduct "*required* or *specifically permitted* by federal or state law." Fla. Stat. § 501.212(1). Lilly must show "a *specific* federal or state law *affirmatively authorized* it to engage in the conduct alleged," *Fox v. Ritz-Carlton Hotel Co., LLC*, No. 17-cv-24284, 2022 WL 6566991, at *8 (S.D. Fla. Aug. 11, 2022), and it cites no law *requiring* or *specifically permitting* claims-data conditions or the ensuing ejection of covered entities from 340B pricing. *See* Mot. at 20-23.

Another court has rejected the argument that Lilly may impose "extra-statutory conditions on covered entities' access to discounted medications." *Eli Lilly & Co. v. HHS*, No. 1:21-cv-00081, 2021 WL 5039566, at *19-20 (S.D. Ind. Oct. 29, 2021), *appeal docketed*, No. 21-3128 (7th Cir. Nov. 15, 2021). *Johnson*, 102 F.4th at 460-61,

464, and *Sanofi-Aventis U.S. LLC v. Dep't of Health & Human Servs.*, 58 F.4th 696, 704 (3d Cir. 2023) do not help Lilly: they rest on statutory *silence*, holding only that Section 340B does not *prohibit* certain contract-pharmacy conditions, which are themselves distinguishable from the "your data or your discount" condition here.

Silence is the opposite of the affirmative authorization the safe harbor demands. In all events, the conduct challenged is not a bare data condition but unilateral self-help termination outside the audit-then-ADR sequence, which HRSA's 1996 guidance directs manufacturers not to pursue without exhausting that process. *See* 61 Fed. Reg. at 65,409-10; Compl. ¶¶ 45-47, 60. Lilly points to a "non-binding" agency notice as authorizing its "standard claims data" policy, Mot. at 23 (citing 59 Fed. Reg. 25,110, 25,114 (May 13, 1994)), but the notice *cautions against* unilateral conditions that would undermine the statutory objective. *See, e.g.*, 59 Fed. Reg. at 25,113-14 ("Manufacturers may not single out covered entities . . . for restrictive conditions that would undermine the statutory objective."); *id.* at 25,113 ("A manufacturer may not condition the offer of statutory discounts upon an entity's assurance of compliance with section 340B provisions."); *id.* at 25,113-14 (addressing requests for "assurances").

Though the notice allows supplier agreements to "address *customary* business practice, request *standard* information, or include other *appropriate* contract provisions," *id.* at 25,114, TGH alleges Lilly's demand (a prescription-level data feed spanning in-house pharmacy and medical claims across its entire line, enforced by immediate self-help) is extraordinary, not customary. Compl. ¶¶ 69, 71-76.

Lilly contends 340B's audit provisions entitle it to impose unilateral conditions; the Complaint alleges this is pretext. *See id.* ¶¶ 53-54. Section 340B sets requirements for covered entities and manufacturers and procedures for audits, but none *requires* or *affirmatively authorizes* a manufacturer to collect broad claims-level data. *See generally* 42 U.S.C. § 256b; *see Valiente v. Unilever United States, Inc.*, No. 22-21507-CIV, 2022 WL 18587887, at *11-12 (S.D. Fla. Dec. 8, 2022) (denying safe-harbor dismissal because showing federal law does not *prohibit* conduct "is not the same as 'specifically permit[ting] that practice'").

Contrary to Lilly's argument, Mot. at 21, 23, TGH does not use FDUTPA to create a "new obligation" on Lilly. The reverse is true: Lilly seeks to expand Section 340B to create a new entitlement to impose claims-data conditions. The "new" obligations it flags are the generally applicable FDUTPA duties binding all sellers: to avoid unfair, anticompetitive, and unconscionable conduct toward Florida residents.

Lilly has not shown that its conduct is required or specifically permitted by federal law, and the safe harbor does not apply. *See Herazo v. Whole Foods Mkt., Inc.*, No. 14–61909–CIV, 2015 WL 4514510, at *4 (S.D. Fla. July 24, 2015) (defendant did not show the FDA "specifically authorized the labels at issue" so declined to apply safe harbor); *State of Fla., Off. of Atty. Gen., Dep't of Legal Affs. v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1310 (S.D. Fla. 2005) (rejecting safe harbor at motion to dismiss stage where defendant did "not identify any federal statue [sic] or regulation that 'specifically permitted'" the challenged conduct).

## CONCLUSION

TGH respectfully requests that the Court deny the Motion as to Counts I and II and allow TGH an opportunity to amend Count III. Counts I and II rest on FDUTPA, target conduct that Section 340B neither authorizes nor occupies the field to immunize, and are supported by well-pled factual allegations that Lilly's Motion does not, and cannot, resolve at the pleading stage. If the Court determines that any part of Lilly's Motion should be granted, TGH respectfully requests leave to amend rather than dismissal with prejudice, particularly given that this is the first pleading challenge to the Complaint and any identified deficiency is readily curable.

Dated: October 13, 2026

Respectfully submitted,

/s/ *Stephanie A. Fichera*

Stephanie A. Fichera (FBN 55813)
CARLTON FIELDS, P.A.
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Telephone: (305) 530-0050
Facsimile: (305) 530-0055
sfichera@carltonfields.com

Jon T. Gatto (FBN 0547328)
CARLTON FIELDS, P.A.
4221 West Boy Scout Blvd., Suite 1000
Tampa, Florida 33607-5780
Telephone: (813) 229-4141
Facsimile: (813) 229-4133
jgatto@carltonfields.com

Scott M. Abeles
(*pro hac vice application to follow*)
CARLTON FIELDS, P.A.
1625 Eye Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 965-8189
Facsimile: (202) 965-8104
sabeles@carltonfields.com

Jayashree Mitra
(*pro hac vice application to follow*)
CARLTON FIELDS, P.A.
730 3rd Avenue, 19th Floor
New York, New York 10017
Telephone:(212)380-9605
Facsimile: (212)785-5203
jmitra@carltonfields.com

*Attorneys for Plaintiff*
*Tampa General Hospital*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 13th day of October, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies the recipients of electronic notice.

/s/ *Stephanie A. Fichera*